PS:SLD
F.#2008R01522

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

M-08-811

- - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

- against -

ROBERT SIMELS,
SHAHEED KHAN,
    also known as "Roger Khan"
    and "Short Man," and
ARIENNE IRVING,

       Defendants

SEALED AFFIDAVIT
IN SUPPORT OF
ARREST WARRANTS

(T. 18, U.S.C., § 1512(k))

- - - - - - - - - - - - - - - - - - -X

EASTERN DISTRICT OF NEW YORK, SS:

       CASSANDRA JACKSON, being duly sworn, deposes and says that she is a Special Agent of the Drug Enforcement Administration ("DEA"), duly appointed according to law and acting as such.

       Upon information and belief, in or about and between May 2008 and September 2008, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ROBERT SIMELS, SHAHEED KHAN, also known as "Roger Khan" and "Short Man," and ARIENNE IRVING, together with others, did knowingly and intentionally conspire to corruptly persuade and engage in misleading conduct toward other persons, with intent to (a) influence and prevent the testimony of persons in an official proceeding, to wit: United States v. Shaheed Khan, 06-CR-255 (DLI), a federal criminal trial of the defendant SHAHEED KHAN in the United States District Court for the Eastern

District of New York, and (b) cause and induce persons to withhold testimony in an official proceeding, to wit: the trial in United States v. Shaheed Khan, 06-CR-255 (DLI), in violation of Title 18, United States Code, Sections 1512(b)(1) and (b)(2)(A).

(Title 18, United States Code, Sections 1512(k) and 3551 et seq.)

The source of your deponent's information and the grounds for her belief are as follows:

I. QUALIFICATIONS AND SOURCES OF INFORMATION

1. I have been a DEA Special Agent for five years and am currently assigned to Division Group 32, which is a DEA squad tasked with investigating narcotics trafficking and money laundering offenses. Prior to joining the DEA, I was a police officer with the Newark Police Department in Newark, New Jersey for approximately four and a half years. During my career as a law enforcement officer, I have participated in numerous criminal investigations during the course of which I have conducted physical and wire surveillance, interviewed cooperating witnesses and defendants, executed search warrants, and reviewed and analyzed taped conversations in which criminal activity is discussed.

2. The facts set forth in this affidavit are based upon my own investigation and information that I have learned from review of written documents prepared by, and conversations with, other law enforcement officers who have participated in

this investigation. More specifically, in the portions of this affidavit that describe recorded or intercepted communications, the information, unless otherwise indicated, is based upon my review of the recording, portions of the recording, or a transcript thereof. Furthermore, in the portions below that describe surveillance, all surveillance was conducted by investigators assigned to either the DEA and/or the United State Attorney's Office for the Eastern District of New York, including myself. The observations of the other involved law enforcement officers have been related to me.

     3.  In this Affidavit, I have described portions of certain conversations that were recorded with the consent of one of the participants or during the course of court-authorized surveillance. I have not, however, summarized every pertinent recorded conversation, nor have I included every pertinent part of the conversation that I have summarized. Moreover, any transcripts of recorded conversations are preliminary and in draft form. As such, the summaries and quotations set forth in this affidavit are preliminary in nature. My opinions concerning the meaning of coded or veiled conversations are based, in part, on my training and experience developed as a result of investigating criminal activities, my discussions with other experienced law enforcement officers, as well as the facts and circumstances of this investigation.

     4.  Unless otherwise indicated, identifications of participants to the recorded conversations in this investigation

4

were made by the law enforcement officers reviewing the recordings, with the assistance of a confidential source of information. Officers initially identified the participants to conversations through their identification of themselves by name during the course of the conversation. When possible, such identification was corroborated by, among other means, the confidential source of information who has been used in this investigation. Thereafter, the participant would be identified through either the use of their name or voice identification based upon comparisons with prior or subsequent recordings of that individual.

5. As set forth in the paragraphs below, I believe there is probable cause to believe that the defendants ROBERT SIMELS, SHAHEED KHAN, also known as "Roger Khan" and "Short Man," and ARIENNE IRVING, together with others, are involved in a conspiracy to obstruct justice.[1]

II. BACKGROUND

6. On April 13, 2006, Shaheed Khan, also known as "Roger Khan," "Short Man," and "Boss Man," was indicted in the Eastern District of New York. In the 18-count indictment, captioned United States v. Khan, 06-CR-255 (DLI), Khan is charged with: (a) being the principal administrator of a continuing criminal enterprise, in violation of 21 U.S.C. § 848(b), which

---

[1]/ I have not set forth all facts known to me about this investigation and case, but only those facts that appear to me to be necessary to establish probable cause to believe that the defendants committed the charged offense.

carries a mandatory life sentence; (b) conspiring to import cocaine; (c) conspiring to distribute and possess with intent to distribute cocaine; (d) engaging in an international distribution conspiracy, in violation of 21 U.S.C. § 959; and (e) multiple substantive counts of importing and distributing cocaine. Trial in Khan's case is presently scheduled to commence on November 3, 2008.

7. Based on my review of court filings, I have learned that, at trial, the government will seek to establish that Khan was the leader of a violent drug trafficking organization (the "Khan Organization") that was based in Georgetown, Guyana, from at least 2001 until his arrest in June 2006. Khan and his co-conspirators obtained large quantities of cocaine, and then imported the cocaine into the Eastern District of New York and other places, where it was further distributed. Khan was ultimately able to control the cocaine industry in Guyana, in large part, because he was backed by a para-military squad that would murder, threaten, and intimidate others at Khan's direction. Khan's enforcers committed violent acts and murders on Khan's orders that were directly in furtherance of Khan's drug trafficking conspiracy. Based upon my knowledge of this investigation, I know that this para-military squad was commonly referred to as the "Phantom Squad."

8. On June 29, 2006, Khan was arrested and brought to the United States to be prosecuted in the aforementioned federal case. Since approximately August 2006, Khan has been represented

by, among others, attorneys Robert M. Simels and Arienne J. Irving, who is Simels' associate.

9. In May 2008, a reliable confidential source (hereinafter the "CS") was notified by, among others, a member of the Phantom Squad that Khan's attorney wanted to speak with the CS, himself a member of the Phantom Squad.[2] On or about May 13, 2008, acting at the direction of law enforcement, the CS called Simels, who confirmed that he wished to speak to the CS. Thereafter, the CS met Simels and Irving at Simels' law office on a number of occasions, communicated with them both by email and by telephone. In the initial recorded conversation in May 2008, Simels asked the CS to assist in locating certain individuals he believed to be cooperating against Khan. During subsequent conversations in June, July and August 2008, Simels discussed with the CS what to do when the potential witnesses or their family members were located. In substance and in part, Simels discussed a range of options, from offering them money to murdering their family members. As captured in the recordings, Simels and Irving have been conferring about these options with Khan before discussing them with the CS. Irving has attended some of these meetings with the CS and regularly meets with Khan.

---

[2] The CS has been proven reliable through, among other things, the emails and recordings of his/her personal meetings and telephone conversations with Simels and Irving, as detailed throughout this affidavit. Furthermore, information provided by the CS has led to the seizure of narcotics in the past.

III. THE INVESTIGATION

       10. Acting at the direction of law enforcement, the CS called Simels on or about May 13, 2008, after the CS learned that Khan's attorney wanted to speak with him/her. During the ensuing conversation, Simels confirmed that he did want to speak to the CS and the two scheduled a meeting at Simels' law office for later that day. Prior to the meeting, investigators supplied the CS with a device to surreptitiously record the anticipated meeting, with the consent of the CS. Law enforcement then surveilled the CS enter the building of Simels' law office.

       11. During the May 13, 2008 meeting, Simels and Irving discussed several matters with the CS, including whether the CS would testify on Khan's behalf. Simels and Irving further discussed certain individuals whom they suspected would testify against Khan at his federal criminal trial. Among them was a woman, "Jane Doe #1," and two men, "John Doe #1" and "John Doe #2." In part, Simels told the CS that John Doe #1 was crucial to the government's case against Khan, explaining that the entire case "is based upon [John Doe #1]." Irving inquired if the CS knew the whereabouts of John Doe #1's wife and girlfriend. Simels and Irving agreed that the CS could assist Khan by helping him to locate possible government witnesses and/or the witnesses' family members. They further told the CS that, if the CS were to testify, the CS would need to lie about certain things. For example, in one portion of the conversation, Simels and the CW, in the presence of Irving, had the following exchange:

8

| | |
|---|---|
| Simels: | Now, I guess this, the big question really, um, clearly we're not saying, we'll never say that Roger's involved in any drug dealing, we're going, he is going to be described to the jury as somebody who builds homes, somebody who got a, a, a truck, uh, bus, whatever you want to call it that feeds homeless children, uh, that he's in the timber business. |
| CS: | True. |
| Simels: | So, I know earlier you said that, that Roger, you described him as a boss, uh, but we certainly would not want to describe him as being a drug dealer. |
| CW: | No, we don't want . . . |
| Simels: | But we certainly don't want to . . . |
| CW: | . . . true. |
| Simels: | . . . describe him as being the boss. |
| CW: | True, true, I understand. |
| Simels: | Okay. |

12. After the CS informed Simels and Irving that he/she needed to get Khan's approval before he/she would agree to testify or help to find suspected government witnesses, Simels instructed the CS to "write [Khan] a letter." Irving suggested that the CS "email" them a note for Khan, which they would then deliver to Khan. Irving explained: "we will print [the email] out, show it to [Khan], and he can respond . . . so you don't have to worry about someone else reading it." Simels interjected, explaining further that they would "hand carry it to [Khan] and he'll give you a

response." Prior to leaving the meeting, the CS reiterated that he/she needed Khan to authorize his/her activities. Simels and Irving both replied that they understood the CS's request.

13. On May 19, 2008, a federal investigator, with the knowledge of the CS, sent an email to Simels at "robert@simelslaw.com", the address provided to the CS by Simels on his business card. The email, intended for delivery by Simels and Irving to Khan, stated, in part:

> I spoke to your attorney Mr. Simels. I've also been in contact with some of the guys in Guyana. I understand my help is needed but I'm not sure in what area. I'm also not quite sure what area I'm allowed to get into. Please advise on the way forward. I have my own little network here so things can get done. I understand that [John Doe #1] is here along with extensions of the people going up against you.

14. Simels sent a reply email from "robertsimels@yahoo.com" to the CS at 6:09 p.m. that same day, stating: "Thanks for writing. We are delivering your message as I type and hope to have a reply for you tomorrow."

15. A review of records maintained by the Metropolitan Correctional Center ("MCC"), the federal detention center at which Khan is lodged, reveals that on the next day, May 20, 2008, Irving visited Khan at the MCC.

16. On or about May 23, 2008, at 11:23 a.m., Irving sent the CS an email from "irvingaj@yahoo.com". A "cc" of Irving's message to the CS was sent to Simels at "robert@simelslaw.com". In the email, Irving wrote: "Here is the letter Roger [Khan] sent you

10

. . . Please let me know that you received this." Attached to Irving's email was a "pdf" document. The document appears to be a scanned, handwritten note addressed to the CS. The note states: "Thank you again for everything. I really need you to help. Do not be afraid to tell all that you know, there [sic] are my lawyers and you can trust them. I speak to Paul[3] often, he will confirm. Shaheed Khan." (emphasis in original).

17. On or about June 11, 2008, Irving emailed the CS and informed him/her that Simels was trying to contact the CS. Subsequently, the CS called Simels and they agreed to meet at Simels' office later in the day. Prior to the meeting, investigators supplied the CS with a recording device and surveilled the CS entering the building of the Simels' law office.

18. During the June 11, 2008 meeting, Simels and the CS discussed numerous topics, including a plan to locate certain suspected government witnesses and convince them not to testify at Khan's trial. Simels told the CS that he wanted John Doe #1 "not to testify," or "we need to know every little detail of his life." Simels explained that the government's whole case "falls apart" if John Doe #1 is "neutralized by us [pause] or neutralized by us on cross-examination." Simels further explained that they should explore both options. The CS observed that John Doe #1 might rethink his decision to cooperate once his family was contacted: "I think [John Doe #1] will rethink his position once we start

---

[3] According to the CS, "Paul" was another member of the Phantom Squad and Khan's bodyguard.

reaching out to his extensions. He would rethink his position." Simels replied that it would "be nice if [John Doe #1] decided that he wanted to see me" and sign a statement saying everything he said was a lie. At one point, the CS observed: "One thing I've learned is that a man whether he's a criminal, he's a preacher, he always values his mother. Because if you're not sorted with anyone else to be at your side, your mother's very likely will be there. You don't ever want anything to happen to her."

19. In further discussing the payment of government witnesses to induce them not to testify, Simels told the CS that: "Whatever [Khan's] got to do financially, he's going to do to resolve these issues. [pause] There is money that's available. The only issue I have to know is just [pause] what. And, and that they can let us know." The CS responded that John Doe #1 could receive visitors (in jail) and suggested that John Doe #1 might "suddenly get amnesia." Simels replied: "That's a terrible thing, but if it happens, it happens." In further discussing the plan to "neutralize" John Doe #1, Simels asked the CS "what kind of money do you think we're talking about?", which the CS understood to mean the amount of money necessary to corruptly influence John Doe #1.

20. Simels and the CS also discussed Jane Doe #1, whom Simels and Irving discussed with the CS in the May 13, 2008 meeting detailed above. Simels told the CS that he would provide the CS with all the information that he had regarding her, including her address and her place of employment. Simels informed the CS that Jane Doe #1 was a very important government witness because she was

the only witness who could introduce "so-called drug ledgers" into evidence against Khan. Simels told the CS: "Obviously, any witnesses you can eliminate is a good thing." Simels observed: "So, you would think that if she didn't testify [pause] refused to testify [pause] uh, that would be good [pause] uh, if we can eliminate [John Doe #2], very good."

21. In the context of discussing the plan to "eliminate" and "neutralize" witnesses, in particular John Doe #1, the CS asked Simels about the possibility of "heat" coming back to Khan if a government witness stops cooperating and refuses to testify because someone close to him or her "fall[s] off the face of the earth." Simels replied: "They'd have to figure out a way to tie it back to Roger [Khan]. [pause] But [pause] it seems to me that, that [pause] I'm going to leave it to you to figure out what's going to best get to him [John Doe #1]." Based on my training and experience, as well as my personal involvement in this investigation, I believe that Simels was telling the CS that he would leave it to the discretion of the CS whether to commit acts of violence towards the family members of perceived government witnesses in order to induce them not to testify at Khan's trial.

22. Prior to leaving, the CS informed Simels that he/she would require some money to cover expenses that the CS would incur in locating and "neutralizing" government witnesses, including the cost of acquiring prepaid and unregistered cellphones. Simels informed the CS that he would deliver that message and request to Khan, stating that he was planning on sending "her" (Irving) to see

13

Khan at the MCC the next day. Simels concluded by telling the CS that he would be in contact with the CS after "we see Roger [Khan] tomorrow."

23. A review of MCC visitation records reveals that two days later, on June 13, 2008, Irving visited Khan at the MCC.

24. On June 13, 2008 at approximately 12:50 p.m., Simels sent the CS an email "robertsimels@yahoo.com" that read: "Simply [Khan] says be careful in your efforts to gather information, and do not do anything that can be misconstrued by anyone. These are difficult times and people will draw the most unfavorable inferences. So be cautious. Have authorization for payment for gathering materials." Based upon the investigation conducted thus far, I believe that Khan was informing the CS that he would pay for expenses incurred in the CS's efforts to find witnesses and corruptly induce them not to testify for the government at his upcoming trial.

25. On or about June 17, 2008, the CS called Simels' office in an attempt to speak with him about the email. Irving got on the telephone and informed the CS that Simels was presently in Guyana, but that she would contact him to find out when he was returning so that the two could meet. During the conversation, Irving confirmed that she had met with Khan and seen the email sent to the CS by Simels. In pertinent part, Irving stated, "Because he [Simels] sent you in relation to some of the people, I saw, I saw the, the email that he [Simels] sent you. Because I had met with Roger [Kahn] . . . looking for the people that, you know . . .

yeah, which ah, because I had met with Roger, so then he [Simels] emailed you after that." Irving later explained that she would have Simels contact the CS when he returned to the United States because, as she explained, "I know he [Simels] definitely wants to meet up with you again, talk about everything and give you some money, because I know you need money to get started and everything."

26. Later, on June 19, 2008, the CS and Simels agreed to meet at his office. Prior to the meeting, investigators supplied the CS with a recording device and surveilled the CS entering the building of Simels' law office. During that meeting, Simels paid the CS $1,000 in United States currency, and the two had the following exchange:

| | |
|---|---|
| Simels: | Here's a thousand dollars to get started. |
| CW: | Alright, no problem. |
| Simels: | Um, all he [Khan] says is be careful. He says don't kill the mother. |
| CW: | Don't kill the mother. |
| Simels: | He said you know, said just, just . . . |
| CW: | So what other option would he prefer? |
| Simels: | He doesn't want you anywhere near her. |
| CW: | No, no, no, no, no, no, no, no, I, I can't get anywhere near it. That's why I'm asking about options does he prefer, you know? So I can know what I'm doing I do exact so what, what I know well he can't say well you know I didn't approve it. |
| Simels: | Well, he'd like as much pressure being put on [John Doe #1] as possible. Uh, but |

|  |  |
|---|---|
|  | he thinks that if [John Doe #1]'s mother gets killed that . . . |
| CW: | . . . it takes . . . |
| Simels: | . . . the government will go crazy. Uh, and he's probably right. That, that they'll put him into the, the SHU, special housing unit, limit his phone calls, limit my access to him. So . . . |
| CW: | That is why I really didn't find out with him 'cause after I got your email I said well you know let me just read until, well, you know, we meet, you know, and talk let me know exactly well. |
| Simels: | Yeah, I mean he wants to do . . . |
| CW: | . . . what advice you got . . . |
| Simels: | . . . whatever needs to be done, then obviously, if you can find [John Doe #2], great. If you can find [Jane Doe #2] who was . . . |
| CW: | So he want, you want me now to deal with them though? [John Doe #2] and these other people? |
| Simels: | What's that? |
| CW: | What would he want me to do now with them [John Doe #2] and the other people? |
| Simels: | With [John Doe #2] he said you can deal with [John Doe #2] however you think that [John Doe #2] has to be dealt with in, in terms of finding out where he is in this thing. If he's cooperating, that it's a bad thing. Uhm, if he's not cooperating and he wants to talk about [John Doe #1], um, then we want him to talk to us about [John Doe #1]. I, I don't think he cares about [John Doe #2] in terms of, of . . . 'cause I don't think they, they will put the heat on him that, that screwing around with the mother would. I mean doing something violent or . . . |
| CW: | Alright. |

27. Subsequently, the CS returned to Simels' law office to meet with Simels on July 18, 2008. Prior to the meeting, investigators supplied the CS with a recording device and surveilled the CS entering the building of the law office. During the ensuing conversation, at the instruction of law enforcement, the CS informed SIMELS, in sum and in substance, that John Doe #1's girlfriend ("Jane Doe #2"), was willing to testify in conformity with Khan's defense. SIMELS then discussed with the CS how much money Jane Doe #2 would require to do so, asking the CS whether she would need "5,000, 10,000, 20,000" referencing $5,000, $10,000 or $20,000.

28. During the same meeting, Simels typed a document detailing what he wanted Jane Doe #2 to say and handed it to the CS, who later provided it to law enforcement. In part, the document contains claims that John Doe #1 is affiliated with terrorist organizations and stated that John Doe #1 intended to testify falsely against Khan. The document also had blank spaces in which Jane Doe #2 was to add names.

29. On or about July 21, 2008, at the direction of law enforcement, the CS called Simels. During this telephone conversation, the CS stated that he spoke with Jane Doe #2 and that she wanted "10" (reference to $10,000). The CS then explained that for that price, he/she would have Jane Doe #2 sign the proposed

17

document, which needed some restructuring,[4] and have her signature notarized.

30. In a subsequent telephone conversation, on or about July 22, 2008, Simels explained that he wanted to meet Jane Doe #2 to get her to sign an affidavit. In pertinent part, Simels instructed the CS to inform Jane Doe #2 that she will not receive any money until she meets with Simels. In pertinent part, Simels said: "Tell her that obviously she can't get any money until she meets with me, but that I'll make the agreement with her . . . she's got to meet with me, if she does it and she signs the document, she gets half then and she gets half when she, ah, finishes testifying." Simels later explained that he planned of visiting "him," referring to Khan, and that he would "give him a fill in on everything that's happening."

31. Over the course of the next several weeks, Simels spoke with the CS on several occasions, both in person and over the telephone. During these conversations, at the direction of law enforcement, the CS reported that Jane Doe #2 was reluctant to meet with Simels. Simels, in turn, repeated that he would not give Jane Doe #2 any money until they met. As Simels explained it during a telephone conversation on August 5, 2008, "Nobody wants to pay for a pig in a poke, that is, to give people money without knowing what they are getting."

---

[4] During a subsequent personal meeting with Simels, on July 30, 2008, which was recorded with the consent of the CS, the CS advised that Jane Doe #2 would sign the affidavit without any regard to what it said.

18

WHEREFORE, your deponent respectfully requests that arrest warrants be issued for the defendants ROBERT SIMELS, SHAHEED KHAN, also known as "Roger Khan" and "Short Man," and ARIENNE IRVING, so that they may be dealt with according to law.

In addition, it is respectfully requested that this affidavit be filed under seal

Cassandra Jackson
Special Agent
Drug Enforcement Administration

Sworn to before me this
___ of September, 2008