KTC/PC:SLD/MJF
F#2008R01522

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -             08 CR 640 (JG)

ROBERT SIMELS and
ARIENNE IRVING,

       Defendants.

- - - - - - - - - - - - - - - X

GOVERNMENT'S MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS' PRETRIAL MOTIONS

BENTON J. CAMPBELL
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York  11201

STEVEN L. D'ALESSANDRO
MORRIS J. FODEMAN
Assistant United States Attorneys
    (Of Counsel)

## **Table of Contents**

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . 1

FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . 3

    A.    Background . . . . . . . . . . . . . . . . . . . . 3

    B.    The Confidential
            Source of Information . . . . . . . . . . . . . . . 4

    C.    The "Fire Wall" Procedures . . . . . . . . . . . . 4

    D.    The Title III Interception of
            Oral and Visual Communications . . . . . . . . . . 6

    E.    The Search of Simels' Law Office . . . . . . . . . 7

    F.    The Indictment . . . . . . . . . . . . . . . . . 10

    G.    The Guilty Plea and Privilege
            Waiver of Shaheed Khan . . . . . . . . . . . . . 10

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . 13

    POINT ONE:    THE DEFENDANTS' MOTION
                    FOR SEVERANCE IS MOOT . . . . . . . . . . 13

    POINT TWO:    THE CONSENSUAL RECORDINGS
                    SHOULD NOT BE SUPPRESSED . . . . . . . . 14

                   A.    The Defendants Lack
                         Standing to Raise Any
                         Claim under the Fifth
                         And Sixth Amendments . . . . . . . . 15

                   B.    There Was No Violation
                         Of the Sixth Amendment . . . . . . . 16

                   C.    There Was No Violation
                         Of the Fifth Amendment . . . . . . . 29

                   D.    The Defendants' Recorded
                         Statements Are Not Protected
                         "Attorney Work Product" . . . . . . . 29

                   E.    There Was No Violation of

i

The Fourth Amendment. . . . . . . .   33

POINT THREE:   THE TITLE III INTERCEPTS
               SHOULD NOT BE SUPPRESSED. . . . . . . .   35

               A.   A *Franks* Hearing
                    Is Not Required. . . . . . . . . .   35

               B.   Alternative Techniques
                    Were Properly Considered.. . . . . .   40

               C.   The Government Has Properly
                    Minimized the Interceptions. . . . .   45

                    1.   Applicable Law.. . . . . .   45

                    2.   The Minimization Procedures
                         Were Reasonable Here.. . . .   47

POINT FOUR:    THE COURT SHOULD CONDUCT
               AN AUDIBILITY HEARING.. . . . . . . . .   53

POINT FIVE:    THE EVIDENCE RECOVERED FROM
               THE SEARCH OF THE SIMELS' LAW
               OFFICE SHOULD NOT BE SUPPRESSED.. . . . .   55

               A.   The Court Properly Authorized the
                    Government to Seize the Electronic
                    Eavesdropping Equipment. . . . . . .   55

               B.   The Court Properly Authorized
                    The Recovery of Items 3 and 4. . . .   61

               C.   The Court Should Not Suppress
                    The Fruits of the Search.. . . . . .   67

POINT SIX:     THE INDICTMENT AGAINST IRVING
               SHOULD NOT BE DISMISSED.. . . . . . . .   72

POINT SEVEN:   THE DEFENDANTS' MOTION FOR
               A BILL OF PARTICULARS IS MOOT.. . . . . .   75

CONCLUSION. . . . . . . . . . . . . . . . . . . . .   76

TABLE OF AUTHORITIES

Page

CASES


Clark v. United States,
289 U.S. 1 (1933).. . . . . . . . . . . . . . . . . . . . . 31

Costello v. United States,
350 U.S. 359 (1956) . . . . . . . . . . . . . . . . . . . . 72

Eugenia VI Venture Holdings, Ltd. v. Glaser,
No. 05-CV-7262 (DC),
2005 U.S. Dist. LEXIS 28126 (S.D.N.Y. Nov. 15, 2005) . . . . . 51

Franks v. Delaware,
438 U.S. 152 (1978).. . . . . . . . . . . . . . . . . . .35-37

Hempstead Video, Inc. v. Inc. Village of Valley Stream,
409 F.3d 127 (2d Cir. 2005) . . . . . . . . . . . . . . . . 52

Hickman v. Taylor,
329 U.S. 495 (1947).. . . . . . . . . . . . . . . . . . . . 30

Illinois v. Gates,
462 U.S. 213 (1983) . . . . . . . . . . . . . . . . . . .55-56

In re: Grand Jury Proceedings,
219 F.3d 175 (2d Cir. 2000) . . . . . . . . . . . . . . 32, 33

In re: Grand Jury Subpoena Dated Jan. 4, 1984,
750 F.2d 223 (2d Cir. 1984) . . . . . . . . . . . . . . . . 31

In re: Grand Jury Subpoena Served Upon John Doe, Esq.,
781 F.2d 238 (2d Cir.) (en banc),
cert. denied, 475 U.S. 1108 (1986) . . . . . . . . . . . . . 66

In re: Six Grand Jury Witnesses,
979 F.2d 939 (2d Cir. 1992) . . . . . . . . . . . . . . . . 30

In re: Two Grand Jury Subpoenae
Duces Tecum Dated August 21, 1985,
793 F.2d 69 (2d Cir, 1986) . . . . . . . . . . . . . . . . . 66

In the Matter of Sage Realty Corp. v.
Proskauer Rose Goetz & Mendlesohn,
91 N.Y.2d 30 (1997) . . . . . . . . . . . . . . . . . . . . 71

Klein v. Smith,
559 F.2d 189 (2d Cir.),
cert. denied, 434 U.S. 987 (1977). . . . . . . . . . . . . . . . 23

Klienman v. O'Neill,
No. 03-CV-3829,
2008 WL 5582453 (E.D.N.Y. Dec. 30, 2008) . . . . . . . . . . 70

McMann v. Richardson,
397 U.S. 759 (1970). . . . . . . . . . . . . . . . . . . . . . 16

Murray v. United States,
487 U.S. 533 (1988) . . . . . . . . . . . . . . . . . . . . . 71

Scott v. United States,
436 U.S. 128 (1978) . . . . . . . . . . . . . . . . . . . 46-47

Spinelli v. United States,
393 U.S. 410 (1969)) . . . . . . . . . . . . . . . . . . . . . 56

United States v. Aleman,
286 F.3d 86 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . 73

United States v. Alfonso,
143 F.3d 772 (2d Cir. 1998) . . . . . . . . . . . . . . . . . 73

United States v. Arango-Correa,
851 F.2d 54 (2d Cir. 1988) . . . . . . . . . . . . . . . . 53-54

United States v. Barlin,
686 F.2d 81 (2d Cir. 1982) . . . . . . . . . . . . . . . . . . 59

United States v. Bakhtiari,
913 F.2d 1053 (2d Cir. 1990) . . . . . . . . . . . . . . . . . 56

United States v. Blitz,
533 F.2d 1329 (2d Cir. 1976) . . . . . . . . . . . . . . . . . 72

United States v. Bryant,
480 F.2d 785 (2d Cir. 1973) . . . . . . . . . . . . . . . . . 53

United States v. Burke,
517 F.2d 377 (2d Cir. 1975) . . . . . . . . . . . . . . . . . 70

United States v. Caceres,
440 U.S. 741 (1979) . . . . . . . . . . . . . . . . . . . . . 34

United States v. Caldwell,
205 F.2d 879 (D.C. 1953) . . . . . . . . . . . . . . . . . . 28

United States v. David,
940 F.2d 722 (1st Cir. 1991) . . . . . . . . . . . . . . . 47

United States v. DeVillio
983 F.2d 1185 (2d Cir. 1993) . . . . . . . . . . . . . . . 19

United States v. Dien,
609 F.2d 1038 (2d Cir. 1979) . . . . . . . . . . . . . . . 20

United States v. Diaz
176 F.3d 52 (2d Cir. 1999) . . . . . . . . . . . . . . . . 41

United States v. Dzialak,
441 F.2d 212 (2d Cir. 1971) . . . . . . . . . . . . . . . 68

United States v. Fama,
758 F.2d 834 (2d Cir. 1985) . . . . . . . . . . . . . . . 59

United States v. Fermin,
32 F.2d 674 (2d Cir. 1994) . . . . . . . . . . . . . . . . 36

United States v. Foster,
100 F.3d 846, 852 (10th Cir. 1996) . . . . . . . . . . . . 68

United States v. Gartner,
518 F.2d 633 (2d Cir. 1975) . . . . . . . . . . . . . . 14, 23-24

United States v. George,
975 F.2d 72 (2d Cir. 1992) . . . . . . . . . . . . . . . 62, 68

United States v. Ginsberg,
758 F.2d 823 (2d Cir. 1985) . . . . . . . . . . . . . 19, 22-24

United States v. Giordano,
416 U.S. 505 (1974) . . . . . . . . . . . . . . . . . . . 41

United States v. Gotti,
42 F. Supp. 2d 252 (S.D.N.Y. 1999) . . . . . . . . . . . . 40

United States v. Gotti,
04-CR-609 (SIS) . . . . . . . . . . . . . . . . . . . 34, 52

United States v. Gonzalez,
38 F.R.D. 326 (S.D.N.Y. 1965) . . . . . . . . . . . . . . 73

United States v. James,
494 F.2d 1007 (D.C. Cir. 1974) . . . . . . . . . . . 46, 50 ,52

United States v. Kahn,
415 U.S. 143 (1974) . . . . . . . . . . . . . . . . . 41

United States v. Kaplan,
No. 02-CR-883 (DAB),
2003 U.S. Dist. LEXIS 21825 (S.D.N.Y. Dec. 5, 2003) . . . . . 52

United States v. Kaufer,
387 F.2d 17 (2d Cir. 1967) . . . . . . . . . . . . . . . 53

United States v. Khan,
06-CR-255 (DLI). . . . . . . . . . . . . . . . . . . . 33

United States v. King,
536 F. Supp. 253 (C.D. Cal. 1982) . . . . . . . . . . .24-27

United States v. Labate,
2001 WL 533714 (S.D.N.Y. May 18, 2001) . . . . . . . . . . . 37

United States v. LaChance,
788 F.2d 856 (2d Cir. 1986) . . . . . . . . . . . . . . . 62

United States v. Lacy,
119 F.3d 742 (9th Cir. 1997) . . . . . . . . . . . . . . 59

United States v. Le,
306 F. Supp. 2d 589 (E.D. Va 2004) . . . . . . . . . . . . 66

United States v. Leake,
998 F.2d 1359 (6th Cir. 1993) . . . . . . . . . . . . . . 56

United States v. Levy,
577 F.2d 200 (3rd Cir. 1978) . . . . . . . . . . . . . . 23

United States v. Lilla,
699 F.2d 99 (2d Cir. 1983) . . . . . . . . . . . . . .41-42

United States v. Liu,
293 F.3d 138 (2d Cir. 2000) . . . . . . . . . . . . . . . 68

United States v. Longo,
70 F. Supp. 2d 225 (W.D.N.Y. 1999) . . . . . . . . . . . . 67

United States v. Lusterino,
450 F.2d 572 (2d Cir. 1971). . . . . . . . . . . . . . . 28

United States v. Martino,
664 F.2d 860 (2d Cir. 1981) . . . . . . . . . . . . . . . . . 59-60

United States v. Massino,
311 F. Supp. 2d 309 (E.D.N.Y. 2004) . . . . . . . . . . . 21-24

United States v. Matias,
836 F.2d 744 (2d Cir. 1988) . . . . . . . . . . . . . 63, 67-68

United States v. Napolitano,
552 F. Supp. 465 (S.D.N.Y. 1979) . . . . . . . . . . . . . . 46

United States v. Nieves,
No. 97-CR-46-1, 1997 U.S. Dist. LEXIS 11331
(E.D. Pa. 1997). . . . . . . . . . . . . . . . . . . . . . . 29

United States v. Nobles,
422 U.S. 225 (1975). . . . . . . . . . . . . . . . . . . 30, 32

United States v. Osborn,
385 U.S. 323 (1966) . . . . . . . . . . . . . . . . . . . . 34

United States v. Payden,
613 F. Supp. 800 (S.D.N.Y. 1985) . . . . . . . . . . . . . . 73

United States v. Puglisi,
790 F.2d 240 (2d Cir. 1986) . . . . . . . . . . . . . . . . 42

United States v. Richard Roe, Inc.,
68 F.3d 38 (2d Cir. 1995) . . . . . . . . . . . . . . . . . 31

United States v. Singh,
390 F.3d 168 (2d Cir. 2004) . . . . . . . . . . . . . . . . 59

United States v. Tellier,
255 F.2d 441 (2d Cir. 1958) . . . . . . . . . . . . . . . . 20

United States v. Terry,
702 F.2d 299 (2d Cir. 1983) . . . . . . . . . . . . . . . . 45

United States v. Torres,
901 F.2d 205 (2d Cir. 1990) . . . . . . . . . . . . . . . . 42

United States v. Tortorello,
480 F.2d 764 (2d Cir. 1973) . . . . . . . . . . . . . . . . 46

United States v. Twenty-Two Thousand,
Two Hundred Eighty Seven Dollars ($22,287.00)
United States Currency,
709 F.2d 442 (6th Cir. 1983) . . . . . . . . . . . . . . . 70

United States v. Uribe,
890 F.2d 554 (1st Cir. 1989) . . . . . . . . . . . . . . . 47

United States v. Valencia,
524 F.2d 618 (6th Cir. 1979). . . . . . . . . . . . . . . 28

United States v. Van Engel,
15 F.3d 623 (7th Cir. 1993) . . . . . . . . . . . . . . . 17

United States v. Wagner,
989 F.2d 69 (2d Cir. 1993) . . . . . . . . . . . . . 28, 56, 59

United States v. Weiser,
428 F.2d 932 (2d Cir. 1969) . . . . . . . . . . . . . . . 54

United States v. White,
401 U.S. 745 (1971) . . . . . . . . . . . . . . . . . . . 34

United States v. Young,
822 F.2d 1234 (2d Cir. 1987) . . . . . . . . . . . . . . . 42

Weatherford v. Bursey,
429 U.S. 545 (1977). . . . . . . . . . . . 15, 17-18, 20-24, 27

Ziemack v. Centel Corp.,
No. 92-C-3551, 1995 U.S. Dist. LEXIS 6942
(N.D. Ill. May 18, 1995) . . . . . . . . . . . . . . . . . 31

## CONSTITUTIONAL AMENDMENTS

Fourth Amendment. . . . . . . . . . . . . . . . . . . . . Passim

Fifth Amendment.. . . . . . . . . . . . . . . . . . . . . Passim

Sixth Amendment... . . . . . . . . . . . . . . . . . . . Passim

## STATUTES, RULES AND GUIDELINES

21 U.S.C. § 848(b) . . . . . . . . . . . . . . . . . . . . 3

21 U.S.C. § 959 . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 1512 . . . . . . . . . . . . . . . . . . . 6, 8

18 U.S.C. § 1512(k) . . . . . . . . . . . . . . . . . 10

18 U.S.C. § 2511(2)(c). . . . . . . . . . . . . . . 33-34

18 U.S.C. § 2512 . . . . . . . . . . . . . . . . . . . 8

18 U.S.C. § 2512(1)(a) . . . . . . . . . . . . . . . . 60

18 U.S.C. § 2512(1)(b) . . . . . . . . . . . . . . . . 60

18 U.S.C. § 2518 . . . . . . . . . . . . . . . . . . . 41

18 U.S.C. § 2518(1)(c) . . . . . . . . . . . . . 40-42, 44

18 U.S.C. § 2518(3)(c) . . . . . . . . . . . . . . . . 41

18 U.S.C. § 2518(5) . . . . . . . . . . . . . . . . 45, 47

Federal Rule of Evidence 501. . . . . . . . . . . . . . 31

Federal Rule of Evidence 502(b). . . . . . . . . . . . 30

United States Attorney's Manual. . . . . . . . . . . 65-66

<u>PRELIMINARY STATEMENT</u>

The government respectfully submits this Memorandum of Law in opposition to the pretrial motions of defendants Robert Simels and Arienne Irving ("Simels Mot." and "Irving Mot.", respectively).  In the first instance, the defendants seek a limited severance. (Simels Mot. Point V; Irving Mot. Point IV).

Second, the defendants demand that the consensual recordings with the cooperating witness (the "CW") be suppressed as they were made in violation of the Fourth, Fifth and Sixth Amendments and, otherwise, contain attorney work product. (Simels Mot. Point I; Irving Mot. Point I).

Third, the defendants seek to suppress the court-authorized recordings of their meetings with co-defendant Shaheed Khan.  Irving seeks suppression based upon claims that the government's application failed to properly articulate necessity (Irving Mot. Point II) and contained material omissions (Irving Mot. Point III).  Because of these alleged omissions, Irving continues, a <u>Franks</u> hearing is required. (Irving Mot. Point III). Simels seeks to suppress the court-authorized recordings, arguing that the government failed to minimize the interceptions correctly (Simels Mot. Point II).  In addition, Irving individually seeks a <u>Franks</u> hearing based upon what she claims to be material omissions in the agent's affidavit. (Irving Mot. Point III).

1

Fourth, the defendants request an audibility hearing with regard to the court-authorized recordings. (Simels Mot. Point III; Irving Mot. Point V).

Fifth, Simels seek to suppress the items recovered during a search of his law office based upon claims that the grant of search authority for some items was overbroad, the government's articulation of probable cause as to other items was stale and some of the items recovered were beyond the scope of the warrant. (Simels Mot. Point IV).

Sixth, Irving individually seeks to dismiss the indictment, claiming that the evidence is insufficient. (Irving Mot. Point IV).

Finally, Simels requests a limited bill of particulars identifying the witness(es) who were the target of the charged obstruction misconduct. (Simels Mot. Point VI).

For the reasons discussed below, the defendants' motions should be denied in their entirety.

STATEMENT OF FACTS

A.  Background

On April 13, 2006, Shaheed Khan, also known as "Roger Khan," "Short Man" and "Boss Man," was indicted in the Eastern District of New York. (Affidavit in Support of Arrest Warrant (Exhibit A), ¶ 6).  In the 18-count indictment, captioned United States v. Khan, 06-CR-255 (DLI), Khan was charged with: (a) being the principal administrator of a continuing criminal enterprise, in violation of 21 U.S.C. § 848(b); (b) conspiring to import cocaine; (c) conspiring to distribute and possess with intent to distribute cocaine; (d) engaging in an international distribution conspiracy, in violation of 21 U.S.C. § 959; and (e) multiple substantive counts of importing and distributing cocaine. (Id.).

The government's investigation revealed that Khan was the leader of a violent drug trafficking organization (the "Khan Organization") that was based in Georgetown, Guyana, from at least 2001 until his arrest in June 2006. (Id. at ¶ 7).  Khan and his co-conspirators obtained large quantities of cocaine, and then imported the cocaine into the Eastern District of New York and other places, where it was further distributed. (Id.).  Khan was ultimately able to control the cocaine industry in Guyana, in large part, because he was backed by a para-military squad that would murder, threaten, and intimidate others at Khan's direction. (Id.).  Khan's enforcers committed violent acts and

3

murders on Khan's orders that were directly in furtherance of Khan's drug trafficking conspiracy. (Id.).  This para-military squad was commonly referred to as the "Phantom Squad." (Id.).

From approximately August 2006 until their arrest in September 2008, Khan was represented by, among others, the defendant-attorneys Robert Simels and Arienne Irving, who is Simels' associate. (Id.).

B.    The Confidential Source of Information

In furtherance of this investigation, law enforcement had access to a reliable confidential source of information (the "CW") who was himself a member of Khan's Phantom Squad. (Id. at ¶ 9).  In May 2008, the CW was notified by, among others, a member of the Phantom Squad that Khan's attorney wanted to speak with the CW. (Id.).  Subsequently, at the direction of law enforcement, the CW personally met with Simels and Irving on a number of occasions at their law office. (Id.).  The CW also spoke to Simels and Irving over the telephone. (Id.).  With the CW's consent, law enforcement recorded these personal and telephonic conversations.

C.    The "Fire Wall" Procedures

Recognizing the complexities involved in the investigation of an attorney, the government imposed a number of strict procedures designed to limit the dissemination of the evidence collected in this case.  These prophylactic procedures

were constructed specifically because the investigation of Simels might reveal privileged information or matters related to the defense of Khan.  For that reason, the procedures prohibited the disclosure or dissemination of any information collected during the investigation to those involved in the prosecution of Khan for his drug-related offenses.  The involved law enforcement agencies were instructed to impose similar procedures. Periodically, the government reminded the involved parties of their continuing obligations.

Furthermore, prior to the arrest of Simels, Irving and Khan, the government updated its procedures to address the various forms of evidence collected during the investigation, such as the Title III intercepts and the anticipated search of the defendants' law office.  At their core, the procedures prohibited the disclosure of any material collected during the investigation to those involved in the prosecution of Khan for his drug-related offenses.  Meanwhile, those involved in the prosecution of the instant matter were prohibited from learning the contents of the Title III intercepts, save those portions that had been minimized, as well as any materials collected during the search of the defendants' law office, save those to which any claim of privilege was unsuccessful.[1]  These procedures

---

[1]  Demonstrating the government's appreciation of the sensitive nature of this case, the parties entered into a consent agreement further restricting the government's access to the

continue to remain in effect today.[2]

D.     The Title III Interception of
       Oral and Visual Communications

       On July 7, 2008, the government filed an application

with the Honorable Laura T. Swain, United States District Judge,

Southern District of New York, seeking authorization to intercept

the oral and visual communications occurring within the third

floor attorneys' visiting rooms at the Metropolitan Correction

Center (the "MCC"), where Khan was being housed. (Exhibit B).  In

support of the government's application, Drug Enforcement

Administration ("DEA") Special Agent Cassandra Jackson filed an

affidavit that articulated facts establishing probable cause to

believe that Simels, Irving and Khan were obstructing justice, in

violation of 18 U.S.C. § 1512, and that law enforcement was

likely to capture discussions between them in furtherance of

their criminal activity within the attorney visiting rooms at the

MCC. (Exhibit C).  The government further articulated the

necessity of such interceptions in order to advance the

investigation. (Id. at ¶¶ 45-57).

       After consideration of the matter, Judge Swain granted

_____

materials recovered during the search.  A copy of which has been
previously provided to the Court.

       [2]  Recently, in light of the plea and waiver of Khan,
discussed below, counsel for Simels and Irving have consented to
the disclosure of the materials seized from their law offices to
the prosecution team in the instant matter.

the government's application to intercept the oral and visual communications between Simels, Irving and Khan occurring within the attorneys' visiting rooms at the MCC for a period of thirty days.[3] (Exhibit D (Order Authorizing Interception of Oral Communications); Exhibit E (Order Authorizing Interception of Visual Communications)). Pursuant to the court's authorization, the government intercepted and recorded two meetings.  The first meeting was between Irving and Khan on July 24, 2008.  The second meeting was between Simels and Khan on July 29, 2008.

Subsequently, the recordings were presented for minimization to members of the "Intercept Team" consistent with the Court's minimization instructions (Ex. D at 5-7), in combination with the minimization instructions issued to the monitoring agents (Exhibit F (Minimization Instructions)) and the Office's "firewall procedures."

E.   The Search of Simels' Law Office

On September 9, 2008, DEA Special Agent Cassandra Jackson filed an affidavit in support of the government's application for a search warrant for the defendants' law office. (Exhibit G).  In her affidavit, Agent Jackson described the instant investigation and articulated facts establishing probable cause to believe that the law office contained evidence of

---

[3]  The government did not seek to renew its authority to intercept at the conclusion of the initial period of authorization.

various crimes, including witness tampering, in violation of 18

U.S.C. § 1512, and importing and possessing illegal

eavesedropping equipment, in violation of 18 U.S.C. § 2512. (Id.)

With respect to the basis for believing that the

illegal eavesdropping equipment was present at the law office,

Agent Jackson stated:

> 12. The investigation has also revealed that
> Simels is in possession of illegal eavesdropping
> equipment.  In particular, during the course of his
> representation of Khan, Simels disclosed various
> telephone conversations that he intended to introduce
> at trial.  According to the [CW], prior to his arrest,
> Khan used a computer while in Guyana to surreptitiously
> record telephone conversations of individuals.  I
> believe that the conversations disclosed by Simels were
> captured using Khan's eavesdropping equipment that is
> now in the possession of Simels.  My belief is
> corroborated by records maintained by the Department of
> Homeland Security, Bureau of Customs and Border
> Protection ("CBP").  According to those records, on or
> about October 11, 2007, prior to the disclosure of the
> recorded conversations, equipment identified as a
> "PORTABLE AUTO DATA PROCESSING MACH[INE]", was shipped
> from Guyana to Simels at the PREMISES. CBP records
> further document that from October 9, 2007 to October
> 12, 2007, Simels was in Guyana.  Furthermore, on July
> 18, 2008, during a recorded conversation with the [CW],
> Simels confirmed that he is in "control" of "Roger's
> [Khan's] triangulation equipment" and that it "is in
> the right hands."  According to the [CW], he understood
> the equipment referred to by Simels to be the same
> equipment used by Khan to intercept telephone
> conversations.  Based upon the foregoing, I believe
> that while he was in Guyana, Simels received Khan's
> illegal eavesdropping equipment and shipped it to his
> office (the "PREMISES") in the United States.  Once
> there, Simels retrieved intercepted communications from
> the computer and disclosed them.

> 13. Based upon my conversations with AUSA
> D'Alessandro, I have been informed that, in pertinent
> part, Title 18 of the United States Code, Section

2512(1) (a) makes it a crime for anyone to intentionally send through the mail or foreign commerce "any electronic, mechanical, or other device, knowing or having reason to know that the design of such device renders it primarily useful for the purpose of the surreptitious interception of wire, oral or electronic communications." Similarly, Title 18 of the United States Code, Section 2512(1) (b) makes it a crime for anyone to knowingly possess such a device.

*       *       *       *

41. Finally, as the CBP records evidence the shipment of equipment, believed to be the computer used by Khan to illegally intercept wire communications in Guyana, was shipped to Simels at the PREMISES (¶ 12, supra), coupled by Simels own statement that he is in possession and control of "Roger's [Khan's] computer" (id.), I believe that the illegal eavesdropping equipment will be located at the PREMISES. Additionally, there will likely be the data recovered from that equipment, in the form of compact discs, for example, stored at the PREMISES, as well as shipping, importation and/or billing records related to the importation and receipt of the equipment stored at the PREMISES.

(Ex. G).

After consideration of the matter, Judge Gabriel W. Gorenstein, United States Magistrate Judge, Southern District of New York, granted the government's application for a search warrant. (Exhibit H).  In particular, based upon the articulated probable cause in Agent Jackson's affidavit, Judge Gorenstein authorized the government to search the defendant's law office and seize the following items, generally described as: (1) witness statements or drafts thereof for four individuals pertaining to the underlying drug case; (2) cash and financial records related to Khan and/or the underlying drug case; (3)

9

"appointment books, telephone logs, or other records reflecting appointments and telephone calls from October 2007 through and including September 2008;" (4) retainer agreements between Simels and/or Irving and Khan; (5) records reflecting payments to the CW or any witness in the underlying drug case; (6) any electronic eavesdropping equipment; (7) importation, shipping, receipt or related billing records related to the article shipped on October 11, 2007 from Guyana to the law office; and (8) any and all data contained in, among other things, computers that pertains to the preceding categories. (Id., Attachment).

On September 10, 2008, members of the DEA executed the search warrant.  After conducting the search, law enforcement recovered approximately a box and a half of records, as well as the electronic eavesdropping equipment, money, jewelry and computers.

F.   The Indictment

On September 19, 2008, a grand jury sitting in the Eastern District of New York returned a single-count indictment against the defendants Simels, Khan and Irving, charging them with a conspiracy to obstruct justice, in violation of 18 U.S.C. § 1512(k). (Exhibit I).

G.   The Guilty Plea and Privilege
     Waiver of Shaheed Khan

On March 16, 2009, the defendant Shaheed Khan pled guilty to, among other crimes, the obstruction of justice offense

10

charged in this matter.  As part of his agreement with the government, Khan agreed to a sweeping waiver of all attorney-client and work product privileges, as well as any claims based upon the Fourth, Fifth and Sixth Amendments related to this case. In pertinent part, the agreement reads as follows:

> 6.  The defendant waives his attorney-client and work product privileges and withdraws any previously asserted claim of privilege with respect to (a) all communications to, from, by or through and any materials prepared by, for or at the direction of Robert Simels and/or Arienne Irving, as well as their employees, agents and/or representatives; (b) all materials seized on or about September 10, 2008 during the search of the law offices of Robert Simels and/or Arienne Irving, located at 1735 York Avenue, Suite 35C, New York, New York 10128; (c) all oral and visual communications intercepted within the third floor attorneys' visiting rooms at the Metropolitan Correction Center, 150 Park Row, New York, New York 10007, pursuant to the order of the Honorable Laura T. Swain, United States District Judge, Southern District of New York, issued on or about July 7, 2008; (d) any materials produced in discovery by the government in United States v. Robert Simels, et al., 08 CR 640 (JG); and (e) any communications to, from, by or through, and any materials prepared by, for or at the direction of any attorney representing the defendant in United States v. Shaheed Khan, 06 CR 255 (DLI).  The defendant specifically consents to the disclosure of any and all material identified in (a) through (e) to the government, including, without limitations, the prosecution team in United States v. Simels, et al., 08 CR 640 (JG).  The defendant further waives any claim, direct or indirect, that the government's investigation herein violated his rights under the Fourth, Fifth and Sixth Amendments, withdraws any previously asserted claims on those grounds and does not authorize any present, former or future representative to pursue such claims.  The government agrees that it will not use any privileged or work-product protected communications

11

and/or materials identified in (a) through (e) in any
future criminal proceedings against the defendant.

(Exhibit J).

ARGUMENT

POINT ONE

THE DEFENDANTS' MOTION FOR SEVERANCE IS MOOT

Simels and Irving seek a severance from their co-defendant Khan for a variety of reasons. (Simels Mot. at 37-40; Irving Mot. at 14-15). However, after the filing of Simels' and Irving's motions, on March 16, 2009, Khan pled guilty to, among other crimes, the obstruction of justice offense charged in this matter. Accordingly, the defendants' request for a severance is moot.

<u>POINT TWO</u>

<u>THE CONSENSUAL RECORDINGS</u>
<u>SHOULD NOT BE SUPPRESSED</u>

The defendants Simels and Irving demand that their recorded statements to the cooperating witness (the "CW") be suppressed based upon a variety of claims.[4] (Simels Mot. at 1-17; Irving Mot. at 2-6). First, the defendants argue that the government's use of a CW to record their statements violated the Sixth Amendment by intruding into the attorney-client relationship. (Simels Mot. at 7-13; Irving Mot. at 4-5). For substantially the same reasons, the defendants contend that the government's investigation infringed on the due process clause of the Fifth Amendment. (Simels Mot. at 13; Irving Mot. at 5). Next, the defendants claim that their recorded statements should be suppressed because they are "attorney work product" and immune from disclosure. (Simels Mot. at 14-15; Irving Mot., 6). Finally, the defendants aver that "[b]ecause the government had no warrant, probable cause or reasonable suspicion of wrongdoing," the recordings were made in violation of the Fourth Amendment. (Simels Mot. at 15-17; Irving Mot. at 5-6). The

---

[4]  It is noteworthy that neither Simels nor Irving seek to preclude the testimony of the CW, only the recorded statements. <u>See</u> <u>United States v. Gartner</u>, 518 F.2d 633, 636 (2d Cir. 1975) (Commenting that there is no difference for "constitutional purposes" between an informant simply testifying as to what was said during a meeting with an attorney and client, which would not violate the Sixth Amendment, and recording the conversation).

14

defendants' claims are without merit and should be denied in their entirety.

As an initial matter, neither Simels nor Irving have standing to raise the majority of these claims.  Indeed, Khan has waived both the attorney-client and work product privileges, as well as his rights under the Fourth, Fifth and Sixth Amendments. (Ex. J, ¶ 6).  Nevertheless, even in the absence of such a sweeping waiver, the defendants' claims are substantively deficient.  First, while an intrusion by the government into the attorney-client relationship may constitute a violation of the Sixth Amendment (see Weatherford v. Bursey, 429 U.S. 545 (1977)), no such intrusion occurred in this case, let alone one that would warrant suppression of the evidence.  Second, by the same token, the government's investigation did not constitute a violation of the due process clause of the Fifth Amendment.  Third, even if the court were to construe any portion of the defendants' statements to the CW as "attorney-work product," they are unworthy of protection for a variety of reasons, including the "crime fraud exception."  Finally, as the recordings at issue were made with the CW's consent, a party to the conversations, no warrant was required under the Fourth Amendment.

A.   The Defendants Lack Standing to Raise Any
     Claim under the Fifth and Sixth Amendments

Khan has waived any and all privilege he may have enjoyed with Simels or Irving. (Ex. J, ¶ 6).  As part of that

15

waiver, Khan specifically "waive[d] any claim, direct or indirect, that the government's investigation herein violated his rights under the Fourth, Fifth and Sixth Amendments, [withdrew] any previously asserted claims on those grounds and does not authorize any present, former or future representative to pursue such claims." (Id.).  Furthermore, Khan has made a sweeping waiver of his attorney-client and work product privileges.  Based upon these waivers, the defendants have no standing to pursue any claim based upon a violation of Khan's rights under the Fifth and Sixth Amendments.[5]

B.   There was no violation of the Sixth Amendment[6]

        The Sixth Amendment guarantees a defendant in a criminal prosecution the right "to have the Assistance of Counsel for his defense." U.S. Const. Amend. VI.  This right has been recognized to include the guarantee of "the effective assistance of counsel." McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970). In substance, the defendants claim that, through the CW, the government intruded into their attorney-client relationship with Khan and compromised their effectiveness as counsel because, among other things, during their meetings with the CW, they

---

[5]   Nevertheless, in the interest of completeness, the government responds to the substance of the defendants' claims. This is not intended to constitute a waiver of the government's position that the defendants lack of standing.

[6]   We address the defendants' arguments in the order presented in Simels' motion.

revealed "defense strategies" for the underlying drug case. (See Simels Mot. at 7-13).  For the reasons discussed below, the government's conduct did not violate the Sixth Amendment and the recordings should not be suppressed.

The government is entitled to investigate potential criminal activity even if the activity involves a defendant's attorney.  United States v. Van Engel, 15 F.3d 623 (7th Cir. 1993) is instructive.  There, the government had conducted an extensive undercover investigation into conduct of the defendant's attorney.  The Court held that even if the criminal investigation of the lawyer had invaded an interest that the Sixth Amendment protects,

> there would be a question whether a criminal investigation of a lawyer that is conducted in good faith can ever invade the Sixth Amendment rights of the lawyer's clients.  Weatherford v. Bursey . . . hints that the answer is no, but the question has never received sustained judicial attention; the previous cases have focused, as have we, on whether the investigation made the lawyer's representation of his client ineffective.

Id.  The Court went on to say that "judges should be reluctant to deter criminal investigations of lawyers by holding over the government's head the threat of dismissing suits against the target's clients should the investigation fizzle."  Id.

In Weatherford, 429 U.S. 545 (1977), the Court considered the constitutional limitations on government use of information in the attorney-client context.  There, an

17

informant-codefendant had attended meetings between Bursey and his attorney at the attorney's request.  The informant did not disclose the substance of those conversations to the government.  After being convicted and serving his sentence, Bursey brought a Section 1983 civil action against state officials for violation of his Sixth Amendment rights.  The Court found that this was not a situation where the government's purpose was to learn what it could about the defendant's defense plans.  Weatherford was found to not have intruded at all; he was invited to the meeting to help Bursey with his trial strategy.  He went, not to spy, but because he was asked and because he wanted to maintain his undercover identity.  Id. at 557.  Further, he did not disclose what he heard to the government.  The court found no Sixth Amendment violation, holding that the mere presence of an informant at attorney-client meetings does not violate the Sixth Amendment when the government's purpose is to preserve the informant's cover rather than to spy on defense preparations and when the informant does not reveal defense strategy or evidence to the prosecution.[7]  Id. at 557-58.

        The Second Circuit has construed Weatherford as prohibiting the government from using defense meeting

_____

        [7]  The Weatherford Court indicated that the right to counsel would be violated if the government or its CI "purposely intruded" upon the attorney-client relationship with the intent to gain access to defense consultations.

18

information against an accused person in connection with crimes
for which he has been indicted, see United States v. Ginsberg,
758 F.2d 823, 833 (2d Cir. 1985), but allowing information
gathered at a defense meeting about non-charged crimes to be
used against the defendant. See United States v. DeVillio, 983
F.2d 1185, 1191 (2d Cir. 1993).

In Ginsberg, the defendant claimed that the government
violated his right to counsel by allowing an unrevealed
cooperating witness to "mingle" with the other defendants prior
to trial.  The cooperating witness apparently sat at the defense
table during pre-trial court conferences and ate lunch with the
defendants.  The defendant claimed that this amounted to a "spy
in the defense camp."  The court held that where the presence of
the government's agent or informant at the defense conference is
either unintentional or justified by the necessity of protecting
the informant's identity, there is no violation of the Sixth
Amendment without some communication to the government of
valuable information derived from the intrusion. 758 F.2d at
832-33.  The court held that "absent such communication, there
exists no realistic possibility of either prejudice to the
defense or benefit to the government." Id. (Citations omitted.)

With these legal principles in mind, in order to
substantiate a violation of the Sixth Amendment based upon a
claim of governmental intrusion, a defendant must "establish

19

that privileged information had been passed to the government or that the government had intentionally invaded the attorney client relationship, and resulting prejudice." <u>United States v. Dien</u>, 609 F.2d 1038, 1043 (2d Cir. 1979) (citing <u>Weatherford</u>). In the instant matter, the defendants simply cannot establish any of these elements.

First, as early as April 2008, one month before the CW met with either Simels or Irving, the government implemented stringent procedures that prohibited the prosecutors involved in the instant obstruction investigation from disclosing matters to the prosecutors involved in the underlying drug case.[8] The government has scrupulously followed these procedures and no details of the investigation, let alone anything rising to the level of "privileged information," has been disclosed to the prosecutors or agents involved in the underlying Khan drug case.[9]

---

[8] The government instructed the relevant investigating agencies to operate under similar procedures.

[9] There is a substantial question whether any of the statements made by the defendants are privileged. First, Khan has waived any and all privilege. Second, from the beginning, Simels explained to the CW that he expected to use him as a witness at Khan's drug trial. As such, any privileged communications that Simels or Irving disclosed to the CW, a third party-witness, immediately lost their status and protection. <u>See</u> <u>United States v. Tellier</u>, 255 F.2d 441, 447 (2d Cir. 1958) ("[I]t is well established that communications between an attorney and his client, though made privately, are not privileged if it was understood that the information communicated in the conversation was to be conveyed to others.")(citations omitted). Of course, this is seperate from the crime-fraud exception, which applies throughout the defendants' conversations with the CW.

See Weatherford, 429 U.S. at 556 ("Nor do we believe that
federal or state prosecutors will be so prone to lie or the
difficulties of proof will be so great that we must always
assume . . . that an informant communicates what he learns from
an encounter with the defendant and his counsel"); United States
v. Massino, 311 F.Supp. 2d 309 (E.D.N.Y. 2004) (Court found that
the "firewall" procedures installed by the government ensured
that the prosecutors and agents assigned to the underlying
prosecution had no access to the contents of the recorded
conversations between the targeted attorney and informant).  As
such, no privileged information has been disclosed in a manner
that offends the Sixth Amendment.

        Second, at the time the CW contacted Simels, he was a
confidential source of information for the DEA, acting in an
undercover capacity as a member of Khan's criminal organization.
(Ex. A, ¶9).  Before meeting in May 2008, the CW received
instructions from members of Khan's organization to contact
Simels. (Id.).  In order to maintain his apparent allegiance to
Khan and his viability as a confidential source with the DEA,
the CW had to follow the instructions he received, namely, to
contact Simels. Weatherford, 429 U.S. at 557 (No government
intrusion found where informant "invited" to meeting with
defendant and counsel and went "not to spy, but because he was
asked and the State was interested in retaining his undercover

21

services on other matters and it was therefore necessary to avoid raising suspicion that he was in fact the informant whose existence [the client] and [the attorney] already suspected."); Ginsberg, 758 F.2d at 833 (recognizing that under Weatherford, "the need to maintain the confidentiality of an informant's identity is a legitimate law enforcement objective."); Massino, 311 F.Supp. 2d at 315 (same).  Based upon the foregoing, there was no governmental intrusion.[10]

Finally, pursuant to the government's stringent firewall procedures, these recordings were never disclosed to those involved in the underlying drug prosecution.  As such, Simels cannot establish any prejudice.  Weatherford, 429 U.S. at 556 ("If the fact was, as found by the District Court, that

---

[10]  The government disputes Simels' additional allegation that the disclosed "defense strategies" were "elicited" by the CW.  (Simels Mot. at 9).  At the first meeting with Simels, for example, without any provocation, Simels launched into a recitation of the underlying Khan drug case:

    Robert:    What do you know about Roger's [Shaheed Khan] case?

    CW:    Nothing really much because, you know, I've been between there and here.

    Robert:    Well, let me give you an overview and then I can tell you why he thinks you are very important to him and why because of something that the prosecutor's did, you are becoming very important.

    CW:    Alright.

(Excerpt Transcript, May 13, 2008).

22

Weatherford [the informant] communicated nothing about the two meetings [with the attorney and client] to anyone else, we are quite unconvinced that a constitutional claim under the Sixth and Fourteenth Amendments was made out."); Ginsberg, 758 F.2d at 833 ("there can be no violation of the sixth amendment without some communication of valuable information derived from the intrusion to the government: absent such communication, there exists no realistic possibility of either prejudice to the defense or benefit to the government.") (citing Weatherford, 429 U.S. at 558; Klein v. Smith, 559 F.2d 189, 197 (2d Cir.), cert. denied, 434 U.S. 987 (1977)); Massino, 311 F.Supp. 2d at 315 (no prejudice where no privileged defense strategy was communicated to the underlying prosecution team).[11]   The complete lack of any prejudice is even more apparent in this case as Khan has pled guilty and waived any potential claim under the Sixth Amendment.

Recognizing the deficiency of his argument, Simels proffers that he was prejudiced because the recordings led directly to his indictment. (Simels Mot. at 9-10).  However, "prejudice" to Simels' is not what is at issue.  The Sixth

---

[11]  Even in cases where information gathered by a government informant from defense counsel was disclosed, courts still weigh whether any prejudice resulted from the disclosure. See United States v. Levy, 577 F.2d 200 (3rd Cir. 1978)(court considered issue of prejudice to the defendant after finding that defense strategy was disclosed to the agents and prosecutor); Gartner, 518 F.2d 633 (where content of meeting between defense counsel and defendant disclosed to prosecution, court considered whether there was prejudice).

Amendment right to the effective assistance of counsel is enjoyed by Khan, the client, not Simels, the attorney. Therefore, any claim that this right was compromised and resulted in prejudice must focus on Khan's drug case, where the attorney-client relationship existed.  Accordingly, Khan may have suffered prejudice if, for example, the prosecutors assigned to his drug case learned of his intended defense strategies. See, e.g., Gartner, 518 F.2d 633.  Contrarily, there can be no prejudice where those same prosecutors remained ignorant of such matters. See, e.g., Weatherford, 429 U.S. at 556; Ginsberg, 758 F.2d at 833; Massino, 311 F.Supp. 2d at 315. The fact that Simels was indicted for conspiring to obstruct justice with Khan, his client, based upon evidence the government learned of while the two had a relationship simply does not constitute the type of "prejudice" precluded by the Sixth Amendment.

Despite the clarity of the law and facts of this case, the defendants try to blur the analysis by focusing the court's attention on United States v. King, 536 F. Supp. 253 (C.D. Cal. 1982), a case Simels claims to be "strikingly similar." (Simels Mot. at 7; Irving Mot. at 4-6).  The decision, however, is of limited, if any, value.

In King, the district court considered the propriety of the government recording a meeting between the defendant-

24

attorney, King, her then client, Smith, and a former employee of
her client-turned government informant, Key.[12]  Similar to the
defendants, King moved to suppress the recording based upon a
claim that the government interfered with her effectiveness to
her clients under the Sixth Amendment.  The court denied King's
motion on three grounds, two of which apply with equal force in
the present situation.  First, the court decided that the
government did not interfere with the defendant's representation
of her clients, because Key "avoided discussion of the defense
case." King 536 F. Supp. at 264.  For different reasons, as
articulated above, the government did not interfere with the
defendants' relationship with Khan.  Indeed, the government has
not disclosed the details of the investigation to the
prosecutors or agents involved in the underlying drug case.[13]  As
such, it is as if there was no discussion of the defense case.

        Second, the court in King explained that the recorded

_____

        [12]  Although superficially similar, King is dissimilar in
significant ways.  For example, as a former employee of the
client, the court determined that the informant was also a client
of the target-attorney. King, 536 F. Supp. at 259.  In stark
contrast, no attorney-client relationship was ever formed between
Simels and the CW.

        [13]  Of equal significance, Khan has waived all privilege and
any claim made under the Sixth Amendment.  Furthermore, he has
forbade anyone from pursuing any claim under the Sixth Amendment.
By contrast, the client in King continued to assert his rights
and the court determined that the defendant-attorney could had
standing to raise the challenge on her clients' behalf. King, 536
F.Supp. at 259.

                              25

statements were not protected because the Sixth Amendment, like the attorney-client privilege, does not shield unlawful communications. King 536 F. Supp. at 264-5.  In the present matter, the recorded statements are riddled with unlawful communications intended to obstruct justice. (See, e.g., Ex. A, ¶ 26 ("Simels: Here's a thousand dollars to get you started . . . All he [Khan] says is be careful.  He says don't kill the mother [of a perceived witness]."). Surely, these statements, like so many others that were recorded with the consent of the CW, are unworthy of constitutional protection.[14]

Finally, the court in King found that the Sixth Amendment right to effective counsel "should [not] be applicable where the parties to the communication should have reasonably foreseen the possibility of a breach of confidentiality by one of the persons present." King, 536 F. Supp. at 265.  This decision was based upon Key's self-identification as a cooperator.  Obviously, the CW in this case did not disclose the fact that he was cooperating with law enforcement.  Moreover, since the defendants were seeking to commit crimes with the CW, it is very likely that they hoped that their conversations would remain private.  Fortunately, they were not and the Sixth Amendment should not reward the defendants for their furtive

---

[14]  We note that the defendants have failed to identify which statements they believe to be protected by virtue of their attorney-client relationship with Khan.

actions.

In the final analysis, <u>King</u> is simply another
application of the law that was articulated by the Supreme Court
in <u>Weatherford</u>, limited to the unique facts of that case.  It is
not, as Simels appears to suggest, an articulation of a new
standard.  Despite this, the defendants rely heavily on <u>King</u> as
a foundation on which to build several of their arguments.  For
example, Simels comments that the government in <u>King</u> had *prima
facie* evidence of King's misconduct before recording the meeting
between her and the informant.  From this, Simels argues that
the government should be required to have some level of proof
("*prima facie* evidence, probable cause to believe, or even
reasonable suspicion") before it is permitted to conduct an
investigation of an attorney in this way. (Simels Mot. at 3, 10-
11).  However, there is simply no such requirement in the law.[15]
Were the Court to adopt Simels' proffered application of <u>King</u>,
the government's ability to investigate criminal activity would
be severely hampered, whenever the perpetrator is an attorney,
which would establish a repugnant double-standard.[16]

---

[15]   In any event, as detailed above, the CW had a
justifiable reason to contact Simels, specifically, to maintain
his confidential status as an informant.  Although Simels
disputes this as a basis for which the investigation proceeded,
Simels concedes that this is a lawful ground for contacting an
attorney in an undercover capacity. (Simels Mot. at 12).

[16]   Applying the requirements suggested by Simels, for
example, before meeting with a target-attorney, the informant

27

There is no good-faith basis to claim that the government's decision to use the opportunity presented by the CW to investigate Simels' unlawful conduct was improper in any respect.[17] Compare United States v. Lusterino, 450 F.2d 572 (2d Cir. 1971)(fake defendants tried with other defendants); United States v. Caldwell, 205 F.2d 879 (D.C. 1953) (prosecution fully aware of, received routine reports from and made little efforts to stop paid informant who worked for defense counsel and had "gained free access to the planning of the defense"); United States v. Valencia, 524 F.2d 618 (6th Cir. 1979) (in her capacity as a government-paid informant, lawyer's secretary disclosed content of attorney-client communications, including lawyer's files).  For all the reasons discussed, Khan's Sixth Amendment right to the effective assistance of counsel was not violated.  There was no intrusion into his attorney-client

---

would have to disclose that he or she was cooperating with law enforcement and the government would be required to first articulate its evidence of misconduct.  Operating under these requirements, the likelihood of the government uncovering criminal misconduct by an attorney would be, at best, slim.

[17]  Moreover, the government proceeded, in part, upon the representations of an informant who was deemed reliable by law enforcement. (Ex. A, ¶9 n.2); see United States v. Wagner, 989 F.2d 69, 72-73 (2d Cir. 1993) ("The core question in assessing probable cause based upon information supplied by an  informant is whether the information is reliable.  Information may be sufficiently reliable to support a probable cause finding if the person providing the information has a track record of providing reliable information, or if it is corroborated in material respects by independent evidence.")

relationship; no privileged communications were disclosed; and he has suffered from no prejudice.  Accordingly, the defendants' motion should be denied.

C.   There was no violation of the Fifth Amendment

          In passing, Simels and Irving proffer that for substantially the same reasons that the Sixth Amendment was violated, the government's investigation "offend[ed] the Fifth Amendment's due process clause." (Simels Mot. at 13; Irving Mot. at 5).  In making his claim, Simels relies on <u>United States v. Nieves</u>, No. 97-CR-46-1, 1997 U.S. Dist. LEXIS 11331 (E.D. Pa. 1997), in which a district court in Pennsylvania considered whether the government's use of an informant violated a defendant's Fifth Amendment right.  In determining this issue, the court applied a test that considered similar issues as those involved in an alleged Sixth Amendment violation.

          However, for the same reasons there was no Sixth Amendment violation, there was no Fifth Amendment violation.  As previously discussed, the CW initially met with the defendants to maintain his cover and no information from that meeting was disclosed to the Khan drug prosecution team, as such Khan suffered no prejudice.

D.   The Defendants' Recorded Statements
     Are Not Protected "Attorney Work Product"

          The defendants further seek to suppress their recorded statements to the CW by labeling them as "attorney work

29

product." (Simels Mot. at 14-15; Irving Mot. at 6).  First
recognized by the Supreme Court in Hickman v. Taylor, 329 U.S.
495 (1947), the attorney work product doctrine shields an
attorney's mental processes from compulsory and, in some cases,
inadvertent disclosure (see Federal Rule of Evidence 502(b)).
While the defendants casually assert that their statements fall
within this broad category of protected material, they fail to
identify which of their recorded statements, or portions
thereof, constitute "work product."  Without such a specific
assertion, the government is significantly impeded from
responding to the defendants' claim.  In any event, even if the
defendants were able to identify any of the recorded statements
as "work product," their request for suppression fails for a
number of reasons.

        First, now that Khan has pled guilty and waived any
privilege, the justifications behind the work product doctrine
are no longer applicable. See United States v. Nobles, 422 U.S.
225, 238 (1975) (In discussion the underpinnings of the attorney
work product doctrine, the Supreme Court commented: "The
interests of society and the accused in obtaining a fair and
accurate resolution of the question of guilt or innocence demand
that adequate safeguards assure the thorough preparation and
presentation of each side of the case."); In re Six Grand Jury
Witnesses, 979 F.2d 939, 944 (2d Cir. 1992)("Both common law

30

principles embodied in the attorney-client privilege and the
work product doctrine are to be applied in a common sense way in
light of reason and experience as determined on a case-by-case
basis.")(citing Fed. R. Evid. 501; In Re Grand Jury Subpoena
Dated Jan. 4, 1984, 750 F.2d 223, 224 (2d Cir. 1984)); Ziemack
v. Centel Corp., No. 92-C-3551, 1995 U.S. Dist. LEXIS 6942, at
*6 (N.D. Ill. May 18, 1995) ("Because the attorney-client
privilege and work-product doctrine obscure the search for the
truth, both should be confined to their narrowest possible
limits to minimize the impact upon the discovery process.")
(citations omitted).

      Second, the defendants statements are unworthy of
protection under the "crime fraud exception." See Clark v.
United States, 289 U.S. 1, 15 (1933) (Recognizing that the
attorney-client privilege "takes flight if the relation is
abused.  A client who consults an attorney for advice that will
serve him in the commission of a fraud will have no help from
the law. He must let the truth be told"); United States v.
Richard Roe, Inc., 68 F.3d 38 (2d Cir. 1995) ("[T]here is a
societal interest in enabling clients to get sound legal advice,
[but] there is no such interest when the communications or
advice are intended to further the commission of a crime or
fraud").

      Finally, suppression is unwarranted in the interest of

31

fairness. As detailed in his papers, Simels intends to make the affirmative defense that his conduct was lawful and that his intention was solely to encourage other persons to testify truthfully. (Simels Mot. at 37). In furtherance of this defense, Simels avers that he "will need to divulge attorney work product and reveal planned defense strategies." (Id. at 39; see also Irving Mot. at 14). To permit the defendants to selectively disclose work product or purportedly privileged information in furtherance of their defense, yet suppress their recorded statements on a claim of privilege, despite the fact that the recordings are directly relevant, would enable the defendants to use the work product doctrine as both a shield and a sword. See Nobles, 422 U.S. at 240 ("Respondent can no more advance the work-product doctrine to sustain a unilateral testimonial use of work-product materials than he could elect to testify in his own behalf and thereafter assert his Fifth Amendment privilege to resist cross-examination on matters reasonably related to those brought out in direct examination."); In re: Grand Jury Proceedings, 219 F.3d 175, 182 (2d Cir. 2000) ("[A] party cannot partially disclose privileged communications or affirmatively rely on privileged communications to support its claim or defense and then shield the underlying communications from scrutiny by the opposing party.") (citations omitted). Accordingly, even if any portion

32

of the recorded statements contain work product, the court
should not suppress the recordings in the interest of fairness.[18]

E.    There was no violation of the Fourth Amendment

        Simels and Irving argue that their status as attorneys
entitle them to more protection than the public.  In particular,
the defendants suggest that the consensual recordings violated
their Fourth Amendment rights because they were made without
some form of "antecedent justification - a warrant, probable
cause or at least reasonable suspicion of concrete professional
'misconduct'." (Simels Mot. at 16; Irving Mot. at 5).  In making
this argument, both defendants readily admit that recordings
made by government informants are exempt from the Fourth
Amendment's warrant requirement. (Simels Mot. at 15; Irving Mot.
at 5).  Nevertheless, the defendants argue that their status as
lawyers demand special protection under the law.  This is simply
wrong.

        Neither Title III (18 U.S.C. § 2511(2)(c)[19]) nor the
Fourth Amendment prohibits a law enforcement officer or a person

_____

        [18]  The present situation is conceptually similar to an
"advice of counsel" defense.  In such cases, courts have deemed
an implied privilege waiver in the interest of fairness. See In
re: Grand Jury, 219 F.3d at 182.

        [19]  Title 18 of the United States Code, Section 2511(2)(c)
provides: "It shall not be unlawful under this chapter for a
person acting under color of law to intercept a wire, oral, or
electronic communication, where such person is a party to the
communication or one of the parties to the communication has
given prior consent to such interception."

acting under color of law from intercepting a wire, oral, or electronic communication without a court order when one of the parties to the communication has consented to the interception. See United States v. Caceres, 440 U.S. 741 (1979); United States v. White, 401 U.S. 745 (1971).  The defendants provide no legal support for their "modest" proposal that the rule is somehow different when the criminal target is an attorney, nor can they.[20]

In the instant matter, the CW provided law enforcement with consent to record his conversations with Simels and Irving. Pursuant to 18 U.S.C. § 2511(2)(c), the ensuing recordings were lawfully obtained.  Accordingly, neither Simels' nor Irving's rights under the Fourth Amendment were violated and the Court should deny their motion.

---

[20]   Simels references United States v. Osborn, 385 U.S. 323 (1966), in support of his position and provides a copy of the transcript of a status conference in United States v. Gotti, 04-CR-609 (SIS) (Simels Mot., Ex. D).  However, both are easily distinguishable from the present situation.  In, Osborn, the Supreme Court determined that a tape recording between an informant and an attorney did not violate the Fourth Amendment because it was preceded by a warrant.  The Court, however, did not make a warrant a prerequisite for consensual interceptions. Moreover, Osborn was decided before Congress passed Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (Title 18 U.S.C. § 2510, et seq.), which specifically made consensual recordings lawful (Title 18 U.S.C. § 2511).  Meanwhile, in Gotti, the district court was addressing non-consensual recordings made between an attorney and his client pursuant to 18 U.S.C. § 2511(2)(a)(ii).

<u>POINT THREE</u>

<u>THE TITLE III INTERCEPTS</u>
<u>SHOULD NOT BE SUPPRESSED</u>

A.   <u>A *Franks* Hearing Is Not Required</u>

Defendant Irving alone moves to suppress the recorded
conversations at the MCC on the grounds that the application
authorizing the recordings contained "material misstatements or
omissions made with intent to deceive the issuing judge, or with
reckless disregard for the truth." (Irving Mot. at 10).  Based
upon that assertion, Irving also seeks a <u>Franks</u> evidentiary
hearing to explore the circumstances of these alleged
misstatements or omissions.  For the reasons set forth below,
Irving's arguments are without merit and should be denied
without a hearing.

In <u>Franks v. Delaware</u>, 438 U.S. 152 (1978), the
Supreme Court authorized the suppression of evidence obtained
pursuant to a warrant only in an extremely narrow category of
cases.  The Court found that because the Warrant Clause requires
a factual showing of probable cause, "the obvious assumption is
that there will be a truthful showing." <u>Id</u>. at 164.  The Court,
however, cautioned that "truthful" does not mean that "every
fact recited in the warrant affidavit is correct." <u>Id</u>. at 165.
Rather, the Court recognized that probable cause may be founded
upon "information within the affiant's own knowledge that
sometimes must be garnered hastily.  But surely it is to be

35

'truthful' in the sense that the information put forth is believed or appropriately accepted by the affiant as true." <u>Id</u>. The Court established a two-part test to determine whether an evidentiary hearing is necessary.  First, "there must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof."  <u>Id.</u> at 171.  Secondly, even if these requirements are met,

> if, when material that is the subject of the
> alleged falsity or reckless disregard is set
> to one side, there remains sufficient
> content in the warrant affidavit to support
> a finding of probable cause, no hearing is
> required.

<u>Id</u>. at 171-172.

Since <u>Franks</u>, courts have interpreted very narrowly the first prong of the <u>Franks</u> test, <u>i.e.</u>, "deliberate falsehood or reckless disregard for the truth."  For example, in <u>United States v. Fermin</u>, 32 F.2d 674, 676 (2d Cir. 1994), the Second Circuit found no "intentional misleading" of the authorizing judge, despite the fact that the supporting affidavit that relied largely on information from a confidential informant failed to mention, among other things, that the CI had stolen a gun from the office of an assistant U.S. Attorney. 32 F.2d at 676.  Furthermore, the <u>burden of proof</u> in showing deliberate falsehood or reckless disregard for the truth <u>rests squarely with the defendant</u>, and any such allegations must make a

36

"substantial preliminary showing" that is "accompanied by an offer of proof. . . . Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence explained." <u>United States v. Labate</u>, 2001 WL 533714, at *17 (S.D.N.Y. May 18, 2001) (quoting <u>Franks</u>, 438 U.S. at 171). Here, Irving supplies only the declaration of her attorney (the "Solano Declaration") in support of her claim, which falls woefully short of demonstrating even a material misstatement or omission, let alone that such was made deliberately or recklessly. As a result, Irving fails to make the "substantial preliminary showing" required under <u>Franks</u>.

Nevertheless, Irving primarily focuses on three alleged omissions in Jackson's application: (1) "that Simels was willing to have the [CW] visit Khan at the MCC," (Irving Mot. at 11); (2) that "Simels considered and interviewed [the CW] as a prospective witness," sought his assistance with respect to the defendant's representation of Khan and "discussed strategy for Khan's upcoming trial," (<u>Id</u>.); and (3) that "during a July 30, 2008 consensual recording between Simels and the [CW], Simels made it abundantly clear  . . . that Simels was 'not paying her to bribe her as a witness' and the witness was not being asked to 'to say anything that was theoretically untrue.'" (<u>Id</u>.).

Irving's first complaint, that the application omitted the fact that Simels sought to arrange a visit between the CW

37


and Khan, while true, is of no moment.  Irving fails to explain
how this fact, if disclosed, would have in any way lessened the
probable cause to believe that the requested interceptions would
reveal the commission of a crime.  To the contrary, the fact
that Simels and Irving sought to arrange a face-to-face meeting
between their client Khan (the leader of a violent drug
organization) and the CW (a former member of his organization),
as opposed to arranging a simple telephone call between the two
which necessarily would have been recorded by the facility, only
serves to confirm that Simels, Irving and Khan sought to enlist
the CW in their illicit efforts to obstruct justice.  In any
event, as discussed further below, by the time the Title III
application was made on July 7, 2008, Simels had already
informed the CW that visiting Khan would not be possible because
of the CW's immigration status. (See Excerpt Transcript, June
20, 2008 ("Simels: If I wasn't so afraid of them picking up on
the fact that you're here beyond your visa, I would gladly have
you go down and see him [Khan].")).

         Irving's second complaint is equally unavailing as it
is simply incorrect.  Irving claims that the Title III
application failed to advise the authorizing judge that Simels
interviewed the CW as a "prospective witness," that he sought
the CW's "assistance" with Khan's trial and "discussed strategy
for Khan's trial" him. (Irving Mot. at 11).  However, contrary

38

to Irving's claim, the affidavit specifically addressed these
issues:

> 21.  During the May 13, 2008 meeting, SIMELS and
> IRVING discussed several matters with CS-1, including
> certain individuals whom they suspected would testify
> against KHAN in the aforementioned federal trial.
> SIMELS asked CS-1 if CS-1 would testify as a defense
> witness in KHAN's case.  When CS-1 expressed a
> willingness to testify, SIMELS and IRVING coached CS-1
> to lie during CS-1 proposed testimony.  SIMELS, who
> was under the impression that CS-1 was not lawfully
> employed, instructed CS-1 as follows: "You do know
> that if you testify you have to say that you have some
> sort of job alright? Whatever that may be, laborer or
> anything, right?  SIMELS further instructed CS-1 to
> testify that KHAN was not the only individual whom CS-
> 1 knew by the name "Short Man," despite the fact that
> CS-1 had told SIMELS that KHAN was the only individual
> whom CS-1 knew by that nickname.  SIMELS told CS-1,
> who had worked for KHAN's narcotics trafficking
> organization in 2005, not to testify that KHAN was a
> drug dealer.

> *     *     *     *

> 22.  During the same meeting, SIMELS and IRVING
> also discussed with CS-1 the whereabouts of several
> individuals whom they believed would be witnesses for
> the government at KHAN's upcoming trial.  CS-1 was
> told that they were looking for several individuals
> whom they suspected might testify for the government,
> including JANE DOE #1 and JOHN DOE #2.  SIMELS further
> reported that he had located JOHN DOE #1, another
> suspected government witness, at a jail in Queens, New
> York.  SIMELS told CS-1 that JOHN DOE #1 was crucial
> to the government's case against KHAN, explaining that
> the entire case is based upon [JOHN DOE #1].

(Ex. C).

Finally, Irving complains that Agent Jackson failed to
reference the contents of a July 30, 2008 consensual recording
between Simels and the CW. (Irving Mot. at 11).  Irving

39

apparently fails to recognize that the Title III application was made July 7, 2008, three weeks <u>before</u> the July 30 consensual recording was even made.

In sum, Irving has plainly failed to show any material misstatement or omission in the Title III application. Accordingly, she has failed to meet her burden and her motion to suppress the Title III recordings should be denied without a <u>Franks</u> hearing.

B.   Alternative Techniques
     Were Properly Considered

Irving alone also moves to suppress the electronic surveillance evidence on the grounds that the government failed to demonstrate a "genuine need" for the court-authorized surveillance of conferences between Khan, Simels and Irving at the MCC. (Irving Mot. at 8-10).  Despite Irving's claim to the contrary, the government's affidavit in support of the Title III demonstrates that the government fulfilled its obligation under 18 U.S.C. § 2518(1)(c) to provide a "full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  Accordingly, Irving's argument is without merit.

The law requires that, before authorizing the interception of electronic communications, other investigative measures must reasonably appear to be unlikely to succeed, be

40

too dangerous, or to have been tried and failed.  See 18 U.S.C.
§ 2518(1)(c) and (3)(c); United States v. Giordano, 416 U.S.
505, 515 (1974); United States v. Kahn, 415 U.S. 143, 153 n.12
(1974).  Such a requirement is "simply designed to assure that
wiretapping is not resorted to in situations where traditional
investigative techniques would suffice to expose the crime."
Kahn, 415 U.S. at 153 n.12.  A wiretap application must provide
a practical basis for concluding that other investigative
techniques are not feasible.  See United States v. Lilla, 699
F.2d 99, 103 (2d Cir. 1983) (citing S. Rep. No. 1097, 90th
Congress, 2d Sess. 101).

          Irving argues that the government's application for
Title III surveillance here failed to demonstrate it had
"exhaust[ed] [a]lternative [i]nvestigative [t]echniques."
(Irving Mot. at 7).  In fact, the purpose of Section 2518 is not
to preclude the government's resort to wiretapping "until after
all other possible means of investigation have been exhausted by
investigative agents."  United States v. Diaz, 176 F.3d 52, 111
(2d Cir. 1999).  Rather, the statute only requires that the
court be informed of the "nature and progress of the
investigation and of the difficulties inherent in the use of
normal law enforcement methods."  Id.  A reviewing court's
determination as to whether this requirement has been met "is
not de novo, but is limited to determining whether that judicial

41

officer had a 'substantial basis' for her determination." <u>United States v. Gotti</u>, 42 F. Supp. 2d 252 (S.D.N.Y. 1999); <u>see also</u>, <u>United States v. Torres</u>, 901 F.2d 205, 231 (2d Cir. 1990).  As a result, a district court's determination that the government satisfied the necessity requirement is rarely disturbed. <u>See</u>, <u>e.g.</u>, <u>United States v. Young</u>, 822 F.2d 1234, 1237 (2d Cir. 1987) (surveillance and undercover operations impossible and other techniques would have been unavailing); <u>United States v. Puglisi</u>, 790 F.2d 240, 241-42 (2d Cir. 1986); <u>but see Lilla</u>, 699 F.2d at 104-05 (necessity not shown where record suggests that other investigative techniques were working).  Here, the Title III application makes clear that Judge Swain had a "substantial basis" for her determination that the requirements under 18 U.S.C. § 2518(1)(c) had been met.

In her affidavit in support of the Title III application, DEA Agent Jackson, with over nine years of law enforcement experience, discussed the various methods used in this investigation, including reviewing MCC visiting logs, carrying out physical surveillance, to the extent possible, of Simels and Irving and conducting consensually-recorded meetings with Simels, Irving and a confidential source, the CW.[21]  (Ex. C, ¶¶ 45-57).  The Title III application also explained the

---

[21]  The CW is referred to in the government's application as "CS-1".

shortcomings of these and other techniques in developing evidence of, <u>inter</u> <u>alia</u>, Khan's role in the plot to obstruct justice.  <u>Id</u>.

For example, Agent Jackson explained that physical surveillance of meetings between the defendants and Khan was impossible because Khan was incarcerated at the MCC and their meetings necessarily occurred in the private attorney visiting area of the facility. <u>Id</u>. at ¶ 46.  Moreover, even if surveillance were possible without disclosing the existence of the investigation, physical surveillance would only have established that the co-conspirators were meeting (a fact of no significance given their pre-existing attorney-client relationship) and would not have revealed the nature of their communications. <u>Id</u>. at 47.  For the same reasons, the introduction of an undercover to infiltrate the conspiracy was not feasible. <u>Id</u>. at 48.  Likewise, continuing to monitor Khan's mail and telephone calls, which Khan knew could be reviewed by prison officials and the government, was unlikely to reveal Khan's role in the plan to obstruct justice in his trial. <u>Id</u>. ¶ 49.

Irving argues that the government "attempted to minimize the value of the investigative assets already at its disposal" in "omitt[ing] [from the Title III affidavit] the fact that Khan's attorneys Simels and Irving were willing and

43

actually began to assist the [CW] in filling out a visit application to the M.C.C. so he could meet with Khan" and presumably record their conversations. (Irving Mot. at 9-10). What Irving fails to mention in her argument is that, while Simels and Irving apparently made efforts to arrange a visit between Khan and the CW at the MCC, the attorneys later informed the CW that visiting Khan would not be possible citing the CW's immigration status. (See Excerpt Transcript, June 20, 2008 ("Simels: If I wasn't so afraid of them picking up on the fact that you're here beyond your visa, I would gladly have you go down and see him [Khan]."")).  In any event, even assuming that the CW could have visited Khan at the MCC and recorded their conversation, the CW would not have been able to record conversations between Khan and his attorneys to which the CW was not a party.

Simply put, Irving's second-guessing of the government's investigative techniques is without merit and fails to demonstrate that the government failed to comply with its obligation under 18 U.S.C. § 2518(1)(c) to provide a "full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  As such, Irving's motion to suppress on these grounds should be denied.

44

C.   The Government Has Properly
     Minimized the Interceptions

          Defendant Simels alone next argues that the government

failed properly minimize the recorded MCC meetings. (Simels Mot.

at 18-23).  Simels maintains that such court-authorized

recordings were "objectively unreasonable" because minimization

occurred after the interceptions were made. (Simels Mot. at 18).

Therefore, according to Simels, all of the wiretap recordings

must be suppressed. (Id. at 23).  However, as shown below, the

minimization procedure employed during the instant investigation

was reviewed and authorized by Judge Swain, and resulted in the

trial team receiving only pertinent portions of the recordings,

and nothing more.  Under the circumstances of this case, the

procedure was reasonable and Simels' motion to suppress the

recordings on these grounds should therefore be denied.

     1.   Applicable Law

          An order authorizing a wiretap interception must

require that the interception "be conducted in such a way as to

minimize the interception of communications not otherwise

subject to interception under this chapter."  18 U.S.C. §

2518(5).  The minimization requirement is intended to insure

that investigators "observe reasonable safeguards against

excessive intrusion."  United States v. Terry, 702 F.2d 299, 312

(2d Cir. 1983); Scott v. United States, 436 U.S. 128 (1978)

("The statute does not forbid the interception of all

                                45

nonrelevant conversations, but rather instructs the agents to
conduct the surveillance in such a manner as to 'minimize' the
interception of such conversations"). Whether the intercept was
conducted in a manner to minimize unauthorized interceptions
must be determined objectively. Scott, 436 U.S. at 137-38.
Thus, the minimization inquiry turns on the "objective
reasonableness without regard to the underlying intent or
motivation" of the law enforcement officers conducting the
intercept and depends on the particular facts of the case. Id.
at 140. United States v. Napolitano, 552 F. Supp. 465, 476
(S.D.N.Y. 1979)("[A] determination as to whether minimization
has been complied with requires an assessment of the
reasonableness of interceptions in light of the purpose of the
wiretap and the totality of the circumstances of each case" )
(citing Scott, at 130). "The minimization requirement is
satisfied if 'on the whole the agents have shown a high regard
for the right of privacy and have done all they reasonably could
to avoid unnecessary intrusion.'" United States v. James, 494
F.2d 1007, 1018 (D.C. Cir. 1974) quoting United States v.
Tortorello, 480 F.2d 764, 784 (2d Cir. 1973).

Courts have examined a variety of factors to determine
whether the government's minimization efforts were reasonable.
For example, if a conspiracy is believed to be widespread, "more
extensive surveillance may be justified in an attempt to

46

determine the precise scope of the enterprise."  Scott, 436 U.S.
at 140.  In the context of a traditional telephone wiretap,
"during the early stages of the surveillance the agents may be
forced to intercept all calls to establish categories of
nonpertinent calls which will not be intercepted thereafter.
Id. at 141.  When members of the conspiracy are believed to
speak in code or use jargon, "criminal conversations [are] more
difficult to detect and decipher" and investigators must be
afforded additional leeway in their surveillance.  United States
v. Uribe, 890 F.2d 554, 557 (1st Cir. 1989).

        Minimization is "normally" done contemporaneously,
that is, as recordings are made.  United States v. David, 940
F.2d 722, 729 (1st Cir. 1991).  However, contemporaneous
minimization is not required under all circumstances.  Id.
Indeed, 18 U.S.C. § 2518(5) specifically permits non-
contemporaneous minimization "[i]n the event the intercepted
communication is in a code or foreign language, and an expert in
that foreign language or code is not reasonably available during
the interception period."

        2.    The Minimization Procedures
              Here Were Reasonable

        The instant case presented a unique situation.  As
established in the Title III application, there was probable
cause to believe attorneys Simels and Irving were conspiring
with their client Khan to obstruct justice, justifying

47

electronic surveillance of their meetings at the MCC.  However,
because the interceptions were expected to record conversations
between attorneys and their client in an attorney visiting room,
investigators endeavored to take "special care . . . to avoid
interception of any privileged communications or the
communications of any individuals other than the SUBJECTS[.]"
(Ex. D at 32).  To that end, the application proposed the
following minimization procedure:

> (a) First, interception of oral communications at
> the SUBJECT LOCATION is initially limited to those
> instances in which the agents and officers conducting
> the interception have reason to believe, through
> physical surveillance, source information, prior
> conduct, or other facts revealed during the course of
> the investigation, that the SUBJECTS are meeting at
> the MCC to engage in conversations regarding the
> criminal activities described above.

> (b) Second, when agents have reason to
> believe that the oral communications of the SUBJECTS
> intercepted at the SUBJECT LOCATION satisfy the
> threshold requirements described in paragraph (a), the
> agents intercepting the meeting will record, but not
> listen to, the communications occurring at the meeting
> (i.e., the monitoring agents will set down their
> headphones but continue to record the conversation).
> The recording(s) of the meeting will then be given to
> different law enforcement officers ("Wall Agents") who
> are not responsible for the investigation and who are
> not one of the case agents.  The Wall Agents will then
> minimize the conversation.  In particular, Wall Agents
> will be instructed to minimize all non-criminal
> privileged communications.  If a conversation is
> minimized, the Wall Agents shall spot check to ensure
> that the conversation has not turned to criminal
> matters.  Next, an Assistant United States Attorney
> who is not otherwise affiliated with this
> investigation (the "Wall AUSA") will review the
> conversation to determine whether the conversations
> are privileged.  Only those conversations that the

48

> Wall AUSA and the Wall Agents determined are not
> privileged will be provided to the DEA Special Agents
> and Assistant United States Attorney's handling his
> investigation.

(Exhibit D at 6-8).  After consideration of the matter, Judge

Swain specifically approved these procedures. (Ex. D at 5-7).

What followed were two meetings between Khan and his

attorneys.  The first meeting, between Irving and Khan, was on

July 24, 2008.  The second meeting, between Simels and Khan,[22]

was on July 29, 2008.  Each meeting lasted a number of hours.

Following the conclusion of each meeting, the government

appropriately minimized the interceptions consistent with the

court's authorization and instructions provided by the

government (Ex. F).

First, a DEA Agent "who [was] not responsible for the

investigation and who [was] not one of the case agents,"

minimized the recording (the "Wall Agent"). (Ex. D at 6-7).

Afterwards, the recording was presented to an "Assistant United

States Attorney who [was] not otherwise affiliated with this

investigation (the 'Wall AUSA')." (Id.).  The Wall AUSA reviewed

the conversations to determine which, if any, portions were

privileged. (Id.).  Only after the Wall Agent and Wall AUSA

completed this process were any portions disclosed to the

Assistant United States Attorneys handling this investigation.

---

[22]  Upon information and belief another individual was
present during a portion of this meeting.

(Id.).  Although the meetings lasted a number of hours, only a
few minutes were deemed pertinent and disclosed.[23]  This
relatively small percentage alone demonstrates that the
government showed "a high regard for the right of privacy and
have done all they reasonably could to avoid unnecessary
intrusion.'" James, 494 F.2d at 1018.

Despite this, Simels charges the government with
failure to minimize under the circumstances.  First, the
defendant claims that the minimization instructions (Ex. F)
demonstrated a conscious abandonment of our legal obligations.
(Simels Mot. at 20).  To the contrary, the instructions were
detailed, thorough and represented a good-faith effort to
satisfy our obligations.  Initially, the instructions delineated
the court ordered procedure by which interceptions were to be
minimized. (Ex. F at 2-4).  This included the installation of

---

[23]  In a letter to the Court of November 12, 2008, the
government explained, with regard to the Title III intercepts
letter to the Court, that: "A Walled AUSA is, however, still
completing the privilege minimization process for these
recordings.  When the minimization process is completed,
recordings of the cleared portions will be provided to the
prosecuting AUSAs and to defense counsel." Id. at 4-5.  The
government further disclosed in a footnote that: "The prosecuting
AUSAs have only listened to limited portions of the recordings
after those portions were cleared by a Wall AUSA."  The
minimization process referenced in the government's letter was a
secondary process that followed the initial minimization process
outlined above.  This secondary process was necessary because the
audio recordings were enhanced.  The only portions of the
interceptions that the prosecutors and investigators in this case
have listened to are those disclosed following the initial
minimization process outlined above.

Wall Agents, Wall AUSAs, as well as the obligation not to disclose matters to the investigating law enforcement officers or prosecutors involved in either the obstruction case or the drug case. (Id.).  Furthermore, the instructions described the various privileges restricted from interception, such as the attorney-client privilege. (Id. at 6-9).  However, the instructions also explained the effect of the "crime fraud exception" to that privilege and the fact that the court had given us specific permission to monitor these communications, given the unique circumstances of the case. (Id. at 7).  When read in totality, as opposed to relying on the defendant's critique, these instructions further demonstrate the government's commitment to effective minimization.

Second, as a general matter, Simels impugns the effectiveness of the "wall" procedure that was used in this case. (Simels Mot. at 21-22).  While certain firewall procedures have received some criticism, as noted in the defendant's papers, the cases cited by Simels do not warrant suppression of the evidence. See Eugenia VI Venture Holdings, Ltd. v. Glaser, No. 05-CV-7262 (DC), 2005 U.S. Dist. LEXIS 28126, (S.D.N.Y. Nov. 15, 2005) (Noting that the Second Circuit has discussed "the efficacy of ethical walls -- 'procedures that may screen and safeguard client confidences.' The Court rejected the view taken by certain district courts that it had, in prior cases, held

51

that ethical walls were 'categorically' ineffective") (quoting Hempstead Video, Inc. v. Inc. Village of Valley Stream, 409 F.3d 127, 132 (2d Cir. 2005)).  For example, in United States v. Kaplan, No. 02-CR-883 (DAB), 2003 U.S. Dist. LEXIS 21825 (S.D.N.Y. Dec. 5, 2003), the court commented that the procedures were of "little use" in that "the FBI case agent was given access to review materials from seized files even before it was determined whether or not the crime-fraud exception applied." Id. at *33.  In the present matter, however, the brief portions of pertinent conversations were disclosed only after an appropriate determination consistent with the wall procedures was made.  Moreover, in Gotti, 04-CR-609 (SIS) , although the court identified "flaws" in the government's procedures, it nonetheless held that they were followed and that minimization was accomplished. ("Therefore, despite the wall procedure's flaws, the government has nonetheless satisfied its initial burden of establishing that minimization requirements were met"). Id. at 38.

        For all these reasons, the Court should deny the defendant's motion to suppress.  The minimization process was reasonable under the unique circumstances of this case and demonstrated a "high regard for the right of privacy and [the government has] done all [it] reasonably could to avoid unnecessary intrusion.'" James, 494 F.2d at 1018.

POINT FOUR

THE COURT SHOULD CONDUCT AN AUDIBILITY HEARING

At trial, the government intends to offer into evidence, among other things, portions of audio and video recordings, obtained pursuant to Title III, of two meetings between Khan, Simels and Irving in the attorney's visiting area of the MCC.[24]  The audio and video recordings have previously been provided to the defense.  Both Simels and Irving contend that the these recordings are so inaudible they are unreliable and, therefore, should be precluded in their entirety. (Simels Mot. at 23; Irving Mot. at 15).  While the government disagrees with the defendants' characterization of these recordings, for the reasons set forth below, it agrees that the Court should conduct an audibility hearing.

The defendants correctly note in their motion papers that the proper procedure for determining the admissibility of a challenged recording or transcript is for the district court to conduct an audibility hearing.  United States v. Bryant, 480 F.2d 785, 790 (2d Cir. 1973).  The admissibility of audio recordings is within the sound discretion of the district court. United States v. Arango-Correa, 851 F.2d 54, 58 (2d Cir. 1988); Bryant, 480 F.2d at 790; United States v. Kaufer, 387 F.2d 17,

---

[24]  The first meeting, on July 24, 2008, occurred between Khan and Irving.  The second meeting, on July 29, 2008, occurred between Khan and Simels.

19 (2d Cir. 1967) ("This question of degree of audibility is a matter of the trial judge's sound discretion.") (citation omitted).  The Second Circuit has held that "[t]he mere fact that some portions of a tape recording are inaudible does not by itself require exclusion of the tape. . . . Our decisions in this area reveal a clear preference for the admission of recordings notwithstanding some ambiguity or inaudibility, as long as the recordings are probative." Arango-Correa, 851 F.2d at 58 (citation omitted); see also United States v. Weiser, 428 F.2d 932, 937 (2d Cir. 1969) ("That some portions of the tapes were inaudible does not necessarily render the entire conversation inadmissible.") (citation omitted).  In Arango-Correa, the Second Circuit found that "the district court correctly focused on the probative nature of the tapes, and not merely their audibility."  Id. at 58-59.

To facilitate the audibility hearing, the government proposes that, in advance of trial, on a date determined by the Court, it will supply the Court and the defense with a set of transcripts for each recorded meeting, highlighting only those portions of the recordings the government will play at trial.

POINT FIVE

THE EVIDENCE RECOVERED FROM THE
SEARCH OF SIMELS' LAW OFFICE
SHOULD NOT BE SUPPRESSED

Simels seeks to suppress the items recovered from his law office based upon a variety of claims.  First, in relation to the electronic eavesdropping equipment, Simels argues that the affidavit failed to articulate probable cause that the equipment was likely to be found at the office.  Second, Simels claims that the affidavit failed to articulate probable cause for two specific items for which authority to search and seize was granted, referred to as Items 3 and 4.  Finally, Simels complains that the agents conducting the search disregarded the terms of the warrant and seized items beyond its scope.  For the reasons discussed below, Simels' claims are unpersuasive.

A.   The Court Properly Authorized
     the Government to Seize the
     Electronic Eavesdropping Equipment

Simels challenges the recovery of the electronic eavesdropping equipment based on a claim of staleness and lack of particularity. (Simels Mot. at 29-31).  In essence, the defendant argues that the government failed to articulate probable cause that the equipment would be located at the law office and that, even if it had, the evidence supporting such a finding was stale.  The defendant's argument is without merit.

In Illinois v. Gates, 462 U.S. 213 (1983), the Supreme

55

Court held that a probable cause determination requires a
"totality-of-the-circumstances approach" and that "[p]robable
cause is a fluid concept -- turning on the assessment of
probabilities in particular factual contexts." 462 U.S. at 232.
The Supreme Court further held that "it is clear that 'only the
probability, and not a prima facie showing, of criminal activity
is the standard of probable cause'" and noted that probable
cause is established if "there is a fair probability that
contraband or evidence of a crime will be found in a particular
place." Id. at 235, 238 (quoting Spinelli v. United States, 393
U.S. 410, 419 (1969)).  Notably, probable cause does not mean
more likely than not, but only a "probability or substantial
chance of criminal activity." United States v. Bakhtiari, 913
F.2d 1053, 1062 (2d Cir. 1990); Wagner, 989 F.2d at 72 ("The
quanta of proof necessary to establish probable cause is 'only
the probability, and not a prima facie showing, of criminal
activity.") (citing Gates, 462 U.S. at 235 (quoting Spinelli,
393 at 419)).  Further, "after-the-fact scrutiny by courts of
the sufficiency of an affidavit [applying for a warrant] should
not take the form of de novo review.  A magistrate's
'determination of probable cause should be paid great deference
by reviewing courts.'" Gates, 462 U.S. at 236 (quoting Spinelli,
393 U.S. at 419); see also United States v. Leake, 998 F.2d
1359, 1363 (6th Cir. 1993)).  Applying these principles to the

instant matter, the magistrate judge's determination that there
was probable cause to believe that the electronic eavesdropping
equipment would be found at Simels' law office was clearly
appropriate.

In pertinent part, Agent Jackson's affidavit provided
the following articulation of facts:

12. The investigation has also revealed that
Simels is in possession of illegal eavesdropping
equipment.  In particular, during the course of his
representation of Khan, Simels disclosed various
telephone conversations that he intended to introduce
at trial.  According to the CS, prior to his arrest,
Khan used a computer while in Guyana to
surreptitiously record telephone conversations of
individuals.  I believe that the conversations
disclosed by Simels were captured using Khan's
eavesdropping equipment that is now in the possession
of Simels.  My belief is corroborated by records
maintained by the Department of Homeland Security,
Bureau of Customs and Border Protection ("CBP").
According to those records, on or about October 11,
2007, prior to the disclosure of the recorded
conversations, equipment identified as a "PORTABLE
AUTO DATA PROCESSING MACH[INE]", was shipped from
Guyana to Simels at the PREMISES. CBP records further
document that from October 9, 2007 to October 12,
2007, Simels was in Guyana.  Furthermore, on July 18,
2008, during a recorded conversation with the CS,
Simels confirmed that he is in "control" of "Roger's
[Khan's] triangulation equipment" and that it "is in
the right hands."  According to the CS, he understood
the equipment referred to by Simels to be the same
equipment used by Khan to intercept telephone
conversations.  Based upon the foregoing, I believe
that while he was in Guyana, Simels received Khan's
illegal eavesdropping equipment and shipped it to his
office (the "PREMISES") in the United States.  Once
there, Simels retrieved intercepted communications
from the computer and disclosed them.

(Ex. G).

57

From this, the magistrate judge was able to clearly find that
Simels had ready access to the equipment, hence his ability to
disclose the illegal recordings to the government.  Moreover,
the fact that he disclosed those recordings in his capacity as
Khan's attorney supported a finding that the equipment was in
his law office.  These findings were corroborated by Simels'
statement to the CW on July 18 that he was in possession of the
electronic eavesdropping equipment, _i.e._, that "he [wa]s in
'control' of 'Roger's [Khan's] triangulation equipment' and that
it 'is in the right hands.'"[25]  The judge could equally find that
the "PORTABLE AUTO DATA PROCESSING MACH[INE]" shipped directly
to the defendant's law office from Guyana while Simels was in

---

[25]  The relevant portion of the July 18 meeting is as
follows:

| | |
|---|---|
| CW: | Why is he [Khan] still maintaining the information, the triangulation equipment? |
| Simels: | What about it? |
| CW: | I thought he [Khan] would have just erased it. You know keep it free, in case it land in the wrong hands. |
| Simels: | It's not in the wrong hands. |
| CW: | Alright. |
| Simels: | It's in the right hands. |
| CW: | Alright. |
| Simels: | We have, I have control of it. |

(Excerpt Transcript, July 18, 2008).

Guyana was the equipment at issue.  Indeed, prior to his arrest, Khan was using the equipment in Guyana.

Second, with respect to Simels' challenge based on staleness, the Second Circuit has explained that "[w]here the supporting affidavit[] present[s] a picture of continuing conduct or an ongoing activity, as contrasted with isolated instances of illegal acts, the passage of time between the last described act and the presentation of the application becomes less significant." United States v. Martino, 664 F.2d 860, 867 (2d Cir. 1981); see also Wagner, 989 F.2d at 75 (citing United States v. Fama, 758 F.2d 834, 838 (2d Cir. 1985); United States v. Barlin, 686 F.2d 81, 87-88 (2d Cir. 1982)).  Moreover, "the passage of time is not controlling and is but one factor to be considered, along with the kind of property sought and the nature of the criminal activity, in resolving the issue of probable cause for a search warrant." United States v. Singh, 390 F.3d 168, 181-82 (2d Cir. 2004); see also United States v. Lacy, 119 F.3d 742, 745-46 (9th Cir. 1997) (observing that mere lapse of substantial amounts of time is not controlling on question of staleness of information in search warrant affidavit; rather, staleness is evaluated in light of the particular facts of the case and nature of criminal activity and property sought).

In this case, Agent Jackson set forth in her affidavit

59

facts that "present [such] a picture of continuing conduct or ongoing activity," <u>Martino</u>, 664 F.2d at 867, making the passage of time that the defendant objects to inconsequential.  Indeed, the facts presented demonstrated that Simels imported the electronic eavesdropping equipment and continued to possess it, all in violation of 18 U.S.C. § 2512(1)(a) and (b).  By its very nature, the control and possession of the equipment, as admitted to by Simels, constituted an ongoing crime.  Furthermore, the amount of time between Simels' statement and the issuance of the warrant was less than two months.  In light of the foregoing, the evidence presented to the magistrate judge was not stale and justified the issuance of the search warrant.

In addition to the foregoing, we note that the defendants do not object to the seizure of the computers.  Upon information and belief, the electronic eavesdropping equipment appears to be nothing more than a laptop computer.  As such, even assuming that the probable cause showing for the electronic eavesedropping equipment was deficient, which it was not, the government lawfully seized the equipment pursuant to the warrant's authority to seize computers found within the law office.  Upon subsequent inspection, the government would have inevitably discovered that it was the equipment at issue. <u>United States v. Roberts</u>, 852 F.2d 671, 675-76 (2d Cir.), <u>cert</u> <u>denied</u>, 488 U.S. 993, 102 (1988) (quoting <u>Nix v. Williams</u>, 467 U.S. 431,

447, (1984)) (Under the inevitable discovery doctrine, "evidence
that was illegally obtained will not be suppressed 'if the
government can prove that the evidence would have been obtained
inevitably' even if there had been no statutory or
constitutional violation.")

For all these reasons, the Court should deny Simels'
motion to suppress the electronic eavesdropping equipment.

B.    The Court Properly Authorized
      the Recovery of Items 3 and 4

Simels also seeks to suppress enumerated Items 3 and 4
of the warrant.  Those items are described in the search warrant
as follows:

> 3.   Any and all appointment books, telephone log
> books, or other records reflecting appointments and
> telephone calls for the period from October 2007
> through and including September 2008.

> 4.   Any and all retainer agreements between
> Robert M. Simels and/or Arienne J. Irving and Shaheed
> Khan, also known as "Roger Khan," "Short Man," and
> "Boss Man."

(Ex. H (Attachment)).  With regard to Item 3, the defendant
argues that the description was not particular enough, that is,
it "did not limit the search to the particular client and
matter" and improperly authorized the recovery of materials
beginning in October 2007. (Simels Mot. at 31-32).  As for Item
4, the defendant suggests, without any basis for its
suppression, that the government had impure motives for
requesting this material and should have otherwise sought it by

61

subpoena. (Simels Mot. at 32-33).  The defendant's motion is
without merit in all respects.

        To satisfy the Fourth Amendment, a warrant must be
"sufficiently specific to permit the rational exercise of
judgment [by the executing officers] in selecting what items to
seize." United States v. LaChance, 788 F.2d 856, 874 (2d Cir.
1986) (internal quotation marks omitted).  "A failure to
describe the items to be seized with as much particularity as
the circumstances reasonably allow offends the Fourth Amendment
because there is no assurance that the permitted invasion of a
suspect's privacy and property are no more than absolutely
necessary." United States v. George, 975 F.2d 72, 76 (2d Cir.
1992).  In raising his objections to the materials described in
Item 3 of the search warrant, Simels does not contend that the
description of materials was not "particular," nor can he.  The
description is a specific and readily identifiable list of
records.  Instead, Simels argues that the warrant was overbroad
because the government failed to articulate probable cause for
these items. (Simels Mot. at 31).  Simels suggests that Item 3
should have been restricted to "the particular client and matter
- [his] representation of Khan" and the time frame of the
"alleged conspiracy to tamper with witnesses." (Id.).  The
defendant's argument conflates the concepts of probable cause
with particularity, but to no avail.

In the first instance, Simels' claim that Item 3 was not limited to Khan, is simply wrong.[26]  As detailed in the last paragraph of the attachment to the warrant, Item 9:

> 9. While the warrant is being executed, every effort will be made to avoid disrupting the law practice of Simels and Irving, and the law practice and business of any other occupants of the PREMISES. Every effort will also be made to avoid the examination of files or documents, including computer files, relating to clients or matters not covered by this Attachment.  Computers will be seized only if it is necessary to access and review the files pertaining to the matters covered by this Attachment.

(Ex. H (Attachment))(emphasis added).  As such, the scope of the warrant was clearly limited to those records that related to Khan.

Second, there was probable cause to recover the materials described in Item 3 of the search warrant, generally described as records reflecting appointments and telephone calls.  As discussed throughout Agent Jackson's affidavit, Simels was using his law office to commit crimes, from conspiring to obstruct justice to storing illegal electronic

---

[26]  Simels avers that the description "authorized agents to seize all of Mr. Simels' appointment records and notes of presumably privileged conversations with other clients for almost an entire year." (Simels Mot. at 31).  Despite this proclamation, Simels does not state that the agents actually took such records. In any event, to the extent the government recovered items that are outside the scope of the warrant, the proper remedy is their suppression, rather than the suppression of all the materials. United States v. Matias, 836 F.2d 744, 747 (2d Cir. 1988) ("when items outside the scope of a valid warrant are seized, the normal remedy is suppression and return of those items, not invalidation of the entire search") (citations omitted) .

eavesdropping equipment. (Ex. G).  For example, with regard to the CW, Simels was meeting with him at the law office and speaking with him over the telephone. (Id. at ¶ 10).  Moreover, at the time the warrant was issued, there was a pending meeting scheduled between Simels and Jane Doe #2, a person Simels agreed to pay for her testimony. (Id. at ¶¶ 35-36).  Clearly, records of the type described in Item 3 were relevant to the investigation and, to the extent they existed, there was probable cause that they would contain evidence of the crimes charged.

Finally, the probable cause for these records was not limited simply to the time period in which Simels was dealing with the CW, May 2008 to September 2008, but preceded it. Indeed, telephone and appointment records would confirm that Simels was in Guyana at the time the government alleges that he sent the eavesdropping equipment, in October 2007.  Furthermore, the affidavit explains that the CW contacted Simels at the direction of members of Khan's criminal organization.  As such, telephone records and appointment books demonstrating contact with those members would constitute relevant evidence and necessarily precede the involvement of the CW in May 2008.

In seeking the suppression of Item 4, the defendant offers no legal support.  Rather, the defendant challenges the government's motives for requesting these materials and charges

that its actions violated a section of the United States Attorney's Manual. (Simels Mot. at 32-33).  None of these claims carry any merit.

First, the defendants are charged for their illegal conduct while acting in their capacities as lawyers for Khan. Indeed, their special relationship with Khan provided them with the knowledge, intent and motive to commit the crime of obstructing justice on his behalf.  Clearly, evidence documenting this special relationship, such as the contested retainer agreements, is relevant and material.

Moreover, this Office did not violate any section of the United States Attorney's Manual in seeking this evidence. The section referred to by Simels cautions against "impinging on valid attorney-client relationships" and instructs prosecutors "to take the least intrusive approach consistent with vigorous and effective law enforcement". U.S. Attorney's Manual 9-13.420 (Dec. 2006).  To such end, the section suggests that prosecutors consider the use of, among other methods, subpoenas. Id. However, the section further instructs prosecutors to take such alternative steps "unless such efforts could compromise the criminal investigation or prosecution, or could result in the obstruction or destruction of evidence, or would otherwise be ineffective."[27] Id.  Based upon the foregoing, Simels avers that

_____

[27] Simels conspicuously omits this portion of the Guideline from his papers.

the retainer agreements should be suppressed because it was
sought through a warrant, as opposed to a subpoena. (Simels Mot.
at 33).  This argument is specious.

        The United States Attorney's Manual does not provide a
legal basis for the suppression of evidence. See United States
v. Le, 306 F. Supp. 2d 589 (E.D. Va 2004)("This conclusion is
bolstered by the fact that internal DOJ guidelines do not create
any substantive or procedural rights for a defendant")
(collecting cases).  As specifically articulated in § 1-1.100,
the United States Attorneys' Manual "is not intended to, does
not, and may not be relied upon to create any rights,
substantive or procedural, enforceable at law by any party in
any matter civil or criminal."  Accordingly, Simels reliance on
the United States Attorney's Manual as a basis for suppression
is misplaced.

        Additionally, § 9-13.420 is not even applicable.
Indeed, a retainer agreement does not constitute "privileged"
material and would, therefore, fall outside the scope of this
guideline.  In re Two Grand Jury Subpoenae Duces Tecum Dated
August 21, 1985, 793 F.2d 69 (2d Cir, 1986) ("We have
consistently held that, 'absent special circumstances, client
identity and fee information are not privileged.'" (quoting In
re Grand Jury Subpoena Served Upon John Doe, Esq., 781 F.2d 238,
247 (2d Cir.) (en banc), cert. denied, 475 U.S. 1108 (1986))).

Moreover, the defendant cannot credibly claim that his receipt of a grand jury subpoena, as the target of an investigation, would have been effective.  Indeed, such an act would have, at a minimum, disclosed the existence of the investigation and contravened the guideline's stated goal.

In any event, as evidenced by his pending motion, the defendant has not lost any right to object to the government's ability to retain or use these agreements, simply because they have been taken by a warrant, as opposed to some other form of compulsory disclosure.

Based upon these reasons, the Court should deny Simels' motion to suppress Items 3 and 4.

C.   The Court Should Not Suppress
     the Fruits of the Search

Finally, Simels seeks to suppress all of the materials recovered during the search of his law office, claiming that the paper records recovered were outside the scope of the warrant. (Simels Mot. at 34).  Simels' request should be denied.

In the first instance, the Second Circuit has stated "when items outside the scope of a valid warrant are seized, the normal remedy is suppression and return of those items, not invalidation of the entire search". Matias, 836 F.2d at 747 (citations omitted); see also United States v. Longo, 70 F. Supp. 2d 225, 252 (W.D.N.Y. 1999) ("[R]emedy with respect to any items exceeding the scope of the warrant [is not] invalidation

67

of the search but suppression of those items.")(citing George,
975 F.2d at 79).  Blanket suppression, of the type requested by
Simels, has been referred to by the Second Circuit as a "drastic
remedy." Matias, 836 F.2d at 748; see generally United States v.
Foster, 100 F.3d 846, 852 (10th Cir. 1996)(commenting that "the
extreme remedy of blanket suppression should only be imposed in
the most extraordinary of cases") (internal quotation marks
omitted).  The instant matter is not "the most extraordinary of
cases" that warrants the "drastic remedy" sought by the
defendant.

          "[W]holesale suppression is required only when (1)
[the agents] effect a 'widespread seizure of items that were not
within the scope of the warrant,' and (2) do not act in good
faith." United States v. Liu, 293 F.3d 138 (2d Cir. 2000).  Such
is not the case here.  The search was conducted at an attorney's
office.  Given the fact that the agents walked out with what has
been described as a box and a half of records demonstrates that
they acted with restraint.  This is further evidenced by the
defendant's own description that, of the recovered items, only
"handfuls" of documents unrelated to Khan were recovered.
(Simels Mot. at 35).  This defies the definition of a "general
search" that is an indiscriminate "rummaging" or wholesale
collection of items. See United States v. Dzialak, 441 F.2d 212,
217 (2d Cir. 1971) (general search found where agents "in

68

executing what was a very precise warrant, [] spent more than four hours ransacking a[] house for any possible incriminating evidence," and "of the items seized, those which were not described in the warrant far outnumbered those described").

Moreover, even if some items outside the scope of the warrant were initially seized that, in and of itself, would not constitute a violation of the law under the warrant that was issued in this case.  As part of the search warrant, Magistrate Judge Gorenstein issued special procedures. (Ex. G).  Those procedures instructed that, after law enforcement seized materials covered by the warrant, the items would be inspected by "wall AUSAs" to insure that the recovered materials did not constitute privileged materials.  That procedure, later overseen by this Court, has resulted in the disclosure to the prosecution team of approximately 18 documents, some of which have been heavily redacted.  This result further defies the definition of a "general search" conducted in "bad faith" requiring "blanket suppression."

To the extent that this was not completed at the time the materials were initially seized is of no moment.  The Fourth Amendment does not specify that search warrants contain expiration dates.  Indeed, federal courts that have considered the validity of searches conducted after the expiration of the warrant have concluded that completing a search shortly after

69

the expiration of a search warrant does not rise to the level of a constitutional violation and cannot be the basis for suppressing evidence seized so long as probable cause continues to exist, and the government does not act in bad faith.  See United States v. Burke, 517 F.2d 377, 386-87 (2d Cir. 1975); see also United States v. Twenty-Two Thousand, Two Hundred Eighty Seven Dollars ($22,287.00) United States Currency, 709 F.2d 442 (6th Cir. 1983).  The same logic applies to the present situation.

        Finally, based upon his general description of records that he believes to be outside the scope of the warrant, it appears that Simels' objection is that the government took Khan's case file.  However, now that Khan has pled guilty, Simels is no longer his attorney, and Khan has specifically authorized the government to have these records.  Even assuming arguendo that the records recovered were outside the scope of the warrant at the time they were seized, suppression is unwarranted.  Indeed, as set forth above, Khan has specifically waived any claim of privilege in connection with the records and consented to the disclosure of those records to the government. Because the file belongs to the client, see Klienman v. O'Neill, No. 03-CV-3829, 2008 WL 5582453 (E.D.N.Y. Dec. 30, 2008) (ordering attorney to provide former client entirety of case file, including work product); In the Matter of Sage Realty

70

Corp. v. Proskauer Rose Goetz & Mendlesohn, 91 N.Y.2d 30, 36
(1997) (recognizing "an expansive general right of the client to
the contents of the attorney's file, upon termination of the
attorney-client relationship, [as it] more closely conforms to
the position taken by the courts of this State on the client's
broad rights to the contents of the file when representation
ceases on a matter still pending"), the government is entitled
to retain these records as a result of Khan's authorization.
Cf. Murray v. United States, 487 U.S. 533 (1988) (rejecting
suppression of evidence initially discovered during illegal
search, but later obtained by lawful means through independent
source).  Accordingly, to the extent that the government is in
possession of portions of Khan's client file outside the scope
of the warrant, we are entitled to retain those records as we
have been given permission by the former client.

        For all these reasons, the Court should deny Simels'
request to suppress the fruits of the search.

71

POINT SIX

THE INDICTMENT AGAINST IRVING
SHOULD NOT BE DISMISSED

Defendant Irving moves to dismiss the indictment on the ground that there is insufficient evidence against her to support its sole charge of obstruction of justice. (Irving Mot. at 16-17).  Specifically, Irving alleges that her actions were merely that of a "law associate working at a law firm" and that she simply "visited a client and ask[ed] the client questions . . . [and] attend[ed] a meeting with a prospective witness." Id. at 16.  According to Irving, this Court "should use its inherent supervisory power" to dismiss the indictment against her. Id. (citation omitted).  As set forth below, Irving's motion to dismiss should be denied because the indictment clearly establishes the requisite elements of the crime and provides adequate notice of the charges against her.

"An indictment returned by a legally constituted and unbiased grand jury, . . . if valid on its face, is enough to call for trial of the charge on the merits."  Costello v. United States, 350 U.S. 359, 363 (1956).  See also United States v. Blitz, 533 F.2d 1329, 1344 (2d Cir. 1976). "Unless the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial . . ., the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment."  United States

72

v. Alfonso, 143 F.3d 772, 776-77 (2d Cir. 1998).  See also
United States v. Payden, 613 F. Supp. 800, 809 n.4 (S.D.N.Y.
1985) ("A general claim that the evidence presented was legally
inadequate is not a valid ground for dismissal of the
indictment."); United States v. Gonzalez, 38 F.R.D. 326, 328
(S.D.N.Y. 1965) ("[A] claim that the evidence presented to a
grand jury was incompetent or inadequate is not a ground for
inspection or dismissal of the indictment."); United States v.
Aleman, 286 F.3d 86, 92 (2d Cir. 2002.) (district court should
avoid deciding on a pretrial motion issues relating to a
defendant's criminal liability).

        Here, Irving's claim that there is insufficient
evidence to support the indictment is based only on her reading
of the government's limited proffer of the evidence - that
contained in its application in support of its Title III
application - which was tailored to satisfy that limited purpose
and by no means constituted a full proffer of the government's
evidence against Irving.  Indeed, in concluding that the
evidence is insufficient to support the charge against her,
Irving ignores all of the other evidence proffered by the
government, such as that contained in the affidavits in support
of her arrest warrant and the search of her office, each of
which established probable cause to believe Irving committed the

crime charged.  Accordingly, Irving's motion to dismiss the indictment should be denied.

POINT SEVEN

THE GOVERNMENT WILL PROVIDE A
LIMITED BILL OF PARTICULARS

The defendant Simels seeks a limited bill of particulars "specifying the prospective witness(es) at issue." (Simels Mot. at 40).  The government has agreed to provide defense counsel with the identities of those witnesses with whom the defendants are alleged to have sought to tamper.  The parties have agreed that the disclosure will be governed by a consensually-executed protective order, which is being drafted at this time.

In light of the government's agreement to provide the information requested, Simels' motion for a limited bill of particulars is moot.

75

CONCLUSION

For the reasons outlined above, it is respectfully requested that the defendant's motion be denied in its entirety.

Dated:     Brooklyn, New York
           March 27, 2009

                                   Respectfully submitted,

                                   BENTON J. CAMPBELL
                                   United States Attorney
                                   Eastern District of New York
                                   271 Cadman Plaza East
                                   Brooklyn, New York 11201


Steven L. D'Alessandro
Morris J. Fodeman
Assistant U.S. Attorneys
      (Of Counsel)

76