UNITED STATES DISTRICT COURT                    <u>ELECTRONIC PUBLICATION ONLY</u>
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

UNITED STATES OF AMERICA,

             -against-                                        MEMORANDUM
                                                             <u>AND ORDER</u>
                                                             08-CR-640 (JG)

ROBERT SIMELS and ARIENNE IRVING,

                    Defendants.
-----------------------------------------------------------x
A P P E A R A N C E S :

        BENTON J. CAMPBELL
              United States Attorney
              Eastern District of New York
              271 Cadman Plaza East
              Brooklyn, New York 11201
        By:   Steven L. D'Alessandro
              Morris J. Fodeman
              *Attorneys for the United States*
              *of America*

        LAW OFFICES OF GERALD L. SHARGEL
              570 Lexington Avenue, 45th Floor
              New York, NY 10022
        By:   Gerald L. Shargel
              Evan L. Lipton
              *Attorneys for Defendant Robert Simels*

        LAW OFFICES OF JAVIER A. SOLANO, PLLC
              350 Fifth Avenue, Suite 5900
              New York, NY 10118
        By:   Javier A. Solano
              Lawrence K.W. Berg
              *Attorneys for Defendant Arienne Irving*

JOHN GLEESON, United States District Judge:

              Defendants Robert Simels and Arienne Irving moved for various forms of pre-

trial relief, including suppression of certain communications recorded pursuant to Title III of the

1

Omnibus Crime Control and Safe Street Act of 1968, 18 U.S.C. §§ 2510 *et seq.* ("Title III"). I ruled on most of the motions after oral argument on April 17, 2009, but I reserved decision on whether the government violated Title III's minimization requirement, and, if so, whether the violation warrants the suppression of the recordings at issue.

Because the targets of the electronic surveillance were two lawyers and their client, the government sought and obtained court approval of a special minimization procedure for the interception of communications. The procedure, though well-intentioned, was neither necessary nor authorized by Title III. In addition, despite proposing the customized minimization provisions, the government left the standard minimization provision in its proposed order. When the authorizing court issued that order, the government could not conduct the surveillance without violating one of the two provisions. As discussed below, I now grant the motion to suppress the fruits of the Title III surveillance.

BACKGROUND

In June 2006, Shaheed Khan was arrested on narcotics trafficking charges and detained at the Metropolitan Correction Center ("MCC"). Khan was represented in that case by, among others, Robert Simels and Arienne Irving. During the course of the representation, the government began to investigate allegations that Simels and Irving were conspiring with Khan to influence potential witnesses against him.

Pursuant to this investigation, the government applied for authorization to electronically intercept communications involving Khan and Simels or Irving (or all three of them) in the attorneys' visiting rooms on the third floor of the MCC. On July 7, 2008, Judge Laura Swain of the United States District Court for the Southern District of New York issued an

order authorizing the surveillance. The order contained two provisions concerning minimization; both had been proposed by the government.

First, the order provided "that all monitoring of oral communications shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under [Title III], including but not limited to privileged communications between the subjects and interceptees." Gov. Mem. Ex. D ("July 7 Order") at 5.[1]

Second, the order directed

that, to avoid interception of any privileged communications or the communications of any individuals other than the subjects during the interception of oral communications at the subject location, pursuant to [18 U.S.C. § 2518(5)], the following additional procedures be employed . . .

(a) First, interception of oral communications at the subject location is initially limited to those instances in which the agents and officers conducting the interception have reason to believe, through physical surveillance, source information, prior conduct, or other facts revealed during the course of the investigation, that the subjects are meeting at the MCC to engage in conversations regarding the criminal activities described above.

(b) Second, when agents have reason to believe that the oral communications of the subjects intercepted at the subject location satisfy the threshold requirements described in subparagraph (a), the agents intercepting the meeting will record, but not listen to, the communications occurring at the meeting (i.e., the monitoring agents will set down their headphones but continue to record the conversation). The recording(s) of the meeting will then be given to different law enforcement officers ("Wall Agents") who are not responsible for this investigation and who are not one of the case agents. The Wall Agents will then minimize the conversation. In particular, the Wall Agents will be instructed to minimize all non-criminal or privileged oral communications. If a conversation is minimized, the Wall Agents shall spot check to ensure that the conversation has not turned to criminal matters. Next, an Assistant United States Attorney who is not otherwise affiliated with this investigation (the "Wall AUSA") will review the conversations after they have been minimized by the Wall Agents to determine whether the

---

[1] The July 7 Order uses all capitals for terms like "SUBJECTS" and "INTERCEPTEES." In quoting from it here, I do not follow this convention. Those particular terms are not defined by the order, but the context makes clear that they mean the same as the phrases "SUBJECT INDIVIDUALS" and "SUBJECT INTERCEPTEES," which are defined as Simels, Irving and Khan. July 7 Order at 1.

conversations are privileged. Only those conversations that the Wall AUSA and the Wall Agents determine are not privileged will be provided to the DEA Special Agents and Assistant United States Attorneys handling this investigation.

July 7 Order at 5-7 (capitalization omitted).

Pursuant to the order, two meetings were recorded. The first was between Irving and Khan on July 24, 2008. The second, which took place on July 29, 2008, involved Simels and Khan. Simels maintains that one of the meetings also involved a jury consultant, and the government concedes that a third party was present during the initial portion of that conversation.

The government followed only the second of the two minimization directives quoted above, and thus the meetings were recorded in their entirety and not contemporaneously monitored. Each meeting "lasted a number of hours," Gov't Mem. 49, but the post-interception minimization process yielded only "a few minutes" of pertinent, nonprivileged conversation. *Id.* at 50.

On September 18, 2008, a grand jury returned the indictment in this case against Simels, Khan, and Irving for conspiring to obstruct justice, in violation of 18 U.S.C. § 1512(k). Khan subsequently pleaded guilty, and the indictment against Simels and Irving has since been superseded in ways that have no bearing on the outcome of this motion.

DISCUSSION

Simels contends that the two conversation recorded in the MCC must be suppressed because the government failed to minimize the interception of non-pertinent communications.

4

A.	*Title III's Minimization Requirements*

Title III regulates "wiretapping and other forms of electronic surveillance." *Scott v. United States*, 436 U.S. 128, 130 (1978). As a general matter, it provides that persons who engage in such surveillance risk criminal and civil penalties unless the surveillance is authorized by the statute: "Except as otherwise specifically provided in this chapter any person who . . . intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication . . . shall be punished as provided in subsection (4) or shall be subject to suit as provided in subsection (5)."[2] 18 U.S.C. § 2511(l)(a). The Attorney General or his delegate "may authorize an application to a Federal judge of competent jurisdiction for, and such judge may grant in conformity with section 2518 of this chapter an order authorizing or approving the interception of wire or oral communications by [an investigating agency] when such interception may provide or has provided evidence of . . . [any of numerous listed offenses]."[3]  18 U.S.C. § 2516(1).

Section 2518 provides detailed procedures for the issuance and execution of judicial orders "authorizing or approving the interception of a wire, oral or electronic communication." 18 U.S.C. § 2518(1). It details when and how an "investigative or law enforcement officer" may apply to a federal judge for such an order, *id.* at § 2518(1), the circumstances under which a judge may issue an order, *id.* at § 2518(3), and the specific information the order must contain. *Id.* at § 2518(4). It further provides that "[e]very order . . .

---

[2]	"'[I]ntercept' means the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4). It is undisputed that the government "intercepted" the conversations at the MCC that are the subject of the instant motion.

[3]	The numerous listed offenses include obstruction of justice and conspiring to obstruct justice, in violation of 18 U.S.C. § 1512. *See* § 2516(1)(c).

shall contain a provision that the authorization to intercept . . . shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter . . . ." 18 U.S.C. § 2518(5). In 1986, this minimization requirement was amended to add a provision on which the government relies heavily in its opposition to the defendants' motion to suppress. Congress added the following language to § 2518(5): "In the event the intercepted communication is in a code or foreign language, and an expert in that foreign language or code is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception." 18 U.S.C. § 2518(5).

The terminology used by Congress in the 1986 amendment is unfortunate. In my view it tends to confuse, and it is likely responsible for confusion in the Title III order in this case. As described above, the order contained two minimization provisions -- one based on the standard directive that has been in § 2518(5) from its inception and the other apparently based on the "code or foreign language" provision added in 1986. The first instruction used language borrowed directly from § 2518(5) and appears in virtually all orders authorizing electronic surveillance. Accordingly, I refer to it here as the "Standard Minimization" provision. It required that the monitoring "be conducted in such a way as to minimize the interception of communications not otherwise subject to interception." July 7 Order, at 5; *see also* § 2518(5). Since, as noted above, a conversation is "intercepted" when its content is either overheard or acquired by electronic recording, *see* § 2510(4), this standard minimization language required the contemporaneous minimization that typically occurs when Title III orders are executed. By definition, an agent cannot minimize the *interception* of communications that should not be intercepted by intercepting all communications and sorting them out later.

The second minimization provision in the order, however, prescribed precisely such a post-interception protocol. It was tailored for this particular investigation because all of the conversations targeted by the order would involve an attorney (or two) meeting with the attorney's client. I refer to this minimization protocol here as the "Post-Interception Minimization" provision. It directed the agents to record (without listening to) all communications between Simels or Irving and their client, and provided for after-the-fact minimization by "Wall Agents" and a "Wall AUSA." The Post-Interception Minimization provision thus had a built-in anomaly: Its stated purpose was "to avoid interception of any privileged communications" between Khan and his lawyers, but its terms called for the interception of *all* communications between them, to be followed by a process for "minimiz[ing] all non-criminal or privileged" communications. July 7 Order at 5-7.

The anomaly no doubt derives from Congress's use of the word "minimize" in consecutive sentences in § 2518(5) to mean two different things. The first use explicitly directs that "[e]very" Title III order be conducted in a manner that "minimizes the *interception*" of nonpertinent communications. § 2518(5) (emphasis added). The next sentence, added in 1986, says that when coded or foreign language is being used and the necessary expert is not reasonably available "during the interception period, minimization may be accomplished … after … interception." *Id.* Unlike the original minimization provision, this sentence does not expressly state the object of the minimization. However, since the statutory language directs the code-breakers or translators to go to work "after . . . interception" and outside "the interception period," what is "accomplished" by this is not the minimization of interception referenced in the

7

previous sentence.  Rather, it is a process that restricts the *dissemination* of conversations the government has already intercepted, not the interception itself.

The legislative history, which describes this provision as "a special minimization rule for intercepted communications that are in a code or a foreign language," and likens it to "minimization for computer transmissions," buttresses this interpretation.  S. Rep. No. 99-541, at 30-31 (1986).  As the Senate Report makes clear, computer communications, like coded or foreign language conversations, also require "a somewhat different procedure than that used to minimize a telephone call," in which "the initial law enforcement agents" review the interception in its entirety, "delete all non-relevant materials and *disseminate* to other officials only that information which is relevant to the investigation."  *Id.* at 32 (emphasis added).  The thrust of this legislative history is that when it is impossible to minimize the interception of non-pertinent communications, special steps must be taken to minimize their dissemination.

Finally, for clarity's sake, a few words are appropriate on the subject of what constitutes "communications not otherwise subject to interception" under Title III.  The phrase is not defined by the statute.  A judge issuing a wiretapping order must determine, *inter alia*, that "there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in [18 U.S.C. § 2516]," and that "there is probable cause for belief that particular communications concerning that offense will be obtained through such interception."  18 U.S.C. § 2518(3)(a)-(b).  The judge may then authorize interception, but any order issued must specify, *inter alia*, "a particular description of the type of communication sought to be intercepted and a statement of the particular offense to which it relates."  *Id.* at §2518(4)(c).  Thus, Title III is typically read to divide the universe of communications into two

categories: those that "concern[]" or are "relate[d]" to the offense(s) described in the order, *see id*. at §2518(3)(a)-(b), (4)(c), and those that are not. These categories are customarily referred to as pertinent and nonpertinent communications, respectively.

Courts frequently simply assume that privileged communications are "not otherwise subject to interception" and that their interception must therefore be minimized pursuant to §2518(5), but the statute does not support that assumption. Communications undoubtedly occur that are both pertinent to the crimes enumerated in an order issued pursuant to 18 U.S.C. § 2518 and privileged under some other body of law, and nothing in Title III prohibits the interception of such communications based on their privileged status. Indeed, the statute expressly contemplates that privileged communications will be intercepted, and provides that such communications "intercepted *in accordance with*, or in violation of, the provisions of this chapter" shall not lose their privileged character. 18 U.S.C. § 2517(4) (emphasis added). This provision supports the inference that pertinent but privileged communications may properly be intercepted, and nothing in the statute provides otherwise.[4]

In any event, the precise contours of the phrase "communications not otherwise subject to interception" need not be resolved here, for two reasons. First, the order at issue

_____

[4]     *See* Michael Goldsmith and Kathryn O. Balmforth, *The Electronic Surveillance of Privileged Communications*, 64 S.Cal. L. Rev. 903, 926-27 (1991) ("For example, if a target and an attorney are discussing matters unrelated to the crime, their conversation must be minimized because it is nonpertinent, not because it is privileged. If a target and an attorney are coconspirators in the crime under investigation, their pertinent conversation may be intercepted. Because such conversations would fall within the crime-fraud exception to the attorney-client privilege, they do not raise concerns about intrusion on the privilege. However, if a target discusses a crime with an attorney and the attorney provides legitimate legal advice, their conversation is privileged but still subject to interception if it pertains to the crime under investigation."); *see also* Eric D. Mcarthur, *The Search and Seizure of Privileged Attorney-Client Communications*, 72 U. Chi. L. Rev. 729, 741-42 n. 58 (2005) (student comment) ("Thus, when judges hold that agents must minimize the interception of privileged communications, they must be invoking something besides Title III.").

barred the interception of both nonpertinent and privileged communications, thereby eliminating any distinction between these two categories. The Standard Minimization provision, which was not followed, ordered that communications not otherwise subject to interception "includ[ed] but [were] not limited to privileged communications." July 7 Order at 5. The Post-Interception Minimization provision took a different route to the same result. It did not define "communications not otherwise subject to interception" to include privileged communications, but rather instructed the "Wall Agents" "to minimize all non-criminal [*i.e.*, nonpertinent] or privileged oral communications." *Id.* at 7.

Second, in defending against Simel's claim of a minimization violation, the government makes no distinction between nonpertinent and privileged communications. In other words, it makes no contention that its failure to minimize the interception of communications is excusable because only privileged (as opposed to nonpertinent) communications were weeded out by the provision it followed. Accordingly, for the purpose of the Title III surveillance at issue here, I join the parties in assuming that "communications not otherwise subject to interception" included both nonpertinent and privileged communications, and that both types of communications were recorded using the MCC bug and filtered from the MCC tapes to produce the few minutes of conversation the government seeks to offer at trial.

B.      *The Supreme Court's Objective Reasonableness Standard*

The Supreme Court has addressed Title III's minimization requirement only once. In *Scott v. United States*, 436 U.S. at 130, it endeavored "to construe the statutory requirement that wiretapping or electronic surveillance 'be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter . . . .'"

(quoting 18 U.S.C. § 2518(5)).[5]  The Court concluded that the statute required objectively

reasonable minimization efforts on the part of the intercepting agents, and stressed the fact-

intensive nature of this inquiry:

> Because of the necessarily ad hoc nature of any determination of reasonableness, there can be no inflexible rule of law which will decide every case.  The statute does not forbid the interception of all nonrelevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to "minimize" the interception of such conversations. Whether the agents have in fact conducted the wiretap in such a manner will depend on the facts and circumstances of each case.

*Id.* at 139-40.  The Court rejected the argument that a failure to make "good-faith

efforts at minimization" is "itself a violation of the statute which requires suppression."  *Id.* at

138-39.   Under the wiretapping statute, as under the Fourth Amendment, the proper focus in

determining reasonableness is on the agents' actions, not their motives.  *Id.* at 139.[6]

C.      *Reasonableness and Post-Interception Minimization*

"Normally, minimization is done extemporaneously and contemporaneously;

when agents who overhear a conversation realize (or have sufficient reason to realize) that it is

unrelated to the investigation, they must desist."  *United States v. David*, 940 F.2d 722, 729-30

(1st Cir. 1991).  In this case, the government recorded the conversations without listening to

them, and then implemented procedures to minimize the dissemination of the intercepted

conversations to the agents and prosecutors who were investigating the defendants.  Simels

---

[5]     The quoted language suggests that the Court regards the minimization requirement of 18 U.S.C. § 2518(5) as a direct regulation of the conduct of the monitoring agents, and not merely as a directive to the court that issues the order.  As explained *infra*, the distinction is potentially relevant to the suppression analysis, but ultimately not dispositive in this case.

[6]     The opinion in *Scott* suggested in dicta that the agents' subjective motives may be relevant to determining whether suppression is appropriate once a statutory or constitutional violation is established.  *Id.* at 139 n.13.

asserts that the government's use of "post-interception" or "after-the-fact" minimization renders its minimization efforts unreasonable under *Scott* and its progeny.

As discussed above, the statute provides that "[i]n the event the intercepted communication is in a code or foreign language, and an expert in that foreign language or code is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception."  18 U.S.C. § 2518(5).   Thus, when the specified circumstances are present, the interceptions themselves need not be minimized, and post-interception minimization may properly be utilized instead.  The obvious implication of the provision is that, when such circumstances are absent, post-interception minimization is insufficient.  The case law supports this intuition: I have not found a single case in which the government has used (or a court has approved) post-interception minimization absent the statutory prerequisites of either coded or foreign language communications.  In short, the statute requires the monitoring agents to conduct the surveillance in such a way as to minimize the interception of nonpertinent conversations.  The agents here failed to conduct the surveillance accordingly.  The statute provides for only one exception, and it is not applicable to this case. Thus, the government's use of the Post-Interception Minimization protocol here initially strikes me as a violation of Title III.

It might be argued that the "code or foreign language" provision implicitly authorizes after-the-fact minimization in lieu of contemporaneous minimization in analogous unspecified circumstances.  I take this to be the government's position, as its memorandum notes that post-interception minimization is explicitly authorized in some circumstances, and it contended at oral argument that the attorney-client privilege is analogous to a foreign language

or code and that the agents monitoring the MCC bug lacked the legal training necessary to distinguish between privileged and nonprivileged communications. But even assuming Title III permits the use of post-interception minimization in situations other than those specifically identified, I nevertheless conclude for the reasons discussed below that it does not permit this technique in the circumstances presented here.

As a threshold matter, the government's analogy is deeply flawed. The mere fact that an intercepted conversation might be protected by a privilege has no special relevance under § 2518(5). Even where courts assume (as they typically do) that monitoring agents are required by the statute and the authorizing order to minimize the interception of privileged conversations pertaining to the offense, they have rejected the argument that agents without formal legal training cannot adequately perform this minimization. In *United States v. Gotti*, 771 F. Supp. 535, 544 (E.D.N.Y. 1991) (Glasser, J.), the defendants urged the adoption of a heightened standard to authorize the interception of conversations between attorney and client because the determination of privilege was "extraordinarily complex" "and should not be left to the officers in the field." 771 F. Supp. at 543. The court persuasively rejected this argument, observing that "[t]he court's attention has not been called to any of the many cases of intercepted attorney-client communications in which that factor was regarded as a matter of moment." *Id.* at 544. Thus, while it is obvious that a person with no proficiency in Spanish would be unable to effectively minimize communications in Spanish, it is not obvious at all that an agent without a law degree would be unable to monitor communications so as to avoid intercepting privileged communications. Indeed, the order in this case, which requires that the "Wall Agents" be instructed to minimize "privileged oral communications," itself assumes that an agent is capable

13

of discerning when the conversations were protected by the attorney-client privilege.  July 7

Order at 7.[7]

Furthermore, even where the statute permits post-interception minimization, it

does so only when a person capable of deciphering the communications in questions is not

"reasonably available during the interception period."  18 U.S.C. § 2518(5).  The order proposed

by the government and issued by the court makes no attempt to limit the use of post-

minimization interception in this way, and the government has offered no justification for this

omission.  Nor has it attempted to demonstrate that, in fact, no one with the requisite expertise

was reasonably available to contemporaneously monitor the interceptions that occurred.  There

were only two conversations to monitor.  There is no indication in the record of how much notice

the government had before Simels or Irving met with Khan at the MCC, and no effort to show

that an Assistant U.S. Attorney from the privilege team (or otherwise unconnected to the

prosecution) was unavailable to monitor these meetings.  As a result, even if I assume that the

statute's exception to the contemporaneous minimization requirement is available in

circumstances other than those specifically enumerated, and that it was potentially available in

these circumstances, I cannot escape the conclusion that the government improperly applied this

exception here.  The order improperly authorized post-interception minimization, and the

government improperly used that technique in this case.

---

[7]      In 1986, language was added to § 2518(5) authorizing "an individual operating under a contract
with the Government, acting under" governmental supervision to conduct interceptions.  18 U.S.C. § 2518(5).  This
provision was added at the request of the Federal Bureau of Investigation to "free field agents from the relatively
routine activity of monitoring interceptions so that they can engage in other law enforcement activities."  S. Rep.
No. 99-541, at 31 (1986).  It implies that the task of monitoring a wiretap or bug is less difficult than the
government's argument suggests.

In contending otherwise, the government cites three factors commonly used to assess the reasonability of challenged minimization techniques, but all are either inapplicable here or weigh against the government. First, more intrusive surveillance may be warranted (*i.e.*, more nonpertinent communications may properly be intercepted) in a case involving a vast conspiracy or one whose participants are unknown. *Scott*, 436 U.S. at 140. But this case involved a small group of identified conspirators suspected of narrow crimes and meeting in the most restrictive and predictable physical context imaginable. Second, more "leeway" may be appropriate when the targeted conversations "frequently utilize codes and specialized jargon," *United States v. Uribe*, 890 F.2d 554, 557 (1st Cir. 1989), but I have already rejected the government's contention that the conversations at issue here involved language that made "criminal conversation more difficult to detect and decipher." *Id.* Finally, the fact that agents in the early stages of a traditional wiretap may need "to intercept all calls to establish categories of nonpertinent calls which will not be intercepted thereafter," *Scott,* 436 U.S. at 142*,* is hardly applicable in a case where the agents are ordered not to begin interception until they have reason to believe that the targets of the surveillance are in the target location to discuss criminal activity. *See* July 7 Order at 6.

As this last observation suggests, the government in fact took steps prior to intercepting communications that are germane to the reasonableness inquiry. It did not simply place a bug in the attorneys' visiting rooms at the MCC, start the recording, and come back thirty days later to pick up the tapes and begin their minimization. Rather, interception occurred only when, through the use of closed circuit television monitors in the MCC and other sources of information, the monitoring agents knew that Khan and at least one of his lawyers were meeting

15

in one of the attorneys' visiting rooms.  As a result of that protocol, the government intercepted

only two conversations, and both involved the subjects of the surveillance and at least some

communications the government alleges were pertinent.  *Cf. Scott*, 436 U.S. at 140 ("[I]f the

agents are permitted to tap a public telephone because one individual is thought to be placing

bets over the phone, substantial doubts as to minimization may arise if the agents listen to every

call which goes out over that phone regardless of who places the call.").

       However, these pre-interception measures serve mainly to underscore the

government's failure to conduct any contemporaneous minimization of the conversations it

intercepted.  The intrusions that did not occur pale in comparison to the intrusions that did -- the

wholesale recording of meetings that lasted "a number of hours," which apparently included a

lengthy conversation with an individual not targeted by the surveillance and only "a few

minutes" of allegedly pertinent communications.  Gov't Mem. at 50.

       The government argues that its decision to forego any attempt at

contemporaneous minimization in favor of post-interception minimization was prompted by a

desire "to take 'special care . . . to avoid interception of privileged communications or the

communications of any individuals other than the subjects[.]"  Gov't Mem. at 48 (quoting Ex. D

at 32).  But the way to avoid intercepting privileged or nonpertinent communications (as opposed

to merely avoiding the unlawful dissemination of communications that should never have been

intercepted in the first place) is take reasonable steps not to intercept them.  Automatically

recording everything, even where that is followed by a post-interception minimization protocol,

virtually guaranteed the interception of communications the government should not have seized.

The post-interception minimization may have closed the barn door, but the horse was already

gone.[8]  That the government was complying with the Post-Interception Minimization provision of the court's order does not alter the reasonableness inquiry.  The specially tailored provision was not foisted on the government; it was proposed by the government and apparently adopted as proposed by the authorizing court.  *See* Gov't Mem. at 48-49.

In sum, the use of post-interception minimization in this case was improper, and the government's minimization efforts were unreasonable.  I conclude that the government has not demonstrated reasonable minimization under the circumstances, and has therefore violated the statutory minimization requirement of § 2518(5).  I also conclude that the government violated the first of the two minimization provisions in the authorizing order -- the Standard Minimization provision requiring "that all monitoring of oral communications shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under [Title III]. . . ."  July 7 Order at 5.

D.      *Suppression of Interceptions Under 2518(10)(a)*

Title III does not explicitly require that communications obtained in violation of the minimization requirement be suppressed at trial.  Instead, Section 2518(10)(a) "provides for suppression of evidence" on three grounds.  *United States v. Giordano*, 416 U.S. 505, 524 (1974).  Specifically,

> [a]ny aggrieved person . . .may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that --
> (i) the communication was unlawfully intercepted;
> (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or

---

[8]      Because the fact that post-interception minimization was used is far more significant than *how* it was used, I need not address Simels's remaining arguments, which mainly rail unpersuasively against the privilege-screening process employed by the government.

(iii) the interception was not made in conformity with the order of authorization or approval.

18 U.S.C. § 2518(10)(a). Simels argues that the recordings should be suppressed, but he does not specify on which ground or grounds. I address the three grounds below.

1.    *Communications Were Unlawfully Intercepted*

In *Giordano*, the Supreme Court rejected the argument that § 2518(10)(a)(i) was implicated only by constitutional, as opposed to statutory, violations. 416 U.S. at 512. However, as the Court observed in a companion case, it did not "go so far as to suggest that every failure to comply fully with any requirement provided in Title III would render the interception of wire or oral communications 'unlawful.'" *United States v. Chavez*, 416 U.S. 562, 574-75 (1974) (holding that misidentification of the officer authorizing the wiretap did not render the wiretap unlawful under § 2518(10)(a)(i) when the application was in fact authorized by an appropriate official). Two passages from *Giordano* provide guidance regarding the types of violations that might implicate this ground for suppression. First, the Court expressed its belief that "Congress intended to require suppression where there is failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." *Giordano*, 416 U.S. at 527. Second, the Court noted that the specific provision at issue in that case "was intended to play a central role in the statutory scheme and that suppression must follow when it is shown that this statutory requirement has been ignored." *Id.* at 528. Thus, the thrust of *Giordano* and *Chavez* is that only the violation of a sufficiently important statutory provision will render an interception "unlawful" under § 2518(10)(a)(i).

18

In a mine-run case involving a violation of Title III's minimization requirement, there might be uncertainty as to whether suppression is properly considered under subsection (i) or (iii); if the monitoring agents are ordered to conduct the surveillance so as to minimize nonpertinent and privileged communications and unreasonably fail to do so, have they "unlawfully intercepted" communications or made interceptions "not … in conformity with the order?"  The answer in the typical case may depend on whether a monitoring agent's duty to minimize emanates from the statute as well as from the authorizing order, which pursuant to § 2518(5) must impose a minimization requirement.  As noted above, the language of the statute ("[e]very order … shall contain a provision [requiring minimization]") on its face governs only the content of the order, but the Supreme Court in *Scott* strongly suggested that the statute imposes a duty to minimize directly on the monitoring agents.  *See* 436 U.S. at 130 ("This case requires us to construe the statutory requirement that . . . surveillance 'be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter . . . .'").

This is not a typical case, however, for the minimization provision the government elected to follow *prohibited* any contemporaneous minimization in favor of post-interception minimization.  Congress authorized such a procedure, but only in narrow circumstances not present in this case.

I have no doubt that the statutory requirement that the interception of nonpertinent communications be minimized "substantially implement[s] the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this

extraordinary investigative device." *Giordano*, 416 U.S. at 527.[9]  Nothing places the

extraordinary intrusiveness of electronic surveillance in clearer relief than the recording of

communications that bear no relationship to the criminal activity giving rise to the surveillance

itself.  At first blush, it may seem anomalous that the government cannot even apply for an

electronic surveillance order without the approval of a high-level Justice Department official, *see*

18 U.S.C. § 2516, when an Assistant United States Attorney acting on her own can apply for a

warrant to enter and search someone's bedroom.  But all one has to do to appreciate the wisdom

of Title III's stringent approval requirements is listen to a recording of a wholly innocent

conversation that should never have been recorded.  Though Congress clearly envisioned that

some communications fitting that description would inevitably be intercepted as part of the

process by which agents determined whether they were pertinent (hence the directive to

"minimize" those occurrences, rather than eliminate them), it is equally clear that the mandated

effort to identify and not intercept such conversations plays "a central role in the statutory

scheme." *Id.* at 528.  The Post-Interception Minimization protocol imposed here is no substitute.

When the government deliberately intercepts nonpertinent communications, it is no comfort to

those whose privacy has been invaded that only government actors not involved in a particular

criminal investigation will be listening to them.

       Congress conditioned the use of electronic surveillance on, *inter alia*, efforts by

law enforcement to minimize the interception of nonpertinent communications.  To the extent it

---

[9]      The Second Circuit, quoting *Giordano*, has held that Title III's rules regarding the sealing and storage of recorded communications, 18 U.S.C. § 2518(8)(a), are sufficiently important under *Giordano* and *Chavez* that a violation of those rules could require suppression. *United States v. Gigante*, 538 F.2d 502, 505 (2d Cir. 1976). It based this conclusion on the premise that "all of the carefully planned strictures on the conduct of electronic surveillance, e. g., the 'minimization' requirement of § 2518(5), would be unavailing if no reliable records existed of the conversations which were, in fact, overheard." *Id.*  If the recording requirement is sufficiently central in part because it enables enforcement of the minimization requirement, it follows *a fortiori* that the minimization requirement is sufficiently important that its violation renders an interception "unlawful" under 2518(10)(a)(i).

was specially tailored to the investigation and followed by the government, the Title III order in this case improperly dispensed with those efforts. As a result, communications were unlawfully intercepted and suppression is appropriate.

2.       *The Authorizing Order Was Insufficient on its Face*

Title III's suppression provision provides that an aggrieved party may move to suppress the contents of an interception "on the grounds that . . .the order of authorization or approval under which it was intercepted is insufficient on its face." 18 U.S.C. § 2518(10)(a)(ii). Although the Second Circuit has not had occasion to interpret this language, the Ninth Circuit has held that an authorizing order, like an application for such an order, is "facially sufficient if, on the basis of the information that appears on its face, it could reasonably be believed that it meets all the statutory requirements." *United States v. Staffeldt*, 451 F.3d 578, 582 (9th Cir. 2006). This strikes me as a sensible and uncontroversial interpretation, and I adopt it.

The authorizing order in this case was internally contradictory. The Standard Minimization provision required that "all monitoring of oral communications shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception . . . , including but not limited to privileged communications between the subjects and interceptees." July 7 Order at 5. Setting aside the portion dealing with privileged communications, this language faithfully tracked the minimization language of 18 U.S.C. § 2518(5), and the gist of this requirement, as discussed above, is that the government must engage in contemporaneous minimization.   However, the Post-Interception Minimization provision stated that, to "avoid interception of any privileged communications or the communications of any individuals other than the subjects," the agents were to employ "additional procedures" that

21

included the interception of all communications, pertinent or otherwise, once they had reason to believe Simels or Irving were meeting with their client. July 7 Order at 5-6. In short, the order simultaneously required and prohibited contemporaneous minimization of the interception of nonpertinent conversations among Khan, Simels and Irving.

I conclude that this fact rendered the order insufficient on its face. A person familiar with § 2518(5) could not read this order's contradictory dictates and reasonably believe that they met the requirements of that statutory provision.

Extending *Giordano*, every circuit to address the issue has held that 2518(10)(a)(ii) does not require suppression if the order's insufficiency is, *e.g.*, "minor," and does not "substantially impair the accomplishment of Congress' purpose." *United States v. Callum*, 410 F.3d 571, 576 (9th Cir. 2005); *see also United States v. Radcliff*, 331 F.3d 1153, 1162-63 (10th Cir. 2003) (collecting cases). For the reasons discussed above, I find the defect here sufficiently severe to warrant suppression.

3. *The Interceptions Were Not Made in Conformity With the Order*

Having proposed and obtained an electronic surveillance order containing two irreconcilable minimization provisions, the government was doomed from the outset to violate the order. Once the monitoring agents had reason to believe Simels or Irving was meeting with Khan in a bugged meeting room at the MCC, they were required by the Post-Interception Minimization provision to "record, but not listen to, the communications occurring at the meeting (i.e., the monitoring agents will set down their headphones but continue to record the conversation)." July 7 Order at 6. By following that order, the agents necessarily violated the

Standard Minimization provision, which ordered them to conduct the monitoring so as to "minimize the interception" of nonpertinent and privileged communications.

The Supreme Court has not yet determined whether the failure to comply with a technical or insignificant provision of an authorizing order would render an interception non-conforming within the meaning (a)(iii), but I feel confident in predicting that it would interpret the provision to require suppression only when central provisions of the order are violated, just as *Giordano* interpreted subsection (a)(i) to require suppression only when central provisions of the statute are violated. And to the extent that the statutory minimization requirement is important, so is the analogous requirement in the authorizing order. Thus, I conclude that the failure to minimize interceptions in this case suffices to implicate this basis of suppression as well.

The Ninth Circuit reached that conclusion, albeit in dicta, in *United States v. Scully*, 546 F.2d 255, 262 (9th Cir. 1976), *vacated on other grounds sub nom. United States v. Cabral*, 430 U.S. 902 (1977), observing that "[t]he minimization provision reflects and substantially implements Congress' intent to limit interceptions. There must be suppression if the government has failed to comply substantially with the minimization requirement." *Accord United States v. Anderson*, 39 F.3d 331, 339 n.5 (D.C. Cir. 1994) (the suppression ground of § 2518(10)(a)(iii) "would apply the suppression remedy, where appropriate, to inadequately 'minimized' interceptions").

E.      *What Is Suppressed?*

      1.      *Suppression Pursuant to § 2518(10)(a)(i)&(iii)*

Having determined that the minimization requirements of both the statute and the order were violated, I must determine which "communication[s]" were therefore "unlawfully intercepted," 18 U.S.C. §2518(10)(a)(i) and which "interception[s]" were not "made in conformity" with the order. *Id.* at § 2518(10)(a)(iii). To determine the consequences of a minimization violation, I begin with the content of the provisions violated. The statute requires that every order shall contain a provision that "the authorization to intercept shall be conducted in such a way as to minimize the interception" of non-pertinent communications. *Id.* at § 2518(5). This language is somewhat confusing, but the context makes clear that "the authorization to intercept" refers to the order itself: for example, the statute also provides that "the authorization to intercept shall be executed as soon as practicable." *Id.* Accordingly, the language seems to require that the order as a whole shall be carried out in a particular way. Because the provision thus purports to govern the execution of the order as a whole, its violation appears to render the entire execution, rather than the interception of particular conversations, improper. It is sensible for the minimization requirement to focus on the execution as a whole, because the requirement is premised on the idea that it cannot be known *ex ante* which conversations will be pertinent or not. Indeed, if the minimization requirement is measured on an interception-by-interception basis, then the *Scott* decision, with its focus on the facts surrounding the execution of the order as a whole, is incomprehensible. *See Scott*, 436 U.S. at 139-40 (minimization requirement governs conduct of "the surveillance" or "the wiretap" and does not simply "forbid the interception of all nonrelevant conversations").

24

However, there is some authority for the proposition that only non-pertinent interceptions are rendered unlawful by a minimization failure. The leading case is the Eighth Circuit's decision in *United States v. Cox*:

> Even if the surveillance in this case did reflect a failure to minimize, it would not follow that Congress intended that as a consequence all the evidence obtained should be suppressed. Quite the contrary, 18 U.S.C. § 2517 manifests an intent to utilize *all* the evidence obtained by eavesdropping, and § 2517(5) expressly permits the use in court of evidence obtained by wiretap of a crime other than the crime upon which the court order was premised. Clearly Congress did not intend that evidence directly within the ambit of a lawful order should be suppressed because the officers, while awaiting the incriminating evidence, also gathered extraneous conversations. The nonincriminating evidence could be suppressed pursuant to 18 U.S.C. § 2518(10) (a), but the conversations the warrant contemplated overhearing would be admitted.

462 F.2d 1293, 1301 (8th Cir. 1972).

This analysis is unpersuasive. Although context is often informative, looking to § 2517 to interpret § 2518 must account for the fact that the former incorporates the latter by reference. Section 2517 does not manifest an intent to utilize "all" evidence obtained by eavesdropping; it authorizes, *inter alia*, the disclosure of all communications intercepted "by means *authorized* by this chapter." 18 U.S.C. § 2517(1) (emphasis added). Similarly, the use of evidence of "other crimes" (*i.e.*, the use of communications outside the scope of the order) is permitted only if a court determines that the communications were "otherwise intercepted in accordance with the provisions of this chapter." *Id.* at § 2517(5). This inquiry turns, in part, on whether the interception of communications was tainted by a failure to minimize. Thus, the meaning of § 2517 depends on the meaning of § 2518, rather than vice versa, as *Cox* suggests.

*Cox* also contends that Congress did not intend the suppression of otherwise lawful evidence "because the officers also gathered extraneous conversations." 462 F.2d at

1301. This argument is a straw man, however, because a contrary interpretation does not require the suppression of otherwise lawful evidence merely because some extraneous conversations were intercepted. It requires such suppression only when such conversations are intercepted *unreasonably*, and the very existence of the minimization and the suppression provisions strongly suggests that such a result is consistent with Congressional intent. It is not likely that Congress drafted a suppression provision that limited the relief available to persons aggrieved by a violation of the minimization requirement to the suppression of nonpertinent (and thus irrelevant) evidence, and then only if it was not probative of some other crime. At the very least, if Congress intended to prohibit the suppression of otherwise lawfully intercepted communication on minimization grounds, it would have said so more clearly. Accordingly, I conclude that when the surveillance, viewed as a whole, violates the minimization requirement of 18 U.S.C. § 2518(5), every communication conducted during that surveillance was obtained unlawfully, and should be suppressed. *See United States v. Focarile*, 340 F. Supp. 1033 (D. Md. 1972), *aff'd on other grounds sub nom. United States v. Giordano*, 469 F.2d 522, (4th Cir. 1972), *aff'd on other grounds*, 416 U.S. 505 (1974).

Applying this analysis to the corresponding provision of the order yields the same result. The Standard Minimization provision states that "all monitoring of oral communications shall be conducted in such a way as to minimize" the recording of non-pertinent material. July 7 Order at 5. This language suggests even more clearly that the violation of this provision taints every interception made pursuant to the order. The failure to monitor in this case was total, as the intercepting agents "put down their headphones" as soon as recording began. *Id.* at 6. Thus, no part of any conversation, pertinent or nonpertinent, was monitored to ensure minimization,

because no monitoring was conducted at all. Therefore, all of the interceptions in this case were "not made in conformity with the order of authorization" and shall accordingly be suppressed. 18 U.S.C. § 2518(10)(a)(iii).

        2.       *Suppression Pursuant to § 2518(10)(a)(ii)*

Subsection (a)(ii) of § 2518(10) authorizes a motion to suppress communications intercepted "under" an order that is insufficient on its face. Because all of the interceptions in the investigation, including the ones at issue on this motion, were made "under" the defective order, they must all be suppressed on this ground as well.

CONCLUSION

For the reasons set forth above, the motion to suppress the conversations recorded pursuant to Title III is granted.

One last issue warrants attention, and that is the indisputable good faith of the government. The Post-Interception Minimization protocol it proposed was in my view unauthorized, and the government's failure to delete the Standard Minimization provision or at least to recognize the incompatibility of the two minimization provisions was in my view careless,[10] but I have no doubt that the government *believed* it was taking careful steps to protect the rights of these defendants.

*Scott* suggests, in dicta, that "[o]n occasion, the motive with which the officer conducts an illegal search may have some relevance in determining the propriety of applying the exclusionary rule." 436 U.S. at 139 n.13. However, the court's use of the definite article masks the fact that there are actually two exclusionary rules potentially at issue here. The exclusionary

---

[10]       This same carelessness rendered the government's written minimization instructions to the monitoring agents and the wall agents virtually incoherent.

rule to which *Scott* refers stems from the Fourth Amendment, as interpreted in *Weeks v. United States*, 232 U.S. 383 (1914), and subsequent cases. But Title III contains its own statutory exclusionary rule, which prohibits the use of intercepted communications and "evidence derived therefrom" when its "disclosure" "before any court . . . would be in violation of this chapter." 18 U.S.C. § 2515. The effect of granting a suppression motion made under § 2518(10)(a) is that the communications suppressed "shall be treated as having been obtained in violation of this chapter" and therefore be deemed inadmissible under § 2515. I find no indication in the statute that good faith is relevant to the operation of this exclusionary rule. It will certainly defeat Title III's criminal sanctions, *see Giordano*, 416 U.S. at 529 n. 18 ("Clearly, the circumstances under which suppression of evidence would be required are not necessarily the same as those under which a criminal violation . . . would be found."); *see also* 18 U.S.C. § 2520(d)(1). And "good faith reliance on . . . a court warrant or order" provides "a complete defense" to a civil action for damages. *See id.* But the statute provides no such defense to a motion to suppress.

Finally, I note that there is no indication that the government derived any other

evidence from these interceptions, and thus conclude that no further suppression is warranted.[11]

So ordered.

JOHN GLEESON, U.S.D.J.

Dated: Brooklyn, New York
      July 2, 2009

---

[11]    Simels and Irving also contend that these recordings should not be admitted at trial because they contain substantial unintelligible portions that render "the recording as a whole untrustworthy." *United States v. Bryant*, 480 F.2d 785, 790 (2d Cir. 1973) (internal quotation marks omitted). The government agrees that an audibility hearing should be held. Having listened to the recordings, I believe defendants' argument have merit, as substantial portions of the recordings are unintelligible. Though the audible portions do not strike me as probative, my limited knowledge of the facts of the case precludes a finding at this stage that the recordings should be suppressed in their entirety on audibility grounds.