UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,

    -against-                    08 CR 640 (S-2) (JG)

ROBERT SIMELS and
ARIENNE IRVING,

          Defendants.

- - - - - - - - - - - - - - - - X


### THE GOVERNMENT'S RESPONSE IN OPPOSITION
### TO THE DEFENDANTS' SENTENCING SUBMISSIONS


BENTON J. CAMPBELL
United States Attorney
271 Cadman Plaza East
Brooklyn, New York 11201


Morris J. Fodeman
Daniel Brownell
Assistant U.S. Attorneys
    (Of Counsel)

TABLE OF CONTENTS

PRELIMINARY STATEMENT...........................................1

FACTUAL BACKGROUND..............................................3

    I.    THE OFFENSE CONDUCT....................................3

        A.    THE SCHEME TO OBSTRUCT JUSTICE....................3

        B.    WIRETAPPING EQUIPMENT............................8

        C.    THE TRIAL AND VERDICT............................9

    II.   THE GUIDELINES CALCULATIONS..........................10

        A.    SIMELS' GUIDELINES CALCULATIONS.................10

        B.    IRVING'S GUIDELINES CALCULATION.................11

ARGUMENT......................................................13

    I.    THE DEFENDANTS' OBJECTIONS TO THE
        GUIDELINES CALCULATION ARE WITHOUT MERIT.............13

        A.    SIMELS' GUIDELINES OBJECTIONS...................13

             1.    The Court Should Impose a Three-
                 Level Aggravating Role Enhancement........13

             2.    The Grouping Analysis Is Correct..........14

        B.    IRVING'S GUIDELINE OBJECTIONS...................16

             1.    The Court Should Impose a Two-
                 Level Abuse of a Position of Trust
                 Enhancement...............................17

             2.    Minimal/Minor Role........................19

    II.   THE SECTION 3553 FACTORS WARRANT A SENTENCE
        WITHIN THE GUIDELINES RANGE FOR SIMELS AND
        A SIGNIFICANT INCARERATORY SENTENCE FOR IRVING.......24

        A.    APPLICABLE LAW..................................24

        B.    SIMELS SHOULD RECEIVE GUIDELINES SENTENCE.......26

        C.    IRVING SHOULD RECEIVE AN INCARERATORY
             SENTENCE........................................31

III. SIMELS IS NOT ENTITLED TO BAIL PENDING APPEAL.......36

     A.    THE GOVERNMENT'S USE OF T-III TO IMPEACH
          SIMELS WAS PROPER..............................38

          1.    Factual Background.......................38

          2.    There was No Error in Admitting the
               T-III to Impeach Simels...................40

          3.    Any Error Was Harmless...................43

     B.    SIMELS' SIXTH AMENDMENT CLAIM LACKS
          STANDING AND IN ANY EVENT LACKS MERIT.........45

     C.    THE SEARCH OF SIMELS' LAW OFFICE WAS PROPER....46

          1.    There was no Error in Admitting
               the Fruits of the Search of the
               Defendants' Offices......................46

          2.    Any Error Was Harmless...................49

     D.    THE "HEAD SHOT" BOARD DISPLAYED TO THE
          JURY WAS ACCURATE, RELEVANT AND NOT
          UNDULY PREJUDICIAL............................49

          1.    Factual Background.......................49

          2.    Applicable Law...........................50

          3.    Discussion...............................51

          4.    Any Error was Harmless...................52

     E.    SIMELS HAS FAILED TO SHOW A DUE PROCESS
          VIOLATION.....................................53

     F.    THE APPLICATION OF SECTION 2512 TO THE
          WIRETAPPING EQUIPMENT HERE DOES NOT
          PRESENT SUBSTANTIAL QUESTIONS.................54

     IV.  ASSUMING DEFENDANT SIMELS IS NOT GRANTED
          BAIL PENDING APPEAL, HE SHOULD BE ORDERED
          TO COMMENCE SERVING HIS SENTENCE IMMEDIATELY...55

1

PRELIMINARY STATEMENT

The government writes in response to defendant Robert Simels' and defendant Arienne Irving's sentencing submissions, dated November 23 and November 25, 2009 respectively (hereinafter "Simels' Sent. Mem." and "Irving's Sent. Mem."), objecting to the United States Sentencing Guidelines ("Guidelines") calculations contained in their Pre-Sentence Reports ("PSR") on various grounds, and seeking non-Guidelines sentences.[1]   Simels alone argues that, assuming he is sentenced to prison, he should be granted bail pending appeal, or, in the alternative, be permitted to self-surrender at a future date.  The defendants are currently scheduled to be sentenced on December 4, 2009 at 3:00 p.m..

For the reasons set forth below, the Court should find that the Probation Department correctly calculated the defendants' applicable Guidelines ranges to be 360 months to life and 151 to 188 months imprisonment respectively.

With respect to defendant Simels, the government submits that the Guidelines sentence is both reasonable and appropriate and should be imposed.  Moreover, the Court should deny Simels' motion for bail pending appeal and order that he begin serving his sentence immediately.

With respect to defendant Irving, the government will not oppose a non-Guidelines sentence.  The government

---

[1]   Simels seeks a sentence of between 33 and 41 months. Simels' Sent. Mem. at 24.  Irving seeks a non-incarceratory sentence. Irving's Sent. Mem. at 10.

2

respectfully submits, however, that the section 3553(a) factors warrant the imposition of a sentence with a significant period of incarceration.

**FACTUAL BACKGROUND**

I.   **THE OFFENSE CONDUCT**[2]

    A.   THE SCHEME TO OBSTRUCT JUSTICE

As the Court is aware, the defendants, both criminal defense attorneys, were tried on a thirteen-count second superseding indictment charging them with various crimes related obstruction of justice through witness tampering, bribery of a witness, making a false statement (to a guard at the GEO prison), and importation and possession of illegal wiretapping equipment. As the evidence presented at trial demonstrated, the defendants sought to use their client Shaheed Khan's Guyana-based criminal organization in an effort to identify, locate, and tamper with individuals they believed were potential witnesses in Khan's criminal trial.

To this end, beginning on May 13, 2008, the defendants repeatedly met and regularly communicated with Selwyn Vaughn, a former member of Khan's criminal organization. At their initial meeting, Simels and Irving discussed several matters with Vaughn, including whether Vaughn would testify on Khan's behalf. Simels, in Irving's presence, informed Vaughn that if he were to testify on Khan's behalf, Vaughn would need to lie about certain things.

---

[2]    Given the Court's familiarity with this case and the fact that the government set forth a more fulsome discussion of the evidence presented at trial in its Memorandum of Law in Opposition to the Defendants' Rule 29 and Rule 33 Motions, the government has only included a summary of the trial evidence in this memorandum. At the Court's request, the government will submit further briefing in support of any of the facts set forth in Probation Department's description of the offense conduct in this case.

4

For example, in one portion of the conversation, Simels and

Vaughn, in the presence of Irving, had the following exchange:

> Simels:   Now, I guess this, the big question
> really, um, clearly we're not
> saying, we'll never say that
> Roger's involved in any drug
> dealing, we're going, he is going
> to be described to the jury as
> somebody who builds homes, somebody
> who got a, a, a truck, uh, bus,
> whatever you want to call it that
> feeds homeless children, uh, that
> he's in the timber business.
>
> Vaughn:   True.
>
> Simels:   So, I know earlier you said that,
> that Roger, you described him [to
> Irving] as a boss, uh, but we
> certainly would not want to
> describe him as being a drug
> dealer.
>
> Vaughn:   No, we don't want . . .
>
> Simels:   But we certainly don't want to
> . . .
>
> Vaughn:   . . . true.
>
> Simels:   . . . describe him as being the
> boss.
>
> Vaughn:   True, true, I understand.
>
> Simels:   Okay.

GX 401T3 at 36.

Over the course of the next nearly four months, the

defendants coordinated with Vaughn on a range of options,

including offering witnesses money, performing acts of violence

against them and their family members, and preventing these

witnesses from testifying against Khan.  Unbeknownst to Khan and

the defendants, Vaughn was cooperating with law enforcement and recording their meetings and telephone conversations.

The defendants focused their corrupt efforts, in part, on cooperating witness, David Clarke.  During their second meeting on June 11, 2006, in the context of discussing the plan to "eliminate" and "neutralize" witnesses, in particular Clarke, Vaughn asked Simels about the possibility of "heat" coming back to Khan if a government witness stops cooperating and refuses to testify because someone close to him or her "fall[s] off the face of the earth."  GX 401T10 at 35.  Simels replied: "They'd have to figure out a way to tie it back to Roger [Khan]. [pause]  But [pause] it seems to me that, that [pause] I'm going to leave it to you to figure out what's going to best get to him [David Clarke]."  Id.  Prior to leaving, Vaughn informed Simels that he would require some money to cover expenses that Vaughn would incur in locating and "neutralizing" government witnesses, including the cost of acquiring prepaid and unregistered cellular phones.  Simels informed Vaughn that he would deliver that message and request to Khan, stating that he was planning on sending "her" (Irving) to see Khan at the MCC the next day.  Simels concluded by telling Vaughn that he would be in contact with Vaughn after "we see Roger [Khan] tomorrow."[3]  Id. at 36.

---

[3]  Visitation records introduced in evidence showed that two days later, on June 13, 2008, Irving visited Khan at the MCC.  GX 703.  That same day, at approximately 12:50 p.m., Simels sent Vaughn an email that read: "[Khan] [s]imply says be careful in your efforts to gather information, and do not do anything that can be misconstrued by anyone.  These are difficult times and people will draw the most unfavorable inferences.  So be

On June 20, 2008, Vaughn and Simels again met in the defendants' office.  During that meeting, Simels paid Vaughn $1,000 in United States currency, and the two had the following exchange:

| | |
|---|---|
| Simels: | Here's a thousand dollars to get started. |
| Vaughn: | Alright, no problem. |
| Simels: | Um, all he [Khan] says is be careful. He says don't kill the mother. |
| Vaughn: | Don't kill the mother. |
| Simels: | He said you know, said just, just . . . |
| Vaughn: | So what other option would he prefer? |
| Simels: | He doesn't want you anywhere near her. |
| Vaughn: | No, no, no, no, no, no, no, no, I, I can't get anywhere near it.  That's why I'm asking about options does he prefer, you know?  So I can know what I'm doing I do exact so what, what I know well he can't say well you know I didn't approve it. |
| Simels: | Well, he'd like as much pressure being put on Clarke as possible. Uh, but he thinks that if Clarke's mother gets killed that . . . |
| Vaughn: | . . . it takes . . . |
| Simels: | . . . the government will go crazy.  Uh, and he's probably right.  That, that they'll put him into the, the SHU, |

cautious.  Have authorization for payment for gathering materials." GX 208.  Meanwhile, also on June 13, Irving drafted a memorandum to Simels and the file indicating that she obtained permission from Khan to pay Vaughn $1,000 for his "investigation" and that Khan did not want Vaughn to do anything "stupid in terms of Clarke's mother." GX 554.

|  |  |
|---|---|
|  | special housing unit, limit his phone calls, limit my access to him.  So . . . |
| Vaughn: | That is why I really didn't find out with him 'cause after I got your email I said well you know let me just read until, well, you know, we meet, you know, and talk let me know exactly well. |
| Simels: | Yeah, I mean he wants to do . . . |
| Vaughn: | . . . what advice you got . . . |
| Simels: | . . . whatever needs to be done, then obviously, if you can find Alison, great.  If you can find Leyslyn who was . . . |
| Vaughn: | So he want, you want me now to deal with them though? George and these other people? |
| Simels: | What's that? |
| Vaughn: | What would he want me to do now with them George and the other people? |
| Simels: | With George he said you can deal with George however you think that George has to be dealt with in, in terms of finding out where he is in this thing.  If he's cooperating, that it's a bad thing. Uhm, if he's not cooperating and he wants to talk about Clarke, um, then we want him to talk to us about Clarke.  I, I don't think he cares about George in terms of, of . . . 'cause I don't think they, they will put the heat on him that, that screwing around with the mother would.  I mean doing something violent or . . . |
| Vaughn: | Alright. |

GX 401T13 at 21-23 (emphasis added).

During the course of their discussions, Simels and

Vaughn discussed bribing David Clarke's girlfriend, Leslyn

Camacho, to testify falsely on Khan's behalf.  As discussed in

8

greater detail below, after some negotiation through Vaughn, on July 22, 2008, Simels ultimately agreed to pay Camacho $10,000: $5,000 upon signing an affidavit and an additional $5,000 after she testified at trial.  GX 401T21 at 1, ln 19-20; 401T22 at 3, ln 13-15.  Vaughn eventually agreed to bring Camacho to the defendants' office on September 10, 2008, purportedly so that she could sign a false affidavit and receive a partial bribe payment. Instead, agents arrived at the office and placed the defendants under arrest.

   B.   WIRETAPPING EQUIPMENT

        While in Guyana, Khan acquired sophisticated wiretapping equipment which he used to locate his enemies and record their cellular telephone conversations.  During the course of his representation of Khan, Simels learned of the existence of this equipment and, with the assistance of defendant Irving, successfully imported the equipment into the United States.

        On September 10, 2008, law enforcement officers executed a search warrant at the defendants' law offices in Manhattan.  At that time, agents recovered, among other things, a Smith Myers "CSM 7806" surveillance device, a compact disc containing operational software for this equipment, and two laptop computers on which this operational software had been installed and used to intercept telephone conversations.[4]

_____

[4]      As the Court is aware, by the time the equipment was seized, it was largely obsolete and not capable of intercepting wireless calls.

C.   THE TRIAL AND VERDICT

On August 20, 2009, following a four-week jury trial, the defendants were each found guilty of various charges.  Simels PSR ¶ 1;  Irving PSR ¶¶ 1-5.

Defendant Simels was found guilty of Counts One through Ten and Twelve and Thirteen of the Second Superseding Indictment.[5]  The Counts of conviction charged Simels with (1) conspiracy to obstruct justice through witness tampering, in violation of 18 U.S.C. §§ 1512(i), (j) and (k); (2) attempting to obstruct justice by tampering with various witnesses, in violation of 18 U.S.C. §§ 1512(b)(1), (b)(2)(A), (i) and (j); (3) offering to bribe potential witness Leslyn Camacho, in violation of 18 U.S.C. § 201(c)(2); and (4) importation and possession of illegal wiretapping equipment, in violation of 18 U.S.C. §§ 2512(1)(a), (b).

Defendant Irving was found guilty of Counts One, Three, Five, Twelve and Thirteen.[6]  The Counts of conviction charged Irving with (1) conspiracy to obstruct justice through witness tampering, in violation of 18 U.S.C. §§ 1512(i), (j) and (k); (2) attempting to obstruct justice by tampering with David Clarke (Count Three) and Vijay Jaignarine (Count Five), in violation of 18 U.S.C. §§ 1512(b)(1), (b)(2)(A), (i) and (j); and (3)

---

[5]   Simels was acquitted only of Count Eleven, which charged him with making a false statement to a prison guard at the GEO Group facility, in violation of 18 U.S.C. § 1001(a)(2).

[6]   Irving was not named in Count Eleven and Count Six was dismissed as to her on the government's motion.  Irving was acquitted of Counts Two, Four, Seven, Eight, Nine and Ten.

importation and possession of illegal wiretapping equipment, in violation of 18 U.S.C. §§ 2512(1)(a), (b).

## II.   THE GUIDELINES CALCULATIONS[7]

   A.   SIMELS' GUIDELINES CALCULATIONS

   The Probation Department determined Simels' applicable total offense level to be 42 and his Criminal History Category to be I based on the following calculation, Simels PSR ¶¶ 42-134:

Counts One through Nine (Conspiracy/Attempted Obstruction)

| | |
|---|---|
| Base Offense Level (2J1.2(c); 2X3.1) | 30 |
| Abuse of Position of Trust (3B1.3) | +2 |
| Role in Offense (3B1.1(b)) | +3 |
| Obstruction of Justice (3C1.1) | +2 |
| Adjusted Offense Level | 37 |

Count Ten (Bribery of Leslyn Camacho)

| | |
|---|---|
| Base Offense Level (2J1.9) | 6 |
| Abuse of Position of Trust (3B1.3) | +2 |
| Role in Offense (3B1.1(b)) | +3 |
| Obstruction of Justice (3C1.1) | +2 |
| Adjusted Offense Level | 13 |

---

[7]   Because Simels and Irving conspired and attempted to obstruct justice in connection with a criminal trial in which the defendant there was charged with a class A felony, they each face a statutory maximum sentence of life in prison.  18 U.S.C. § 1512(j).  None of the crimes of conviction carry a statutory minimum sentence.

Counts 12 and 13 (Wiretapping Equipment)

| | |
|---|---|
| Base Offense level (2H3.2) | 6 |
| Abuse of Position of Trust (3B1.3) | +2 |
| Role in Offense (3B1.1(b) | +3 |
| Obstruction of Justice (3C1.1) | +2 |
| Adjusted Offense Level | 13 |

Multiple Count Adjustment

| | |
|---|---|
| Greated Adjusted Offense Level Above | 37 |
| Multiple Count Increase (3D1.4)[8] | +5 |
| Total Offense Level | 42 |

  B. IRVING'S GUIDELINES CALCULATION

   The Probation Department determined that Irving's applicable total offense level to be 34 and her Criminal History Category to be I based on the following calculation, Irving PSR ¶¶ 42-82:

Counts One, Three and Five (Conspiracy/Attempted Obstruction)

| | |
|---|---|
| Base Offense Level (2J1.2(c); 2X3.1) | 30 |
| Abuse of Position of Trust (3B1.3) | +2 |
| Role in Offense (3B1.1) | +0 |
| Adjusted Offense Level | 32 |

---

[8] While certain counts of conviction group together pursuant to U.S.S.G. §§ 3B1.2; 3D1.2, Counts Three through Nine do not group for purposes of the multiple count analysis as each involved an attempt to tamper with a different victim.  U.S.S.G. § 3D1.2.  PSR ¶ 119.

Counts 12 and 13 (Wiretapping Equipment)

        Base Offense level (2H3.2)              6

        Abuse of Position of Trust (3B1.3)     +2

        Role in Offense (3B1.1)            +0

        Adjusted Offense Level           8

Multiple Count Adjustment

Greated Adjusted Offense Level Above       32

Multiple Count Increase(3D1.4)         +2

Total Offense Level               34

**ARGUMENT**

I.  **THE DEFENDANTS' OBJECTIONS TO THE**
    **GUIDELINES CALCULATION ARE WITHOUT MERIT**

    A.  <u>SIMELS' GUIDELINES OBJECTIONS</u>

        Simels objects to the Probation Department's Guidelines calculation on two grounds.  First, Simels argues that the Court should apply only a two, not a three, level enhancement for his aggravating role in the offense.  Simels Sent. Mem. at 6-7. Second, Simels argues that there should be no multiple count adjustment.  <u>Id</u>. at 7-9.  For the reasons set forth below, as well as those contained in the Probation Department's Addendum to the Simels PSR dated November 20, 2009 ("Simels Addendum"), Simels' arguments are without merit.

        1.  The Court Should Impose a Three-Level
    <u>Aggravating Role Enhancement            </u>

        The Guidelines direct courts to increase a defendant's offense level by three levels if the defendant was a "manager" or "supervisor" of criminal activity involving five more participants or was otherwise extensive.  U.S.S.G. § 3B1.1(b). Simels contends that Guideline 3B1.1(b) should not apply to any of the counts of conviction because, according to him, his crimes did not involve five or more participants.  Simels' Sent. Mem. at 6-7.

        As his PSR correctly notes, Simels not only supervised and directed co-defendant Arienne Irving, but he and Irving also directed several of Khan's associates in Guyana (including Paul Rodriguez, Sean Bellfield and Regan Mark) in carrying out their

crimes.  Simels Addendum at 2-3.  Indeed, during the course of
the trial, the Court ruled that three individuals in Guyana who
were responsible for putting Vaughn in touch with Simels for
purposes of obstructing justice in Khan's case - Colin Moore,
Conrad Sanmoogan and Glenn Hanoman - were also members of the
charged conspiracy.  T. 1080-81; 1098.  Simply put, the effort to
obstruct Khan's criminal trial involved numerous participants,
both in the United States and in Guyana.  As such, a three-level
enhancement is appropriate.

    2.  The Grouping Analysis Is Correct

        Simels next challenges the PSR's finding that the
various obstruction/bribery counts of conviction (Counts Two
through Nine) should not be grouped together for Guidelines
purposes because each involved different victims.  Simels' Sent.
Mem. at 7-9.  PSR ¶ 131 citing U.S.S.G. 3D1.2(B).  Despite the
fact that Simels was convicted of attempting to tamper with eight
different witnesses, Simels argues that the victim of his many
offenses is best described as "society at large."  Id. at 7.  The
government (and the Probation Department) disagree.

        As an initial matter, the Guideline at issue provides
that counts are grouped where they "involve the same victim and
the same act or transaction," or "involve the same victim and two
or more acts or transactions connected by a common criminal
objective or constituting part of a common scheme or plan."
U.S.S.G. § 3D1.2(a),(b).  Application Note 2, upon which Simels
relies, provides that:

> For offenses in which there are no
> identifiable victims (<u>e.g.</u>, drug or
> immigration offenses, where society at large
> is the victim), "the victim" for purposes of
> subsection (a) and (b) is the societal
> interest that is harmed.  In such cases, the
> counts are grouped together when the societal
> interests that are harmed are closely
> related.

Thus, under the plain language of both the Guideline and
commentary, counts can only be grouped where the victim is the
same for all counts.  The instant case, however, does not meet
this requirement.

Moreover, simply because Simels' effort to tamper with
various witnesses was frustrated by the fact that Vaughn was a
government informant, does not mean that Simels did not <u>intend</u> to
tamper with separate, identifiable victims.  As this Court
observed immediately following Simels conviction:

> I have no doubt if Selwyn Vaughn were what
> Robert Simels believed him to be, cooperative
> member of Khan's violent criminal enterprise,
> people [<u>i.e.</u>, intended victims] could have
> easily been murdered and that Simels knew
> that.

T. 2140.

Courts have consistently held that where, as here, the
primary victims of the offenses are different, the counts cannot
be grouped.  <u>See</u>, <u>e.g.</u>, <u>United States v. Owolabi</u>, 69 F.3d 156
(7th Cir. 1995).  Simels attempts to analogize his case to an
unpublished Fifth Circuit opinion, <u>United States v. Agholor</u>, 2002
WL 663704 at *3-4.  In <u>Agholor</u>, the defendant was convicted of
multiple immigration crimes which he carried out by using the
identities of two different people.  Simels correctly notes that

the Fifth Circuit reversed the district court's decision not to group the defendant's convictions for sentencing purposes.  What he ignores is that the Guidelines themselves specifically identify the primary victim of immigration offense to be "society at large."  U.S.S.G. § 3D1.2 n.4.  Here, by contrast, Simels was convicted of tampering with witnesses and there were eight distinct, identifiable people who were the primary intended victims of Simels obstruction of justice-related crimes.  Indeed, following Simels' argument to its natural conclusion would necessarily mean that the same punishment applies whether one is convicted of attempting to tamper with one witness or 100 witnesses.  The government respectfully submits that this reasoning defies common sense.

Accordingly, the Probation Department correctly determined Simels' offense level to be 42 and his applicable Guidelines range to be 360 months to life imprisonment.

B.   IRVING'S GUIDELINE OBJECTIONS

Irving also objects to the Probation Department's Guidelines calculation on two grounds.  First, she contends that the Probation Department erroneously assessed a two-level enhancement for her abuse of a position of trust pursuant to U.S.S.G. § 3B1.3.  Irving Sent. Mem. at 7.  Second, she argues she is entitled to a four-level reduction (presumably with respect to each of her five counts of conviction) for her minimal role in the offenses pursuant to U.S.S.G. § 3B1.2.  Id. at 7-9.  As shown below, Irving's argument fails.

> 1.   The Court Should Impose a Two-Level
>       Abuse of a Position of Trust Enhancement

Defendant Irving argues that she should not be subject to a two-level enhancement for abusing a position of trust because she was supervised by Robert Simels, and according to her, she lacked any discretion in the performance of her duties. Id. at 7.

Section 3B1.3 of the Sentencing Guidelines provides for a two-level enhancement if the defendant "abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3.  Thus, an abuse of trust enhancement is appropriate where: (1) the defendant occupied a position of trust, and (2) the defendant's abuse of that position of trust significantly facilitated her commission or concealment of the crime. Id.

In determining whether an abuse-of-trust enhancement is appropriate, a sentencing court must consider not only the offense of conviction, but also all conduct that qualifies as relevant conduct within Section 1B1.3.  The introductory commentary to Part B of Section Three of the Guidelines, which includes the abuse-of-trust enhancement in Section 3B1.3, expressly states:

> This Part provides adjustments to the offense
> level based upon the role the defendant
> played in committing the offense. The
> determination of a defendant's role in the
> offense is to be made on the basis of all
> conduct within the scope of § 1B1.3 (Relevant
> Conduct), i.e., all conduct included under §

1B1.3(a)(1)-(4), and not solely on the basis
of elements and acts cited in the count of
conviction.

See also United States v. Duran, 15 F.3d 131, 133 (9th Cir. 1994)

(noting that the November 1990 amendments to the Guidelines added

that "'[t]he determination of a defendant's role in the offense

[including whether an abuse of trust enhancement is appropriate]

is to be made on the basis of all conduct within the scope of §

1B1.3(a)(1)-(4), and not solely on the basis of elements and acts

cited in the count of conviction.'" (citing U.S.S.G., App. C,

Amend. 345)); United States v. Cianci, 154 F.3d 106, 112 (3d Cir.

1998) ("§ 3B1.1 was amended in 1991 to clarify that the 'offense'

means the offense of conviction and all relevant conduct under §

1B1.3").

Irving was an attorney who committed her crimes in

direct relation to, and in order to further, her representation

of her client, Shaheed Khan.  As the Probation Department

correctly observed:

> Irving, as an attorney, was entrusted with
> broad power as an officer of the Court and a
> representative of the legal system, which,
> through the commission of the instant
> offenses, she abused and betrayed.  She was
> empowered with the authority, as an attorney,
> to visit her client Shaheed Khan, in prison
> [alone and unsupervised] and entrusted that
> her visitations would take place within the
> bounds of the law, not to violate it.

Irving PSR ¶ 39.

Irving's argument suggests that no trust was put in her

because she was not lead counsel, but merely a law firm

associate.  Irving's Sent. Mem. at 7.  This argument - which

essentially boils down to "I was only following orders" - is not only insulting, it ignores the oath she took as an attorney to uphold the law, not violate it.  In short, the Court should apply the two-level abuse-of-trust enhancement.

        2.   <u>Minimal/Minor Role</u>

        The Probation Department correctly declined to afford Irving a role reduction.  Irving asserts that she should be afforded a four-level, or, in the alternative, a two-level, role reduction.  Irving's Sent. Mem. at 7-9.  According to Irving, her role in the offenses of conviction, which include conspiracy to obstruct justice and attempted witness tampering, and the importation and possession of wiretapping equipment, was "comparable to that of a drug courier in a drug conspiracy."  <u>Id</u>. at 8-9.  Irving further asserts that, unlike Simels, she did not receive any compensation beyond her "nominal salary" in exchange for her participation in charged conspiracy and is, therefore, deserving of a role reduction.  <u>Id</u>. at 9.

        The Guidelines provide that a defendant's base offense level may be reduced by two levels if the defendant was a "minor participant" and four levels if the defendant is a "minimal participant."  The Commentary to the relevant Guideline defines a "minor participant" as a defendant "who is less culpable than most other participants, but whose role could not be described as minimal." U.S.S.G. § 3B1.2(b) & comment. (n.5).  The same Commentary defines "minimal participant" as a defendant who is "plainly among the least culpable of those involved in the

conduct of a group." U.S.S.G. § 3B1.2(a) & comment. (n.4).  An adjustment under Section 3B1.2 is appropriate only when a defendant is "substantially less culpable than the average participant." U.S.S.G. § 3B1.2, comment. (n.3(A)).

A defendant has the burden of proving by a preponderance of the evidence that she is entitled to a role adjustment under Section 3B1.2 of the Guidelines.  See United States v. Yu, 285 F.3d 192, 200 (2d Cir. 2002); United States v. Castano, 234 F.3d 111, 113 (2d Cir. 2000); United States v. Colon, 220 F.3d 48, 51 (2d Cir. 2000).  Courts of Appeals have recognized that a district judge's analysis of the defendant's role in criminal activity is "'highly fact-specific and depends upon the nature of the defendant's relationship to other participants, the importance of the defendant's actions to the success of the venture, and the defendant's awareness of the nature and scope of the criminal enterprise.'" United States v. Carpenter, 252 F.3d at 234 (quoting United States v. Shonubi, 998 F.2d 84, 90 (2d Cir. 1993)).

The gravamen of Irving's argument is that she is less culpable than defendant Simels.  Irving's Sent. Mem. at 8-9.  The government does not disagree.  However, the Second Circuit has stated that "the intent of the Guidelines is not to 'reward' a guilty defendant with an adjustment merely because his [or her] co-conspirators were even more culpable." United States v. Lopez, 937 F.2d 716, 728 (2d Cir. 1991).  The Court of Appeals has repeatedly emphasized that a role reduction "'will not be

available simply because the defendant played a lesser role than his co-conspirators; to be eligible for a reduction, the defendant's conduct must be 'minor' [or 'minimal'] . . . as compared to the average participant in such a crime.'" Carpenter, 252 F.3d at 235 (quoting United States v. Rahman, 189 F.3d 88, 159 (2d Cir. 1999)); accord, e.g., United States v. Jeffers, 329 F.3d 94, 103 (2d Cir. 2003); United States v. Yu, 285 F.3d at 200.

Irving's claim that her role in the offenses of conviction was analogous to that of drug courier in a narcotics conspiracy is factually inaccurate, and, in any event unavailing. Irving's Sent. Mem. at 8-9.  In describing her role, Irving fails to acknowledge that she:

- Knew and interacted with all of the other participants in the scheme, including Simels, Khan, Vaughn and members of the Phantom Squad, and was aware of their respective roles;

- Knowingly and intentionally conveyed critical information between Khan, Simels and Vaughn concerning specific methods which should be used to obstruct justice;

- Knowingly and intentionally conveyed critical information about the whereabouts of potential victims of the witness tampering scheme to Vaughn; and

- Sent transcripts of wiretapped telephone conversations to members of the Phantom Squad in Guyana to use to pressure Jaignarine's brother;

- Facilitated the importation of the wiretapping equipment, provided detailed instruction to a co-conspirator in

Guyana on which equipment to ship and
how to ship it.

Simply put, Irving's role in the offenses was important
to its success, and far more significant than, for example, Colin
Moore, Conrad Sanmoogan and Glenn Hanoman, or a courier in a
narcotics conspiracy for that matter.  Even assuming otherwise,
the Second Circuit and others have routinely upheld the denial of
mitigating role adjustments, even to defendants who acted merely
as brokers or couriers of relatively modest quantities of
narcotics, so long as the defendant's role in the illegal venture
was important to its success. See, e.g., United States v. Imtiaz,
81 F.3d 262, 265 (2d Cir. 1996) (per curiam) (affirming denial of
mitigating role adjustment to broker/courier in single,
two-kilogram heroin transaction); United States v. Garcia, 920
F.2d 153, 154-55 (2d Cir. 1990) (upholding denial of minor role
adjustment to courier who received $150 for single delivery of
one kilogram of cocaine); United States v. Adames, 901 F.2d 11,
12 (2d Cir. 1990) (rejecting minor role adjustment where
defendant claimed to be only an intermediary between
co-conspirator and seller of heroin and defendant had only a
small financial interest in a $723,000 purchase of heroin); see
also United States v. Cantrell, 433 F.3d 1269, 1283 (9th Cir.
2006) ("drug courier and facilitator" responsible for between
one-and-one-half and five kilograms of methamphetamine was
properly denied minor role adjustment); United States v. Zuleta,
427 F.3d 1082, 1086 (8th Cir. 2005) (defendant who "acted as a
courier on more than one occasion" properly denied role

adjustment); <u>United States v. Gonzalez-Soberal</u>, 109 F.3d 64, 74 (1st Cir. 1997) ("even assuming, arguendo, that appellant was able to establish that he was merely a courier, he has failed to carry his burden of showing that he is entitled to a downward adjustment").

Irving also avers that, unlike Simels, she did not directly receive "any compensation for her purported role in the conspiracy, unlike Khan who stood to gain his freedom and Simels who earned a $1.8 million fee." <u>Id</u>. at 9. Again, merely because Simels is more blameworthy, does not, in and of itself, warrant a role reduction for Irving. Moreover, even with respect to drug couriers, the Second Circuit has rejected the argument that the fact that one does not directly share in illegal gains, does not automatically confer the right to a minor role adjustment. <u>See</u>, <u>e.g.</u>, <u>Shonubi</u>, 998 F.2d at 90 (affirming denial of role adjustment where defendant "describes his role in heroin smuggling as that of a lowly courier" and "insists he must be a minor or minimal participant because he had no money to acquire heroin independently and no accumulated drug profits"). Rather, this Court has noted that "couriers are indispensable to the smuggling and delivery of drugs and their proceeds." <u>United States v. Garcia</u>, 920 F.2d at 155. Similarly, Irving was indispensable to the instant crimes.

Accordingly, the Probation Department correctly determined Irving's offense level to be 34 and her applicable Guidelines range to be 151 to 188 months imprisonment.

**II.   THE SECTION 3553 FACTORS WARRANT A SENTENCE
        WITHIN THE GUIDELINES RANGE FOR SIMELS AND
        A SIGNIFICANT INCARERATORY SENTENCE FOR IRVING**

The defendants argue that the Court should grant dramatic departures from the applicable Guideline ranges.  Simels maintains that a sentence of 33 to 41 months - a sentence representing a nearly 90% reduction from the low-end of the applicable range - is appropriate (1) because of his employment history; (2) because there is no need to protect the public from him; (3) because he is a loving family member and friend; and (4) because his client, Shaheed Khan, received a sentence of 15 years.  As explained below, none of these factors militates in favor of a non-Guidelines sentence or significant downward departure.

For her part, Irving asks the Court to ignore her applicable Guidelines range of 151 to 188 months and sentence her to probation.  The government agrees with Irving that the sentence called for by the Guidelines is excessive, and that a non-Guidelines sentence is sufficient in her case.  The government, however, submits that, for reasons discussed below, the section 3553(a) factors support the imposition of a sentence including a period of incarceration.

   A.   <u>APPLICABLE LAW</u>

The government recognizes that, pursuant to the United States Supreme Court's decisions in United States v. Booker, Kimbrough v. United States and Gall v. United States, the Guidelines are advisory rather than mandatory, and the sentencing

court has the authority to fashion a reasonable and appropriate sentence in a given case.  Under Booker, the sentencing court must consider the Guidelines in formulating an appropriate sentence, along with all the factors in 18 U.S.C. § 3553, which include the nature and circumstances of the crime, the history and characteristics of the defendant, the need for the sentence to reflect the purposes of sentencing and the appropriate Sentencing Guidelines range.

Interpreting the Supreme Court's decision in Booker, the Second Circuit has held that "sentencing judges remain under a duty with respect to the Guidelines . . . to 'consider' them, along with the other factors listed in section 3553(a)." United States v. Crosby, 397 F.3d 103, 111 (2d Cir. 2005); see 18 U.S.C. § 3553(a).  Although the Crosby Court declined to determine what weight a sentencing judge should normally give to the Guidelines in fashioning a reasonable sentence, it cautioned that judges should not "return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum."  Id. at 113.

In Gall v. United States, 128 S. Ct. 586, 596 (2007), the Supreme Court explained the proper procedure and order of consideration for sentencing courts to follow:  "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a matter of administration and to secure nationwide consistency, the

Guidelines should be the starting point and the initial
benchmark." 128 S. Ct. at 596 (citation omitted). Next, a
sentencing court should "consider all of the § 3553(a) factors to
determine whether they support the sentence requested by a party.
In so doing, he may not presume that the Guidelines range is
reasonable. He must make an individualized assessment based on
the facts presented." Id. at 596-97 (citation and footnote
omitted).

     B.   SIMELS SHOULD RECEIVE GUIDELINES SENTENCE

          A sentence within the Guidelines range of 360 months to
life in prison is appropriate and reasonable in Simels' case
because it provides an individualized sentence that takes into
account his egregious conduct.

          Simels has not articulated why his situation is one not
contemplated by the Guidelines or how the mitigating factors he
cites were not already taken into consideration by the Sentencing
Commission. Many of the factors he cites, such as his family
relationships, friendships and employment history, are common to
many defendants and "inherently suspect" as grounds for a lower
sentence. See United States v. Rattoballi, 452 F.3d 127, 133 (2d
Cir. 2006) ("[A] non-Guidelines sentence that rests primarily
upon factors that are not unique or personal to a particular
defendant, but instead reflects attributes common to all
defendants should therefore be viewed as inherently suspect.").

          The offenses of conviction are most serious, committed
out of pure greed and a desire to win at all costs. The scheme

was, for lack of better word, outrageous.  First, Simels, with
the assistance of his associate, brazenly instructed Selwyn
Vaughn to lie at Khan's criminal trial.  Such conduct alone
undermines the vary underpinnings of our criminal justice system.
For an attorney to engage in such conduct, especially one with
Simels' level of experience, is inexplicable and inexcusable.

Moreover, there can be no doubt that, without
hesitation, Simels intended to bribe Leslyn Camacho.  Had this
scheme worked as Simels intended, Camacho would have taken the
witness stand in Khan's trial and lied in accordance with a
script Simels himself created.  The only limit to the amount
Simels was willing to pay Camacho for her testimony was what his
client was willing to spend.

Perhaps most shocking was Simels' attempt to harm or
even kill witness to advance his client's case.  Simels own words
after handing Vaughn $1,000 to buy unregistered cell phones,
discussed above, made Simels' intentions abundantly clear.  As
this Court correctly observed:

> [I]f Selwyn Vaughn were what Robert Simels
> believed him to be, a cooperative member of
> Khan's violent criminal enterprise, people
> could have easily been murdered and Simels
> knew that.

T. 2140.[9]

---

[9]    In his letter to the Court, Simels persist in his oft-
repeated claim that he not realize that Vaughn was dangerous or
that he seriously intended harm to witnesses.  Simels' Sent.
Mem., Ex. D at 4-5 ("I never considered that Vaughn was a threat
to anyone, but I should have").  Such claim was rejected by the
jury and belied by the evidence in this case.

28

Simels' effort to suborn perjury and to bribe, threaten and silence witnesses in Khan's trial was no momentary lapse of judgement: over the course of months, Simels repeatedly urged Vaughn to pursue every avenue possible to locate these witness to corruptly convince them not to cooperate with the investigation or to testify in conformity with Khan's defense.  To use his own words, Simels was willing to "do whatever ha[d] to be done to get him [Khan] outta here."  GX 401T10 at 21.

Compounding his crime, Simels undeniably perjured himself on the witness stand at his trial, falsely denying his involvement and deflecting blame toward others.[10]  T. 1200-1584. Without reservation, Simels claimed, among other things, that: (1) he did not intend to bribe Leslyn Camacho; (2) that he never intended to call Vaughn as a witness; (3) that he never intended to call Farah Singh as a witness; (4) that he did not realize that Vaughn and other members of the Phantom Squad were engaged in violent criminal activity and were dangerous; and (5) that a computer malfunction on June 11 distracted him when Vaughn raised the possibility of harming Clarke's mother.  As an attorney and officer of the Court, Simels' attempt to avoid responsibility for his crimes by perjuring himself on the witness stand should be a significant factor in determining an appropriate sentence.

It is significant that Simels continues to reject responsibility for his offense in his sentencing memorandum,

---

[10]/   Simels does not contest a two-level enhancement for obstruction of justice assessed for his false testimony at trial. Simels' Sent. Mem. at 3.

which is replete with outright denials and gross minimizations.
For example, in his letter to the Court, he maintains he was the
victim of his own "reckless[ly]" and "careless[ly]" ill chosen
words and that he "certainly never intended for any witness to be
threatened or harmed." Simels' Sent. Mem., Ex. D at 5. To the
contrary, the evidence showed Simels' words were intentional and
wholly calculated to achieve his criminal, corrupt purpose.
Simels laments he failed to follow his own advise to "[n]ever say
anything you wouldn't want to see on the front page of the New
York Times." Id. at 4. Simply put, Simels is not sorry for his
crimes, or the risk of harm he created; he is sorry he got
caught.

Simels offers numerous letters of support from members
of the bar. Simels' Sent. Mem., Ex. A. According to Simels,
these letters are offered to show that, throughout his career, he
has "distinguished himself as an attorney through diligence,
preparation, and zealous representation of his clients." Simels'
Sent. Mem. at 13. The implication of these letters, explicitly
or implicitly, is that the instant conduct is an anomaly in an
otherwise unblemished legal career. To that, the government
would only say that the obstructive conduct at issue in this
case, as it must, occurred behind closed doors, was shrouded by
the attorney-client privilege and difficult to uncover.
Indeed, Dirmuid White, who represented Khan together with Simels,
writes that he was wholly unaware of Simels' obstructive conduct
in the case until Simels was arrested. Simels' Sent. Mem., Ex. A

45. Certainly, if Simels were able to hide his criminal activity from White, it should come as no surprise that other attorneys with whom Simels interacted would be unaware of any similar conduct in his past.  Rather, the government agrees with the Court's assessment:

> The evidence about suborning perjury showed me that he [Simels] spent many years living on the wrong side of that line.  It just seemed too reflexive for me for a lawyer to so comfortably and as though it were asking Vuaghn to pass a box of tissues, to tell Vaughn that he is going to lie when he takes the stand at trial.

T. 2142.

Finally, Simels contends that Khan's 15-year sentence justifies a sentence of 33 to 41 months for him.  Simels' Sent. Mem. at 23-24.  Simels is correct that this Court should properly consider "the need to avoid unwarranted sentences disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  What Simels' ignores in his analysis is that there are marked differences which make his conduct more egregious and worthy of a lengthier sentence, (let alone the 80% shorter sentence he covets), including:

- Simels is a licensed attorney, who violated the public trust and his oath.

- Simels knew better - he had 35 years of experience as an attorney in the criminal justice system; Khan was a drug dealer from Guyana;

- Khan will deported when his sentence is complete and face the possibility of criminal charges in Guyana;

- As revealed on the July 29, 2009 T-III recording, Simels was the driving force behind the plot to bribe Leslyn Camacho, encouraging Khan to move forward with it. (Simels: "Uh, now, if we can arrange this, you should want, say I want to do it.")

- Simels involved and directed his associate, defendant Irving, in his scheme, which ultimately resulted in her conviction and likely her disbarment; and

- Khan pled guilty, waived attorney-client privilege and accepted responsibility for his actions saving the government substantial resources; Simels proceeded to trial, perjured himself on the witness stand, and as discussed above, has still not truly accepted any responsibility or shown remorse for his actions.

In sum, Simels' crimes are in a class by themselves. They represent a frontal assault on the integrity of the criminal justice system.  A Guidelines sentence is appropriate and reasonable and should be imposed.

C.    <u>IRVING SHOULD RECEIVE AN INCARCERATORY SENTENCE</u>

Irving also seeks for a dramatic departure from her applicable 151 to 188 month Guidelines range.  Irving argues that a probationary sentence is appropriate principally (1) because she did nothing wrong; (2) because she was the victim of circumstance; (3) because of her personal and employment history; (4) because she is less culpable than Simels; and (5) because of purported collateral consequence which flow from her conviction.

While the government agrees that the sentence mandated by the Guidelines is excessive, for the reasons stated below, a significant incarceratory sentence is necessary and appropriate.

As an initial matter, having been convicted of a class A felony, Irving is statutorily barred from receiving a sentence of probation. 18 U.S.C. §§ 3561(a)(1); 3559(a)(1); 1512(j).

Irving avers that she is a loving family member and friend to many who worked hard to achieve her goal of becoming an attorney.  She offers numerous letters of support which confirm the same, and the government has no evidence to the contrary. That said, as noted above, these are "inherently suspect" as grounds for a lower sentence, Rattoballi, 452 F.3d at 133.  There is nothing remarkable about Irving's personal history which is not already accounted for in the Guidelines range or which distinguishes her from many other defendants.  Indeed, unlike many other defendants who come before the Court, Irving grew up in an apparently loving environment, enjoyed the support of those close to her, and received the benefit of a legal education. These circumstances are hardly mitigating.

Moreover, most of the collateral consequences of her conviction which Irving predicts befall many defendants convicted of serious federal felonies.  Indeed, defendants frequently suffer the loss of their livelihood and face financial hardship. While the government does not mean to minimize the significance of Irving's likely loss of her law license, such circumstance

does not warrant ignoring the applicable Guideline range and imposing the overly lenient sentence Irving seeks.

On the other hand, the fact that Irving is utterly devoid of remorse for her actions and has failed to demonstrate even the slightest contrition, should weigh heavily in favor of a significant sentence.  In her letter to the Court, Irving maintains, in no uncertain terms, that she is "an innocent person."  Irving's Sent. Mem., Ex. 1 at 1.  She continues to liken her work in the Khan case to that of any associate in a law firm - drafting memos, handling discovery, working with investigators, and attending meetings with the client.  Irving's Sent. Mem. at 2.   The jury plainly rejected this claim.  Irving ignores, among other things: (1) that she participated in the May 13, 2009 meeting with Vaughn in which Simels repeatedly and blatantly instructed Vaughn to perjure himself on the witness stand; (2) that she immediately thereafter made efforts to secure Vaughn's false testimony by smuggling out of the MCC a letter from Khan to Vaughn; (3) that she personally obtained permission from Khan to pay Vaughn $1,000 so he and his crew could obtain unregistered cell phones; (4) that she discussed and relayed Khan's instruction on how to pressure various potential witnesses including Khan's directive not to "do anything stupid in terms of Clarke's mother"; (5) that she sent Vaughn to speak with Vijai Jaignarine to convince him not testify against Khan, even though Jaignarine had already informed a defense investigator that he was unwilling to speak about Khan without his attorney present;

(6) that she sent transcripts of wiretapped telephone conversations to members of the Phantom Squad in Guyana to use when threatening Jaignarine's brother; and (7) that she personally arranged to import critical components of the wiretapping equipment.  Irving's utter lack of recognition of the wrongfulness of her actions raises serious questions about whether her conviction has truly deterred her not to engage in future criminal conduct.  18 U.S.C. 3553(a)(2)(C).

Irving contends she was simply "in the wrong place at the wrong time."  Irving's Sent. Mem. at 3.  While this does not excuse Irving's criminal conduct, it could, if true, help to explain it.  Indeed, the government conceded during its rebuttal summation that, if Irving was working for another lawyer, she likely never would have engaged in the conduct of which she now stands convicted.  T. 1901.  Since the trial, however, the government has learned that even before Irving worked for Simels, she had a history of deceitful and manipulative conduct as an attorney.  In fact, as described in the Addendum to the Irving PSR, Irving was fired by her previous employer, Laura Miranda, Esq., because she used Ms. Miranda's signature stamp without authorization and then lied about it.  Given these facts, Irving's oft-repeated claim that she only committed these crimes because she worked for Robert Simels, rings hollow.

Finally, a term of incarceration is necessary to adequately deter future violations.  As the Supreme Court has recognized, "custodial sentences are qualitatively more severe

than probationary sentences of equivalent terms." Gall, 128 S.

Ct. at 595.  A probationary sentence would not adequately deter

Irving or other similarly situated individuals from committing

similar crimes in the future.  It is of paramount importance that

attorneys, including law firm associates such as Irving, to

understand that they are accountable for their actions and cannot

simply "follow orders" as Irving maintains she did.  As the Court

is aware, this case has been closely followed by the legal

community.  A probationary sentence for Irving would do nothing

to deter others from engaging in similar offenses.

In the final analysis, what Irving fails to recognize

and acknowledge is the seriousness of her criminal conduct, the

severity of the potential consequences of her and her co-

conspirator's scheme, and the fact that her criminal conduct

simply had nothing to do with the legitimate work of a law firm

associate.  Irving (and Simels, for that matter) did not walk a

fine line of zealous advocacy and accidentally fall over it; they

marched across it and into a criminal conspiracy.

In sum, the government submits that a significant

incarceratory sentence is an appropriate and should be imposed.[11]

---

[11]/   Irving requests leave to self-surrender.  Irving's Sent.
Mem. at 10.  As discussed below, once sentenced, Irving has the
burden of establishing she meets the criteria contained in 18
U.S.C. § 3143(b)(1) to be eligible for release.  The government
respectfully submits that Irving's perfunctory request fails to
meet this burden.

## III. <u>SIMELS IS NOT ENTITLED TO BAIL PENDING APPEAL</u>

In arguing for release pending appeal, Simels raises no remotely close questions of law or fact that will result in a reversal of his conviction.  Under the Bail Reform Act of 1984 (the "Act"), there is a presumption in favor of detention for sentenced defendants, and a defendant seeking bail pending appeal bears "a very heavy burden."  <u>United States v. Ramjohn</u>, 2008 WL 974580, *1 (E.D.N.Y. Apr. 8, 2008).  The Act provides, in relevant part:

> [T]he judicial officer shall order that a person who has been found guilty of an offense and sentenced to a term of imprisonment and who has filed an appeal . . . be detained, unless the judicial officer finds
>
> (A) by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released . . . and
>
> (B) that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in –
>
>> (i)  reversal,
>>
>> (ii)  an order for a new trial,
>>
>> (iii)  a sentence that does not include a term of imprisonment, or
>>
>> (iv)  a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process.

18 U.S.C. § 3143(b)(1).  The strict standard for release set forth in the Act embodies Congress's view that "'once a person

has been convicted and sentenced to jail, there is absolutely no reason for the law to favor release pending appeal or even permit it in the absence of exceptional circumstances.'" United States v. Miller, 753 F.2d 19, 22 (3d Cir. 1985) (quoting H. Rep. No. 907, 91st Cong., 2d Sess. 186-87 (1970)).

The current statutory presumption of detention pending appeal means that the defendant now has the burden of proof, Miller, 753 F.2d at 24, and must be detained pending appeal unless the court finds, inter alia, (1) that there is clear and convincing evidence that the defendant is not likely to flee or pose a danger to the community; (2) that the appeal raises a "substantial question of law or fact" and (3) that if the substantial question is determined favorably to the defendant on appeal that decision "is likely to result in reversal." United States v. Randell, 761 F.2d 122, 125 (2d Cir. 1985); Miller, 753 F.2d at 24. The Second Circuit has explained that the word "substantial" in Section 3143 means "of more substance than would be necessary to a finding that it was not frivolous. It is a 'close' question or one that very well could be decided the other way." Randell, 761 F.2d at 125 (quoting United States v. Giancola, 754 F.2d 898, 901 (11th Cir. 1985)).

As demonstrated herein, Simels has failed to raise a substantial question of law or fact. Each of his claims of error are contradicted by clearly established law. There is thus no issue on appeal that is likely to result in the reversal of the

Simels' conviction.  His motion for bail should therefore be denied.

A.   THE GOVERNMENT'S USE OF T-III TO IMPEACH
     SIMELS WAS PROPER

Simels contends that the government's use of a portion of the previously suppressed T-III recordings raises a substantial appellate question.[12]  He is wrong.

As the government explained in it's July 29, 2009 letter motion, and as this Court ultimately held, the portions of the previously suppressed T-III recordings were admissible for the purpose of impeaching the defendant given his defense that he was not intending to pay Leslyn Camacho but rather conduct his own "sting operation."  T. 1417-26.

1.   Factual Background

As discussed above, during the course of their conversations, Simels and Vaughn discussed bribing Leslyn Camacho to testify falsely on Khan's behalf.  After some negotiation through Vaughn, on July 22, 2008, Simels ultimately agreed to pay Camacho $10,000: $5,000 upon signing an affidavit and an additional $5,000 after she testified at trial.  GX 401T21 at 1; 401T22 at 3.  On July 29, 2008, Simels met with Khan in the Metropolitan Correction Center's ("MCC") attorney visiting room.

---

[12]   In an Order dated July 2, 2009, this Court granted the defendants' motion to suppress those recordings on the grounds that the Government's order authorizing the recordings was "internally contradictory" and failed to meet the minimization requirements set forth in Title III.  United States v. Simels, 2009 WL 1924746 at *12 (E.D.N.Y., July 2, 2009).

Pursuant to a Title III Order, their conversation was surreptitiously recorded by law enforcement.  During the meeting, Simels explained to Khan that he needed money to pay Camacho.  GX 402T2 at 2-3.  The following day, July 30, 2008, Vaughn met with Simels in his Office.  Among other things, they discussed the pending offer to bribe Leslyn Camacho.  During this meeting Simels reported a portion of his conversation with Khan at the MCC, explaining that Khan still wished to pay Camacho, but wanted Vaughn to negotiate an amount less than $10,000.  GX 401T26 at 11.

At law enforcement's direction, Vaughn eventually scheduled a meeting for September 10, 2008, at the defendants' office in order to have Leslyn Camacho sign the affidavit and receive partial payment from Simels.  Immediately prior to the scheduled meeting with Camacho, agents entered the defendants' offices and placed them under arrest.  Agents then searched the office pursuant to a search warrant.  During their search, agents recovered, among other things, a typed affidavit intended for Camacho to sign, GX 513, and a "witness fee" check made payable to Camacho in the amount of $40, GX 509, all from a table in the conference room.  In addition, agents recovered $2,500 in cash wrapped in a plastic bag from the rear of a locked drawer in Simels's desk.  GX 604.  Immediately next to the money was a blue "post-it" note which read "Khan $." GX 605.

Mr. Shargel informed the jury during his opening statement that Simels never intended to pay Camacho, but only

hoped to capture her in an extortion attempt: "[Simels] never intended to give [Camacho] any money.  This was a sting operation." (Tr. 220-21).  Simels ultimately testified in conformity with Mr. Shargels' opening statement:

> Mr. Shargel:   Did you ever intend to
> actually pay money to Leslyn
> Camacho or David Clarke?
>
> Mr. Simels:    Not a cent.
>
> ***
>
> Mr. Shargel:   Did you intend with this sting
> operation to record Leslyn
> Camacho?
>
> Mr. Simels:    It was my intention when and
> if she [Camacho] showed up to
> the office to tape record her.
> . . .I could get her to tell
> us on tape that she was
> seeeking money on behalf of
> Clarke, that was step in our
> direction toward getting to
> Clarke and proving to the
> government that we had been
> extorted.

T. 1419-1421.

>    2.   There was No Error in Admitting the
>         T-III to Impeach Simels

Given Simels's defense, the Court was correct in permitting the government to introduce short portions of the T-III to impeach him.  It is well established that illegally-obtained evidence not otherwise admissible in the government's case-in-chief may nonetheless be used for impeachment.  See United States v. Havens, 446 U.S. 620, 626-27 (1980) (noting the Supreme Court has previously "rejected the notion that the

defendant's constitutional shield against having illegally seized evidence used against him could be 'perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances.'" (quoting Harris v. New York, 401 U.S. 222, 226 (1971)).  Indeed, the Second Circuit has acknowledged that "'[w]hen a defendant offers an innocent explanation' for his conduct, he 'opens the door' to questioning into the truth of his testimony, and the government is entitled to attack his credibility on cross-examination" with previously suppressed evidence.  See United States v. Douglas, 525 F.3d 225, 248 (2d Cir. 2008) (quoting United States v. Payton, 159 F.2d 49, 58 (2d Cir. 1998)).  The ultimate goal of allowing such otherwise inadmissible evidence is to ensure that "when defendants testify, they must testify truthfully or suffer the consequences."  See Douglas, 525 F.3d at 248 (quoting Havens, 446 U.S. at 626).

While Simels correctly notes that the Second Circuit has not specifically addressed the issue, at least six circuits have extended this broad principle, which permits the government to impeach a witness based on evidence obtained in violation of the Constitution, to evidence obtained in violation of Title III. See United States v. Vest, 813 F.2d 477 (1st Cir. 1987); United States v. Caron, 474 F.2d 506 (5th Cir. 1973); United States v. Wuliger, 981 F.2d 1497 (6th Cir. 1992); United States v. Baftiri, 263 F.3d 856, 857-58 (8th Cir. 2001); United States v. Echavarria-Olarte, 904 F.2d 1391 (9th Cir. 1990); Anthony v.

United States, 667 F.2d 870 (10th Cir. 1981).  While Section 2515 effectively "serves as an exclusionary rule," by prohibiting the introduction of any evidence obtained in violation of Title III itself, these Courts have all recognized an impeachment exception.  Wuliger, 981 F.2d at 1505.  Indeed, Simels cites no authority, nor is the government aware of such a case, that adopts his contrary view.

The impeachment exception to Title III's exclusionary rule is an extension of the Fourth Amendment doctrine articulated in Harris, 401 U.S. 222, in which the Supreme Court "held that otherwise impermissible evidence could be used by the prosecution on rebuttal, stating that no exclusionary rule may permit affirmative perjury." Jacks v. Duckworth, 651 F.2d 480, 484 (7th Cir. 1981) (citing Harris, 401 U.S. at 225).  Indeed, "[w]hile Harris and its progeny involved evidence obtained in violation of the Fourth Amendment, the rationale has been extended, and properly so, to cases involving evidence obtained as here in violation of Title III." Jacks, 651 F.2d at 483-84 (citing Caron, 474 F.2d at 509-10) (footnote omitted).

The defendant renews his argument that the plain language Section 2515 does not permit an impeachment exception to Title III prohibition against the use of improperly intercepted communications as evidence.  Simels Sent. Mem. at 26.  As the Fifth Circuit held in Caron, Title III's legislative history "made it clear" that Section 2515 "should not be construed as requiring exclusion" of recorded conversations that had not been

previously authorized by the court and were submitted by the
government for the purposes of impeachment.  <u>Caron</u>, 474 F.2d at
509.  Similarly, in granting the government's motion to admit the
portion of the recording at trial, this Court observed:

> The defendant's argument kind of plays gotcha
> with the language that Congress chose and I
> think there's a long recognized distinction
> between the use for impeachment purposes
> only, as opposed to the government's case in
> chief that Congress intended to deploy in
> this setting, and I think the language [of
> the legislative history] is sufficiently
> susceptible to that construction . . .

T. 1101.

Accordingly, the Court properly admitted the T-III for
impeachment purposes, and Simels, therefore has not raised a
substantial question justifying bail pending appeal.

3.   <u>Any Error Was Harmless</u>

Alternatively, this Court's decision to permit
introduction of portions of the T-III recording for impeachment
purposes does not raise a substantial question because any error
in doing so was harmless.

Absent the T-III recording, the evidence belying
Simels' "sting defense" was overwhelming and included, but was
not limited to, the following:

- The fact that Simels never shared his
  plan to "sting" Camacho with Vaughn or
  sought to have Vaughn record Camacho's
  bribe demand;

- The fact that Simels repeatedly
  instructed Vaughn to tell Camacho that
  the payment was a lawful witness fee;

- The fact that Simels attempted to negotiate, through Vaughn, a lesser bribe amount;

- The fact that Simels did not arrange to have an investigator or law enforcement officer present to witness his meeting with Camacho;

- The fact that Simels prepared a detailed affidavit, which included information he could not possibly have known, for Camacho to sign without ever meeting or speaking with her;

- The fact that Simels had $2,500 in cash - exactly half of the agreed upon total bribe payment - in an envelope marked "Khan $" in his desk drawer at the time of his scheduled meeting with Camacho; and

- The fact that none of the numerous memos or other notes found in the defendants' computers and offices made any reference to the "sting operation."  To the contrary, Irving first raised the idea of recording the meeting, something which Simels viewed as critical to the success of the sting, in her September 5, 2008 memorandum, well over a month after the idea of bribing Camacho was broached.

Indeed, a sense of the minor role the T-III recording ultimately played at the trial may be gleaned from a review of the government's arguments to the jury following its admission. The government did not mention the T-III recording even once during its nearly three hour summation.  During its rebuttal, which itself lasted almost an hour, and covered over 30 pages in the trial transcript, T. 1873-1906, the government's discussion of the T-III recording appears on the 26th page and covers less than a full page of the transcript.  T. 1900-01.  Finally, while

the government re-played numerous recordings introduced in evidence during its arguments to the jury, it never re-played the T-III recording.

Because any error in admitting the T-III recording was harmless, Simels cannot meet his burden of establishing that its admission "is likely to result in reversal." Randell, 761 F.2d at 125; Miller, 753 F.2d at 24.

B.   SIMELS' SIXTH AMENDMENT CLAIM LACKS STANDING AND
     IN ANY EVENT LACKS MERIT

Simels contends that the government's use of a cooperating witness to record his statements violated the 6th Amendment and the Court's denial of his motion to suppress the consensual recordings on these grounds presents a substantial question.  Simels' Sent. Mem. at 27-29.  As shown below, this Court's pre-trial ruling was correct, and bail pending appeal on this grounds should not be granted.

As explained in the government's Response in Opposition to Defendants' Pre-Trial Motions, dated March 27, 2009, Simels lacks standing to even raise this claim.  Id. at 14-29.  While an intrusion by the government into the attorney-client relationship may constitute a violation of the 6th Amendment, those rights belong to Khan, not Simels.  In connection with his plea, Khan made a sweeping waiver of his attorney-client privilege, thus waiving any right for him, let alone Simels, to raise this claim.

Moreover, even if the 6th Amendment right to effective counsel somehow extended beyond Khan to Simels, for the myriad

reasons raised in the government's March 27 submission, which we will not repeat, there was no 6th amendment violation here. Suffice it to say, the government is entitled, if not obligated, to investigate potential criminal activity, even if that activity involves a defendant's lawyer.  After receiving credible evidence that Simels sought to obstruct justice in Khan's criminal trial and learning that he had lied to prison official in attempt to meet with a cooperating witness, the government took reasonable and responsible steps to initiate an investigation.  Most significantly, the government implemented a stringent "firewall" procedure to insure that Khan was not prejudiced as a result of the investigation into his attorneys.

Simply put, there was no 6th Amendment violation and Simels' claims to the contrary are meritless.

C.   <u>THE SEARCH OF SIMELS LAW OFFICE WAS PROPER</u>
   1.   There was no Error in Admitting the
        Fruits of the Search of the Defendants'
        <u>Offices</u>

Simels argues that the "propiety of the search [of the defedants' office] presents a substantial question for appeal." Simels' Sent. Mem. at 30.  Simels renews his pre-trial argument in support of his motion to suppress the fruits of that search on the grounds that agents seized items outside scope of the search warrant.  <u>Id</u>.

As explained in the government's Memorandum in Opposition to to Simels pre-trial motion to suppress, the Second

Circuit has stated "when items outside the scope of a valid warrant are seized, the normal remedy is suppression and return of those items, not invalidation of the entire search." Matias, 836 F.2d at 747 (citations omitted); see also United States v. Longo, 70 F. Supp. 2d 225, 252 (W.D.N.Y. 1999) ("[R]emedy with respect to any items exceeding the scope of the warrant [is not] invalidation of the search but suppression of those items.")(citing George, 975 F.2d at 79).  Blanket suppression, of the type requested by Simels, has been referred to by the Second Circuit as a "drastic remedy." Matias, 836 F.2d 744, 748 (2d Cir. 1987); see generally United States v. Foster, 100 F.3d 846, 852 (10th Cir. 1996)(commenting that "the extreme remedy of blanket suppression should only be imposed in the most extraordinary of cases") (internal quotation marks omitted).  The instant matter is not "the most extraordinary of cases" that warrants the "drastic remedy" sought by the defendant.

        "[W]holesale suppression is required only when (1) [the agents] effect a 'widespread seizure of items that were not within the scope of the warrant,' and (2) do not act in good faith." United States v. Liu, 293 F.3d 138 (2nd Cir. 2000).  Such was not the case here.  The search was conducted at an attorney's office.  Given the fact that the agents walked out with what has been described as five boxes of records demonstrates that they acted with restraint.  This is further evidenced by the defendant's own description that, of the recovered items, only "handfuls" of documents unrelated to Khan were recovered.  Simels

48

Pre-Trial Mot. at 35.  This defies the definition of a "general search" that is an indiscriminate "rummaging" or wholesale collection of items.  See United States v. Dzialak, 441 F.2d 212, 217 (2d Cir. 1971) (general search found where agents "in executing what was a very precise warrant, [] spent more than four hours ransacking a[] house for any possible incriminating evidence," and "of the items seized, those which were not described in the warrant far outnumbered those described").

Moreover, even if some items outside the scope of the warrant were initially seized that, in and of itself, would not constitute a violation of the law under the warrant that was issued in this case.  As part of the search warrant, the magistrate issued special procedures in this case.  Those procedures instructed that, after law enforcement seized materials covered by the warrant, the items would be inspected by "wall AUSAs" to insure that the recovered materials did not constitute privileged materials.  That procedure, later overseen by this Court, resulted in the disclosure to the prosecution team of approximately 18 documents, some of which have been heavily redacted.  This result further defies the definition of a "general search" conducted in "bad faith" requiring "blanket suppression."

For all these reasons, the Court properly denied Simels' pre-trial motion to suppress the fruits of the search and its decision to do so does not present a substantial question on appeal.

2.   <u>Any Error Was Harmless</u>

Alternatively, this Court's decision to permit introduction of the fruits of the search of the defendants' office was harmless.  Clearly, the most significant evidence against Simels were his consensually recorded conversations with Vaughn.  As the Court observed following the verdict, "I don't think the jury's verdicts evinced that it was a hard case.  I saw nothing nuanced or susceptible of interpretation in many of the recorded statements of Mr. Simels."  T. 2140.  Simply put, even absent introduction of a single item recovered during the search, Simels would have been convicted.


D.   THE "HEAD SHOT" BOARD DISPLAYED TO THE
     JURY WAS ACCURATE, RELEVANT AND NOT
     <u>UNDULY PREJUDICIAL</u>

Simels next argues that the introduction of his and Irving's arrest photographs, and the manner it was displayed during the trial, unfairly prejudiced him and presents a sufficiently substantial question to warrant bail pending appeal.  As the Court properly ruled at trial however, defendant's argument lacks merit.  T. 407-08.

1.   <u>Factual Background</u>

During the testimony of Selwyn Vaughn, the government introduced photographs of the various people he discussed and placed them on a velcro board to display to the jury.  Some of these photographs included members of the "Phantom Squad," such as Paul Rodriques, GX 6/T. 262; Gerald Perera, GX

13/T. 267, Lloyd Roberts, GX 26/T 269, and Sean Bellfield, GX 21,
T 270.  Other photographs displayed on the board included those
of potential witnesses whom Simels and his co-conspirators
targeted, such as that of David Clarke, GX 5/T 318, and George
Allison, GX 12/T 358, and those of victims of the Phantom Squad
like Donald Allison, GX 9/T 287) and Ronald Waddelle, GX 35/T
287).  The board ultimately contained photographs of virtually
every individual that Vaughn referenced in his testimony,
including Simels, Irving, Khan and Vaughn himself.  GX 1-4.  The
board itself made no mention of the Phantom Squad, and had no
caption, or even any writing, on it.

     2.  <u>Applicable Law</u>

     Evidence is relevant if it has "any tendency to make
the existence of any fact that is of consequence to the
determination of the action more probable or less probable than
it would be without the evidence."  Fed. R. Evid. 401.  A court
has the discretion to exclude relevant evidence "if its probative
value is substantially outweighed by the danger of unfair
prejudice."  Fed. R. Evid. 403.

     It is settled that "[a] district court judge is in the
best position to evaluate the admissibility of offered evidence."
<u>United States v. Valdez</u>, 16 F.3d 1324, 1332 (2d Cir. 1994)
(citations omitted).  Thus, the district court's "balancing
analysis under Rule 403 is reviewable under an
abuse-of-discretion standard, and its resulting decision to admit
or exclude evidence will not be overturned unless . . . [it]

acted arbitrarily or irrationally." United States v. Thai, 29
F.3d 785, 813 (2d Cir. 1994) (citations omitted); United States
v. Salameh, 152 F.3d 88, 110 (2d Cir. 1998) (in reviewing a Rule
403 ruling "[w]e will second-guess a district court 'only if
there is a clear showing that the court abused its discretion or
acted arbitrarily or irrationally'") (quoting Valdez, 16 F.3d at
1332).  Moreover, when reviewing a Rule 403 ruling, this Court
examines the evidence "'maximizing its probative value and
minimizing its prejudicial effect.'" United States v. Rubin, 37
F.3d 49, 53 (2d Cir. 1994) (quoting United States v.
Arango-Correa, 851 F.2d 54, 58 (2d Cir. 1988)).  Additionally,
the potential prejudicial effect must be evaluated in light of
the seriousness and inflammatory nature of the charges and other
evidence in the case.  See United States v. Livoti, 196 F.3d 322,
326 (2d Cir. 1999) (upholding admission of evidence that "did not
involve conduct more inflammatory than the charged crime");
United States v. Roldan-Zapata, 916 F.2d 795, 804 (2d Cir. 1990)
(same).

     3.   Discussion

     Applying these standards, introduction of Simels'
headshot was proper, and the manner in which it was displayed
fair.  As is the practice with many, if not most, criminal trials
in this district and elsewhere, the government introduced the
photographs of various individuals in order to aid the jury in
remembering the myriad individuals who were relevant to the
trial.

Simels argues that photo board (or chart as he refers to it) had a "devastating and unfair prejudicial effect" because it "falsely suggested that Simels was a leader of the [Phantom Squad]." Simels' Sent. Mem. at 32. It is simply unfathomable to believe that by viewing the board, the jury could have gotten the impression that Simels and Irving were somehow the leaders of the Phantom Squad. To think otherwise, belittles the intelligence of the jury. The fact of the matter is the defendants' co-conspirators in this case were members of a violent Guyanese gang. It should come as no surprise that the defendants' photographs would be shown on the same board as those with whom the defendants chose to commit their crimes. As the Court observed in denying the Simels objection to this evidence at trial, "[t]he prejudice only enures to how strong the government's proof is that he [Simels] was a coconspirator. I don't think the jury will draw a conclusion that is not supported by the government's proof." T. 408.[13]

### 4.   Any Error was Harmless

Even if an appellate court found that it was error to display Simels photograph with that of his co-conspirators, any error would be deemed harmless. It is settled that harmless error analysis applies to evidentiary errors. See United States v. Myerson, 18 F.3d 153, 161-62 (2d Cir. 1994) (finding

---

[13]/   The Court went on to invite Simels to renew his objection if his concern was the length of time the chart was displayed to jury. T. 408. The chart was only sparing shown to the jury during the trial, and neither defendant renewed this objection.

evidentiary error harmless where there was clear evidence of fraud by the defendant); <u>United States v. Puglisi</u>, 790 F.2d 240, 243 (2d Cir. 1986) (holding that if there was evidentiary error, it was harmless in light of "ample evidence" of guilt).  As shown above, the evidence against Simels was overwhelming.

In sum, Simels has failed to show that the Court's decision to overrule his trial objection to introduction and display of his photograph was error, let alone error that raises a substantial question to warrant bail pending appeal.

E.   SIMELS HAS FAILED TO SHOW A DUE PROCESS <u>VIOLATION</u>

Simels alleges, for the first time, that the "cumulative effect" of the various alleged errors discussed above deprived him of due process and a fair trial.  Simels' Sent. Mem. at 32.  The cumulative error doctrine comes into play only where "the total effect of the errors . . . found . . . cast[s] such a serious doubt on the fairness of the trial that the convictions must be reversed." <u>In re Terrorist Bombings of U.S. Embassies in East Africa</u>, 2008 WL 4964777, at *41 (2d Cir. Nov. 24, 2008) (<u>citing</u> <u>United States v. Guglielmini</u>, 384 F.2d 602, 607 (2d Cir. 1967)).  As discussed above, there was no error.  Even had there been error, it does not cast serious doubt on the fairness of the trial.  Thus, whether the "cumulative error" doctrine requires Simels to receive a new trial does not present a substantial question to warrant bail pending appeal.

F.    THE APPLICATION OF SECTION 2512 TO THE
      WIRETAPPING EQUIPMENT HERE DOES NOT
      PRESENT SUBSTANTIAL QUESTIONS

Finally, Simels contends that his previously rejected arguments concerning the wiretap equipment counts (Counts Twelve and Thirteen) present two substantial questions.  Simel's Sent. Mem. at 32-34.  First, Simels again argues that he should be entitled to a judgment of acquittal on these counts because the equipment at issue in this case was not operable.  Id.  Second, he renews his claim that the statutes are unconstitutionally vague as applied to him.  Id. at 34.

For the reasons stated in the government's previous submission responding to these claims, Simels' arguments lack merit.  However, the Court need not reach this issue to resolve Simels' motion of bail pending appeal.  As stated above, to constitute a "substantial question" that would warrant bail pending appeal, it must be one which is "likely to result in - (i)  reversal, (ii) an order for a new trial, (iii)  a sentence that does not include a term of imprisonment, or (iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process.  18 U.S.C. § 3143(b)(1); see also, United States v. DiSomma, 951 F.2d 494 (2d Cir. 1994) (within Court's discretion to grant bail pending appeal where there exists a substantial question "upon which his sole conviction stands or falls") (emphasis added).  Here, even if Simels were successful in gaining dismissal of counts Twelve and Thirteen, the remaining

counts of conviction would stand, and the prison sentence he receives would likely remain unaffected.  Accordingly, granting him bail pending appeal on these grounds is inappropriate.

IV.  ASSUMING DEFENDANT SIMELS IS NOT GRANTED BAIL
     PENDING APPEAL, HE SHOULD BE ORDERED TO COMMENCE
     SERVING HIS SENTENCE IMMEDIATELY

On November 13, 2009, the Court issued an Order for Simels to Show Cause why he should not be incarcerated on the date of sentencing.  In his sentencing submission, Simels argues that the Court previously found that he is not a flight risk or a danger to the community and that the imposition of sentence will not suddenly turn Simels into a flight risk.  Simels' Sent. Mem. at 34-35. The government disagrees.

As the Court is aware, immediately following the jury's verdict convicting the defendants, the government moved to detain Simels pursuant to 18 U.S.C. §§ 3143(a)(2); 3142(f)(1)(B); 1512(j).  T. 2122.  The government argued that Simels posed a flight risk citing principally Simels' history of obstructive behavior, his possible unaccounted for financial resources and incentive to flee given the likelihood of a lengthy prison sentence.  T. 2133-37.  Simels countered that his strong community and familial ties and the fact that he was willing to post additional collateral, provided sufficient moral suasion to ensure his continued appearance.  In arguing for release, Simels stressed that he needed to meet with existing clients, facilitate

their representation by substitute counsel and wind down his law practice.  T. 2131.

The Court observed that the decision whether to release Simels pending sentence was a "close" and "hard" one.  T. 2138. Ultimately, the Court granted Simels bail, with added conditions requiring him to post additional real property collateral, and subjecting him to 24-hour-a-day house arrest with electronic monitoring.  T. 2143.

The government respectfully submits that circumstances have sufficiently changed to warrant immediate incarceration for the following reasons: First, Simels has presumably wound down his law practice, rendering moot one of Simels' more compelling arguments for release.  Second, and more importantly, the lengthy sentences that Simels is likely to receive come December 4 substantially increases the risk of flight.  Until now, Simels had incentive to comport with Court orders and continue to appear so that he could position himself in the best light possible before the Court at sentencing.  Simels does not face any mandatory minimum sentence and, as discussed above, argues that a dramatic reduction from the applicable Guidelines is both reasonable and appropriate.  Once sentenced, this incentive evaporates.  Simply put, assuming that Simels is sentenced to an incarceratory sentence, there is no reason why the Court should risk his non-appearance, and he should not commence serving his sentence immediately.

## CONCLUSION

For the reasons stated herein, the government respectfully submits that the Court should conclude the Probation Department correctly calculated the applicable Guidelines ranges. The Court should also conclude that the section 3553(a) factors warrant the imposing a Guidelines sentence on defendant Simels and a significant incarceratory sentence on defendant Irving. Finally, Simels' motion for bail pending appeal should be denied, and the Court should order him detained when he is sentenced.

Dated:      Brooklyn, New York
            December 1, 2009


                              Respectfully submitted,

                              BENTON J. CAMPBELL
                              United States Attorney
                              Eastern District of New York


                    By:   /s/_____
                              Morris J. Fodeman
                              Daniel Brownell
                              Assistant U.S. Attorneys



cc: Clerk of the Court (JG) (by ECF)

    Gerald Shargel, Esq. (by ECF and e-mail)
    Evan Lipton, Esq. (by ECF and e-mail)
    Javier Solano, Esq. (by ECF and e-mail)

    Probation Officer Frank M. Marcigliano (by e-mail)
    Senior Probation Officer Cheryl Fiorillo (by e-mail)