UNITED STATES DISTRICT COURT          <u>ELECTRONIC PUBLICATION ONLY</u>
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

UNITED STATES OF AMERICA

           -against-                          MEMORANDUM

                                              08-CR-640 (JG)

ROBERT SIMELS and ARIENNE IRVING,

                 Defendants.
-------------------------------------------------------------x

A P P E A R A N C E S :

        BENTON J. CAMPBELL
                United States Attorney
                Eastern District of New York
                271 Cadman Plaza East
                Brooklyn, NY 11201
        By:     Steven L. D'Alessandro
                Morris J. Fodeman
                Daniel D. Brownell
                *Attorney for the United States of America*

        LAW OFFICES OF GERALD L. SHARGEL
                570 Lexington Avenue, 45th Floor
                New York, NY 10022
        By:     Gerald L. Shargel
                Evan L. Lipton
                *Attorneys for Defendant Robert Simels*

        LAW OFFICES OF JAVIER A. SOLANO, PLLC
                350 Fifth Avenue, Suite 5900
                New York, NY 10118
        By:     Javier A. Solano
                Lawrence K.W. Berg
                *Attorneys for Defendant Arienne Irving*

JOHN GLEESON, United States District Judge:

        In the course of investigating suspicions that defendants Robert Simels and

Arienne Irving were engaged in a conspiracy with Shaheed "Roger" Khan to obstruct justice

while acting as criminal defense attorneys, the government obtained a intercept warrant under

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510 *et seq.*

("Title III"). Pursuant to the warrant, federal agents made recordings of consultations between

the defendants and Khan at the Metropolitan Correction Center ("the MCC recordings"). In a

prior opinion, I found that the warrant's minimization provisions fell afoul of Title III's

requirements. *United States v. Simels*, No. 08-CR-640, 2009 WL 1924746 (E.D.N.Y. July 2,

2009) (*Simels II*).[1] Accordingly, I granted Simels's pre-trial motion to suppress the MCC

recordings.

At trial, Simels testified in his own defense. The government contended that his

testimony was contradicted by the MCC recordings, and moved to introduce portions of the

previously-suppressed tapes. Ruling from the bench, I concluded that there is an impeachment

exception to Title III's exclusionary rule, and permitted the government to play the relevant

excerpts from the MCC recordings for the purpose of challenging Simels's credibility. I

promised that an opinion would follow, and this opinion explains my reasons for allowing the

MCC recordings to be used for impeachment.

BACKGROUND

A.      *The Investigation*

In June 2006, Shaheed "Roger" Khan was arrested in Suriname and transported to

the United States to face narcotics trafficking charges in this district. A major figure in his native

Guyana, Khan was accused of being the leader of a criminal enterprise importing large amounts

of cocaine to the United States. Once brought to the United States, Khan was detained at the

---

[1]      In an earlier opinion, *Simels I*, I resolved various motions pertaining to discovery. *United States v. Simels*, No. 08-CR-640, 2008 WL 5383138 (E.D.N.Y. Dec. 18, 2008).

MCC in Manhattan. He hired a team of attorneys to represent him, including Robert Simels and Simels's associate, Arienne Irving.

In the course of the representation, federal agents began to investigate suspicions that Simels and Irving were conspiring with Khan to influence potential witnesses in Khan's upcoming trial.[2] On several occasions in the summer of 2008, Simels met with a member of Khan's Guyanese organization, Selwyn Vaughn, also known as "Fineman." During conversations at Simels's law offices, Simels and Vaughn discussed the possibility that Vaughn would testify at Khan's trial, which was then scheduled to begin on October 27, 2008. In addition, Vaughn also offered to assist Simels's investigations by helping to contact possible witnesses for and against Khan. Unbeknownst to Khan and to the defendants, Vaughn was acting at the behest of federal law enforcement agents and was wearing a recording device during his meetings with Simels.

David Clarke and Leslyn Camacho were among the potential witnesses that Simels and Vaughn discussed. Clarke, a former major in the Guyanese army, was associated with a gang in Guyana aligned against Khan. Clarke claimed to have sold cocaine to Khan, and was slated to be the government's main cooperating witness. Simels told Vaughn: "I think their whole case [against Khan] fall[s] apart if Clarke is either neutralized by us, or neutralized by us

---

[2]  Khan later pleaded guilty to cocaine trafficking, weapons possession and obstruction of justice charges, and was sentenced by the Honorable Dora L. Irizarry to a fifteen-year prison sentence.

on cross-examination." Gov't Ex. 401T10 at 14.[3] Clarke, however, was himself incarcerated on federal narcotics charges and hence was difficult for Simels to contact.[4]

Leslyn Camacho, who apparently lived somewhere in Brooklyn, was Clarke's girlfriend. Simels and Vaughn discussed the possibility that Camacho could be helpful to the defense. Simels said that he hoped Camacho would assist in efforts to impeach Clarke's allegations by testifying that Clarke was lying when he accused Khan of being a drug dealer. Even better, Clarke himself might be persuaded to recant his accusations and to abandon his cooperation agreement. At the direction of law enforcement agents, Vaughn told Simels that Clarke would "rethink his position" once he and Simels started reaching out to Camacho and to Clarke's relatives. More specifically, Vaughn suggested that, once Clarke's relatives got in touch with him, he could "probably suddenly just get amnesia." Gov't Ex. 401T10 at 21. To this last remark, Simels replied: "That's a terrible thing, but if it happens, it happens." *Id.* Shortly thereafter, Vaughn said: "Neutralize Clarke. We either try to buy them or we gotta drive fear in them, is the only option." Simels's response: "I agree with you. I agree with you." *Id.* at 23.[5] Simels left it to Vaughn to "figure out what's going to best get to" Clarke. *Id.* at 35. The two agreed that Vaughn would find Camacho.

On July 18, 2008, Vaughn falsely told Simels that he had been in touch with Camacho, and that Clarke was "willing to play," but that Clarke and Camacho wanted to know

---

[3]     Citations in the form "Gov't Ex. 401T__" are to the government's transcripts of the consensually-recorded conversations between Simels and Vaughn.

[4]     Simels visited Clarke at a jail in Queens, but Clarke refused to speak to Simels. Clarke later pleaded guilty to a narcotics charge, and was sentenced earlier today by the Honorable Raymond J. Dearie to time served after thirty-six months in federal custody.

[5]     Later, Simels instructed Vaughn not to kill Clarke's mother.

what was in it for them.  Gov't Ex. 401T18 at 4.  Simels and Vaughn discussed possible amounts

that Clarke and Camacho might be paid.  Simels wanted Camacho to corroborate damaging

rumors Simels had heard about Clarke.  In Vaughn's presence, Simels typed up a rough draft of

an affidavit that Camacho might ultimately sign regarding Clarke's alleged affairs, drug use, and

anti-American bias.  Vaughn left the office with a copy of the draft.  Tr. 454-55.

On July 21 and July 22, 2009, Vaughn called Simels to tell him – again, falsely –

that Camacho was "prepared to do … what we want" and that "she wants ten for herself."

Gov't Ex. 401T21 at 1.  Vaughn said that Camacho wanted money up front before signing the

affidavit.  Simels told Vaughn that she would get only paid once she signed the document.

Gov't Ex. 401T22 at 2-3.

On July 29, 2008, Simels visited Khan at the MCC.  The next day, Vaughn

returned to Simels's office.  Again, the two men discussed the amount that Camacho would be

paid for her help.  Simels asked: "What does she want to just meet with me?  $500? … I'm

serious.  $250?  $500?  Just to meet with me.  And then, upon the signing of the document, she

gets X more?"  Gov't Ex. 401T26 at 7.  Simels also told Vaughn that Khan wanted Vaughn to

"get the numbers down," and that Khan would "make up" to Vaughn for whatever he could save

on the $10,000.  *Id.* at 11.

On August 5, 2008, Vaughn called Simels to tell him that Camacho was "playing

hardball," and that she wanted half the money up front.  Gov't Ex. 401T28 at 1.  Simels replied

that he was "the guy with the money" and that if Camacho wanted "witness fees" she had to play

by his rules, rather than her own.  *Id.* at 3.

Eventually, Vaughn told Simels that Camacho was willing to come to Simels's

office to sign an affidavit and discuss her testimony.  Vaughn agreed to bring her to the office on

September 10, 2008.  Instead, federal agents came to the office on that day and arrested Simels and Irving.

B.    *The MCC Recordings*

In addition to the consensual recordings of Vaughn's conversations with Simels, the investigators sought to gather evidence using nonconsensual electronic surveillance.  The government obtained court authorization to intercept communications between Khan and Simels or Irving in the attorneys' visiting room at the MCC.[6]

Title III requires that electronic surveillance "be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter."  18 U.S.C. § 2518(5).  In an attempt to comply with this minimization requirement, the government proposed two provisions, both of which were ultimately contained in the court order.  The first of these was a standard minimization provision, under which the surveillance was required to be conducted in such a way as to minimize the interception of non-pertinent and privileged communications.  The second minimization provision authorized an "additional" post-interception procedure, whereby the investigating agents would record – but not listen to – entire meetings, before turning the tapes over to a special segregated group of agents and Assistant United States Attorneys who would minimize non-pertinent communications and excise privileged material from the tapes.  These "Wall Agents" and "Wall AUSAs" would then give the minimized recordings back to the investigative team.

After receiving the court order, the government recorded two meetings: one between Irving and Khan on July 24, 2008, and another between Simels and Khan on July 29,

---

[6]    I described the warrant and the government's minimization procedures in more detail in *Simels II*. 2009 WL 1924746, at *1-2.

2008. The government followed only the second of the two minimization directives, and thus the meetings were recorded in their entirety and not contemporaneously monitored.

C.    *The Successful Pre-Trial Motion to Suppress the MCC Recordings*

Simels and Irving were indicted on various charges relating to their representation of Khan. Before the trial, the defendants moved on various grounds to preclude the government from introducing the Title III recordings. On July 2, 2009, I granted Simels's motion to suppress. *Simels II*, 2009 WL 1924746. I ruled that the government's post-interception minimization procedure was improper under Title III's minimization requirements. *Id.* at *9. Moreover, I found that the warrant was self-contradictory, because it required the government to engage in contemporaneous minimization but also purported to allow post-interception minimization. The government's violation of Title III warranted suppression of the recordings under each of the three grounds contained in 18 U.S.C. § 2518(10)(a), because (i) the communications were unlawfully intercepted; (ii) the order of authorization was insufficient on its face; and (iii) the interception was not made in conformity with the order of authorization. *Simels II*, 2009 WL 1924746, at *9-13.

D.    *The Trial Proceedings*

In its final form, the superseding indictment charged Simels with thirteen counts and Irving with twelve.[7] Particularly relevant to this opinion are the counts that charged both defendants with conspiring to obstruct justice by influencing witnesses (Count One), attempting to obstruct justice by influencing David Clarke's testimony in the Khan trial (Count Three), attempting to obstruct justice by influencing Leslyn Camacho's testimony (Count Seven), and offering to bribe Camacho for helpful testimony (Count Ten).

---

[7]    As against Irving, Count Six was dismissed by the government during the trial.

The trial began on July 13, 2009. In his opening statement, Simels's counsel told the jury that Simels would testify in his own defense. Tr. 217. As to Camacho, Simels's counsel told the jury that Simels never intended to give her any money; rather, Simels's plan was to string Camacho and Clarke along to obtain proof that Clarke – whom Simels believed was a liar – was trying to extort money from Khan. Tr. 220-21.

The consensually-recorded conversations between Simels and Vaughn formed the heart of the government's case against the defendants. After the close of the government's evidence-in-chief, Simels made good on his counsel's promise and stepped into the witness box. He testified that he wanted to contact Clarke so that he could use lawful means to dissuade him from lying about Khan. He never intended to bribe Camacho. Rather, he was using Vaughn to conduct his own "sting operation":

> If we could have gotten evidence [that] David Clarke, in conjunction with Leslyn Camacho, was trying to solicit money from us, whether it be $100 or 5,000 or 10,000, whatever it would be, it would be in Roger Khan's interest, my client's interest. If I could develop that information, give it to the government at some point or expose [Clarke] on the witness stand … , that would be a home run for us.

Tr. 1418. According to Simels, he was just pretending to go along with the bribery plan, and the words he spoke to Vaughn were just a ruse to induce Camacho to come to his office. When she arrived, he would tape-record Camacho demanding a bribe. Tr. 1421.

Simels's version of events was arguably contradicted by three brief portions of the MCC recordings ("the impeachment material"). In his meeting with Khan on July 29, 2008, Simels complained that he was incurring large out-of-pocket expenses while conducting Khan's defense. Apparently referring to Camacho, Simels said: "I've got to come up with this money,

theoretically, in case she is for real." Gov't Ex. 1000T at 2.[8] A few minutes later, after Simels

mentioned various witnesses, including Camacho, he told Khan: "[I]f we can arrange this, you

should … say I want to do it." Khan's response: "She has to lower the amount." *Id.* Later in the

conversation, Simels impressed on Khan the need to "get yourself together money," saying, "I

need money to sling at anything that Fineman tells me is true. Leslyn, whatever …." *Id.* at 3.

        In sum, Simels appeared to be discussing with Khan the source and the amount of

the money that they would pay Camacho. Moreover, Vaughn's recordings reveal that, the day

after Khan told Simels that Camacho had "to lower the amount," Simels told Vaughn that Khan

wanted to "get the numbers down." Gov't Ex. 401T26 at 11. Since there would be no need to

lower the amount of a bribe that would not be paid in any event, Simels's claim that he was

conducting a sting operation is thus undermined by the impeachment material. Unsurprisingly,

the government moved during the trial to introduce it for the purpose of impeaching Simels's

testimony.[9] Simels and Irving objected, arguing that Title III does not provide for an

impeachment exception to its statutory exclusionary rule.[10]

        I ruled on August 3, 2009 that the impeachment material was admissible.

Tr. 1100-01. On August 5, 2009, the government introduced the impeachment material in the

course of cross-examining Simels. Tr. 1448-49, 1452, 1462.

---

[8]      The quotations in this paragraph are taken from the government's transcript of the impeachment material. In summation, Simels's counsel contended that the government had mistranscribed and misinterpreted the conversations.

[9]      The government moved to admit the relevant portions of the tapes on July 29, 2009, in anticipation that Simels would testify that he never intended to bribe Camacho. I reserved decision on the issue until Simels testified.

[10]      Simels also argued, unsuccessfully, that the relevant portions of the tape were so inaudible that the jury should not be permitted to hear them at all.

The jury found Simels guilty of twelve of the thirteen charges, including the conspiracy count, the Clarke count, and the two counts pertaining specifically to Camacho. The jury found Irving guilty on several counts, including the conspiracy count and the Clarke count, but acquitted her on both of the Camacho counts.

DISCUSSION

The government's motion to admit portions of the previously-suppressed recordings raised a matter of first impression in this Circuit: may evidence obtained in violation of Title III nevertheless be admitted to impeach a defendant's testimony?

At first glance, Title III's suppression remedy appears to be absolute. *See* 18 U.S.C. § 2515 (providing that, in the event of a Title III violation, "no part of the contents of [the intercepted] communication and no evidence derived therefrom may be received in evidence in any trial"). As explained below, however, a fuller reading of the provision, informed by the statutory context and by § 2515's legislative history, supports the conclusion that the statutory exclusionary rule is subject to an impeachment exception. The fruits of a Title III violation are therefore admissible for the purpose of impeachment where the defendant's testimony directly contradicts the evidence obtained in violation of the statute.

To put it more bluntly, Title III's exclusionary rule does not permit a criminal defendant to resort to perjury in reliance on the government's inability to introduce contradictory evidence. For that reason, after Simels "opened the door" by claiming under oath that he never intended to pay Camacho, I permitted the government to introduce the portion of the MCC recordings where Simels and Khan discussed paying her for favorable testimony.

A. *The Statutory Text*

A natural reading of the statutory text is "the first criterion in the interpretive hierarchy." *United States v. Wells*, 519 U.S. 482, 490 (1997); *see also Ardestani v. INS*, 502 U.S. 129, 135 (1991) ("The starting point in statutory interpretation is the language of the statute itself.") (internal quotation marks and alteration omitted).

Two provisions govern the suppression of evidence obtained in violation of Title III.[11]  First, 18 U.S.C. § 2518(10)(a) sets out the grounds for suppression.  It provides that an "aggrieved person" may "move to suppress the contents of any wire or oral communication … or evidence derived therefrom" in three circumstances: where "(i) the communication was unlawfully intercepted; (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or (iii) the interception was not made in conformity with the order of authorization or approval."  18 U.S.C. § 2518(10)(a).  As discussed above, the MCC recordings are subject to suppression on each of these three alternative grounds.  *Simels II*, 2009 WL 1924746, at *9-13.  Where a motion to suppress is granted, the contents of the intercepted communication or its fruits "shall be treated as having been obtained in violation" of Title III.  18 U.S.C. § 2518(10)(a).

Standing alone, § 2518(10)(a) simply authorizes a motion to suppress; it provides little support for Simels's contention that Title III suppression is an absolute bar. Simels's argument rests instead on § 2515, which provides as follows:

> Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be

---

[11]    In addition, Title III includes a separate exclusionary provision for sealing violations.  *See* 18 U.S.C. § 2518(8)(a) ("The presence of the seal provided for by this subsection, or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire, oral, or electronic communication or evidence derived therefrom under subsection (3) of section 2517.").

received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter.

As one court has noted, § 2515 is "poorly drafted." *Fleming v. United States*, 547 F.2d 872, 874 (5th Cir. 1977). The provision is circular: it prohibits the reception into evidence of an intercepted communication if its disclosure to the court would violate Title III. Courts have made sense of § 2515 by starting with the premise that the provision's "primary purpose is apparently to exclude evidence derived from illegal, rather than legal, wiretaps." *Id.* The "main thrust" of § 2515 is "to exclude evidence the *seizure* of which was in violation of the chapter, not evidence the disclosure of which was or would be in violation of the chapter." *Id.* (emphasis added).

Once one accepts this gloss on the statutory text, a literal reading of § 2515 provides substantial support for Simels's argument against an impeachment exception. Because the MCC recordings were obtained in violation of Title III, the section provides that "no part of [their] contents" "may be received in evidence" at any trial. Congress did not explicitly limit the evidentiary bar to the government's case-in-chief. Accordingly, Simels argues that the statute creates a bright-line suppression rule devoid of any exception.

B.      *The Statutory Context: Impeachment Exceptions to Other Evidentiary Bars*

Though a plain reading of the words Congress chose provides the starting point for discerning congressional meaning, the interpretive task does not end there. A full appreciation of the text's meaning often requires an examination of the broader context. This broader context includes the surrounding backdrop of existing legal doctrines, rules, and exceptions. Thus, it is "a well-established rule of construction that where Congress uses terms

that have accumulated settled meaning under the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms." *Neder v. United States*, 527 U.S. 1, 21 (1999) (internal quotation marks omitted). A reading of the text informed by the legal context may require an interpretation not immediately apparent from the text itself. *See, e.g., id.* at 24 (finding that liability under several federal criminal fraud statutes required materiality even though the statutory text made no mention of such a requirement).

Here, the most salient aspect of the statutory context is that when Congress passed Title III, it drew on the closely analogous exclusionary rule for the Fourth Amendment, which was subject to a well-established exception for impeachment of defendant's testimony. More broadly, the impeachment principle is generally sufficiently powerful to override prophylactic rules barring illegally-obtained-but-probative evidence. This principle cautions against taking congressional silence as an indication of congressional intent to exclude an impeachment exception.

1.    *The Impeachment Exception to the Fourth Amendment's Exclusionary Rule*

The judicially-created exclusionary rule for the Fourth Amendment is particularly relevant to the scope of Title III's bar on the admission of unlawfully obtained evidence. The primary purpose of the exclusionary rule in Fourth Amendment cases is to deter future police misconduct, not to compensate the defendant for the invasion of his rights. *United States v. Calandra*, 414 U.S. 338, 347 (1974). Similarly, Title III's exclusionary rule represents Congress's judgment that the interest in deterring invasions of privacy using electronic means is sufficiently important to justify barring the government – at least in its case-in-chief – from

introducing into evidence material obtained in violation of the chapter's substantive requirements.

Though we often countenance rules that exclude probative evidence – perhaps more so than any other legal system[12] – we do so while acknowledging a significant cost to the truth-seeking function of the trial. A criminal trial remains a search for truth, however constrained by procedural and evidentiary rules. Recognizing the downside of the Fourth Amendment's exclusionary rule, the Supreme Court has carved out exceptions "where the introduction of reliable and probative evidence would significantly further the truth-seeking function of a criminal trial and the likelihood that admissibility of such evidence would encourage police conduct is but a 'speculative possibility.' " *James v. Illinois*, 493 U.S. 307, 311 (1988) (quoting *Harris v. New York*, 401 U.S. 222, 225 (1971)).

One such exception is that evidence obtained in violation of the Fourth Amendment, even though not admissible in the government's case-in-chief, may be used for impeachment of the defendant's own testimony. The Supreme Court first so held in *Walder v. United States*, 347 U.S. 62 (1954). In *Walder*, the Court established that, even where evidence is suppressed on the ground that it was obtained in violation of the Fourth Amendment, the evidence may nevertheless be admissible to impeach the defendant's credibility where it contradicts what he says under oath at trial.

In memorable prose, Justice Frankfurter gave voice to a powerful instinct, widely shared by trial lawyers:

---

[12] Even after recent efforts to narrow the scope of the Fourth Amendment's exclusionary rule, *see, e.g., Herring v. United States*, 129 S.Ct. 695 (2009), it appears that the United States leads the world in its use of exclusionary rules to deter official misconduct. *See, e.g.,* Adam Liptak, *American Exception: U.S. Is Alone in Rejecting All Evidence If Police Err,* N.Y. Times, July 19, 2008.

> It is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained.  It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths.  Such an extension of the *Weeks* [*v. United States*, 232 U.S. 383 (1914)] doctrine would be a perversion of the Fourth Amendment. ...
>
> There is hardly justification for letting the defendant affirmatively resort to perjurous testimony in reliance on the Government's disability to challenge his credibility.

*Id.* at 65.  In *Walder* itself, the Supreme Court permitted the prosecutor to introduce into evidence heroin unlawfully seized from Walder's home to undermine the credibility of his claim that he had never possessed narcotics.

The impeachment exception to the exclusionary rule was thus a firmly established feature of the Fourth Amendment landscape when, fourteen years after *Walder*, Congress enacted a closely analogous evidentiary rule for Title III violations.

      2.     *The Impeachment Principle Beyond the Fourth Amendment*

The impeachment exception recognized in *Walder* is, in fact, but one instance of a general principle that runs through the law of evidence; impeachment provides an exceptionally powerful countervailing reason for admitting probative material that would otherwise be excluded from trial proceedings.

Though post-1968 jurisprudence is not directly relevant to § 2515's meaning, the Supreme Court's later decisions on the scope of constitutional exclusionary rules illustrate the strength and vitality of the impeachment principle.  "It is essential ... to the proper functioning of the adversary system that when a defendant takes the stand, the government be permitted proper and effective cross-examination in an attempt to elicit the truth."  *United States v. Havens*, 446 U.S. 620, 626-27 (1980).  Thus, the Supreme Court has "repeatedly insisted that when

defendants testify, they must testify truthfully or suffer the consequences." *Id.* at 626 ("reject[ing] the notion that the defendant's constitutional shield against having illegally seized evidence used against him could be 'perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances' " (quoting *Harris v. New York*, 401 U.S. 222, 226 (1971)).

The Supreme Court has determined that the suppression remedy recognized in *Miranda v. Arizona*, 384 U.S. 436 (1966), is also subject to an impeachment exception. Statements taken in violation of the prophylactic *Miranda* rules may not be used in the prosecution's case-in-chief, but they are admissible to impeach conflicting testimony by the defendant. *Harris*, 401 U.S. at 223; *Oregon v. Hass*, 420 U.S. 714, 722 (1975). Particularly relevant to this case, the Supreme Court's decision in *Harris* warns against interpreting a general statement that evidence is inadmissible to exclude an impeachment exception:

> Some comments in the *Miranda* opinion can … be read as indicating a bar to use of an uncounseled statement for any purpose, but discussion of that issue was not at all necessary to the Court's holding and cannot be regarded as controlling. ... It does not follow from *Miranda* that evidence inadmissible against an accused in the prosecution's case in chief is barred for all purposes, provided of course that the trustworthiness of the evidence satisfies legal standards.

*Harris*, 401 U.S. at 223.

Similarly, the Supreme Court held that statements elicited in violation of the Sixth Amendment rule of *Michigan v. Jackson*, 475 U.S. 625 (1986),[13] though inadmissible as substantive evidence, may be used for impeachment if a defendant knowingly and voluntarily waived the right to counsel. *See Michigan v. Harvey*, 494 U.S. 344 (1990).

---

[13] The Supreme Court overruled *Michigan v. Jackson* earlier this year. *Montejo v. Louisiana*, 129 S.Ct. 2079 (2009).

At the very least, the obvious force of the impeachment principle and its widespread acceptance in the constitutional sphere counsel hesitation before concluding that Congress chose to enact an absolute bar on evidence procured in violation of Title III's requirements.

    3.    *Counter-Examples: Exclusionary Rules with No Impeachment Exceptions*

Admittedly, the impeachment principle does not require the recognition of an impeachment exception to every exclusionary rule. For example, the principle has considerably less force where the evidence was excluded from the government's case-in-chief because of doubts as to its trustworthiness. In this respect, suppression under the Fourth Amendment or Title III differs from fundamentally from suppression on Fifth Amendment "voluntariness" grounds. *See Mincey v. Arizona*, 437 U.S. 385 (1978) (statements made while defendant "was weakened by pain and shock, isolated from family, friends, and legal counsel, and barely conscious" were not admissible to impeach defendant's trial testimony).

In arguing against an impeachment exception to § 2515's exclusionary rule, Simels's strongest analogy is to the bar on using statements made in plea negotiations to impeach the defendant's testimony. In *United States v. Lawson*, 683 F.2d 688, 692-93 (2d Cir. 1982), the Second Circuit held that statements made in connection with an offer to plead guilty are inadmissible under Rule 410 of the Federal Rules of Evidence even for the purpose of impeachment. That rule, however, is distinguishable from Title III in important respects. As the Second Circuit noted in *Lawson*, the legislative history demonstrated Congress's "explicit intention to preclude use of statements made in plea negotiations for impeachment purposes"; Congress considered and rejected an impeachment exception. *Id.* at 693. Moreover, the policy reasons for adopting an absolute bar in the plea offer context are obvious: the important interest

in candor during plea negotiations would be seriously damaged if the defendant feared impeachment at trial in the event the negotiations were later to break down.  In *Lawson*, the court was faced with an example of a conscious legislative decision to exclude the operation of the impeachment principle.  Accordingly, *Lawson* provides only limited support for Simels's argument.

C.      *The Legislative History of Title III*

Just as the Second Circuit in *Lawson* was aided in interpreting congressional silence by an "unusually clear legislative history" rejecting an impeachment exception, *see Lawson*, 683 F.2d at 692, I am guided by Title III's legislative history, which affirmatively supports the impeachment exception.

As the Senate Judiciary Committee Report reveals, Title III was inspired in large part by the Fourth Amendment's privacy protections.  Though Title III was prompted partly by dissatisfaction with the substantive scope of the constitutional provision, the exclusionary remedy embodied in §§ 2515 and 2518 of the statute was inspired in large part by the powerful sanction inferred by the judicial branch in *Weeks v. United States*, 232 U.S. 383 (1914), and extended to the states in *Mapp v. Ohio*, 367 U.S. 643 (1961).  The Report's explanation of § 2515 confirms that Title III was understood as an extension of the Fourth Amendment protections and remedies to a new area:

> [Section 2515] largely reflects existing law.  It applies to suppress evidence directly (*Nardone v. United States*, 58 S.Ct. 275, 302 U.S. 379 (1937)) or indirectly obtained in violation of the chapter. (*Nardone v. United States*, 60 S.Ct. 266, 308 U.S. 338 (1939)). There is, however, no intention to change the attenuation rule.  *See Nardone v. United States*, 127 F.2d 521(2d), *certiorari denied*, 62 S.Ct. 1296, 316 U.S. 698 (1942); *Wong Sun v. United States*, 83 S.Ct. 307, 371 U.S. 471 (1963).  Nor generally to press the scope of the suppression

> role *[sic.]* beyond present search and seizure law. *See Walter v. United States*, 74 S.Ct. 354, 347 U.S. 62 (1954). [14]

S. Rep. No. 1097, 90th Cong., 2d Sess., at 68 (1968), *as reprinted in* 1968 U.S.C.C.A.N. 2112, 2185. Particularly significant is the Report's statement that § 2515 bespeaks no intention to "to press the scope of the suppression [rule] beyond present search and seizure law," and its cite to *Walder*, the case that so vividly and emphatically adopted the impeachment exception in the Fourth Amendment context.

  In these circumstances, I conclude that Simels's objection to the admission of the impeachment material is based on an excessively literal reading of the statute's text. The implication that § 2515 is an absolute bar to the introduction of intercept evidence is the result of inexpert statutory craftsmanship rather than any congressional desire to exclude an impeachment exception. On the contrary, Title III's legislative history demonstrates Congress's willingness to incorporate at least some of the exclusionary rule doctrines developed by the Supreme Court in the Fourth Amendment context. Chief among these are (a) the attenuation doctrine; and (b) the impeachment exception, recognized by *Walder* and explicitly referenced in the Senate Report. [15]

---

[14]  The Report's citation to *Walder* in the Report contains a typographical error; the petitioner's name is given as "Walter" rather than "Walder."

[15]  Finally, my construction of § 2515 is consistent with how trial lawyers and trial judges generally understand a rule that prohibits an item from being "received in evidence." Such a rule is understood to disqualify the evidence as proof the crime charged, *i.e.*, as part of the case-in-chief. But trial lawyers do not regard the limited use of the same evidence *to impeach* as inconsistent with a bar on it being received "in evidence." Indeed, a defendant is entitled to a jury instruction that the impeachment material may "not be considered as substantive evidence going to the guilt or innocence of the defendant." *See United States v. Baftiri*, 263 F.3d 856, 858 (8th Cir. 2001). Obviously, when a tape-recorded conversation is admitted at trial, even if only for the limited purpose of impeachment, it is still "received in evidence," and the text of § 2515 fails to preserve the impeachment exception that Congress expressly intended it to include. But reading such an exception into the provision does no violence to the common understanding of what it means to say suppressed material may not be "received in evidence."

D. *Judicial Support for an Impeachment Exception to Title III's Suppression Remedy*

In reaching my conclusion, I derive comfort from the fact that every Circuit to consider the question, to the extent it has taken a position, has concluded that the government may introduce evidence obtained in violation of Title IIII to impeach a criminal defendant's testimony. Four circuits – the First, Fifth, Eighth and Ninth – have endorsed the exception.[16] *United States v. Baftiri*, 263 F.3d 856, 857-58 (8th Cir. 2001); *United States v. Echavarria-Olarte*, 904 F.2d 1391, 1397 (9th Cir. 1990); *United States v. Vest*, 813 F.2d 477, 480 (1st Cir. 1987); *United States v. Caron*, 474 F.2d 506, 509 (5th Cir. 1973).

Of these, only the Fifth Circuit has devoted any substantial effort to the task of squaring the impeachment exception with the statutory text. That court relied on Title III's legislative history for the conclusion that Congress "made it clear" that § 2515 "should not be construed as requiring exclusion" of recorded conversations that had not been previously authorized by the court and were submitted by the government for the purposes of impeachment. *Caron*, 474 F.2d at 509. The judicial consensus that there is an impeachment exception to § 2515 confirms the ubiquity of the idea that impeachment provides a special justification for admitting illegally-obtained evidence. The strength of the *Walder* principle perhaps explains why, notwithstanding the statutory text, other courts faced with this issue have given such short shrift to arguments against using impeachment material previously suppressed under Title III.

---

[16] The government contends that two more circuits have endorsed an impeachment exception to Title III, *see* Gov't Mot. at 5, but that is an exaggeration. In the other two circuits which the government claims have adopted an impeachment exception, the panel simply assumed for the sake of argument that illegally obtained evidence may be used to impeach the testimony of criminal defendants in the course of holding that there is *no* impeachment exception to § 2515 in civil cases, *United States v. Wuliger*, 981 F.2d 1497, 1506 (6th Cir. 1992), and that a criminal defendant may not use material obtained in violation of Title III to impeach a government witness, *Anthony v. United States*, 667 F.2d 870, 879-80 (10th Cir. 1981).

CONCLUSION

Like its close cousin the Fourth Amendment, Title III does not provide a license to use perjury by way of a defense. A defendant who, like Simels, succeeds in getting intercept evidence suppressed has a choice. In choosing to offer testimony that was directly contradicted by the suppressed evidence, Simels forfeited his entitlement under § 2515 to keep the impeachment material from the jury.


So ordered.


John Gleeson, U.S.D.J.

Dated:          December 4, 2009
                Brooklyn, New York