UNITED STATES DISTRICT COURT                    FOR PUBLICATION
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

UNITED STATES OF AMERICA,

              -against-                                    MEMORANDUM
                                                          AND ORDER
                                                          08-CR-640 (JG)

ARIENNE IRVING,

                     *Defendant.*
-----------------------------------------------------------x
A P P E A R A N C E S :

        BENTON J. CAMPBELL
                United States Attorney
                Eastern District of New York
                271 Cadman Plaza East
                Brooklyn, New York 11201
        By:    Daniel D. Brownell
                Steven L. D'Alessandro
                Morris J. Fodeman
                *Attorney for the United States of America*

        LAW OFFICES OF JAVIER A. SOLANO, PLLC
                350 Fifth Avenue, Suite 5900
                New York, NY 10118
        By:    Javier A. Solano
                Lawrence K.W. Berg
                *Attorneys for Defendant Arienne Irving*

JOHN GLEESON, United States District Judge:

PRELIMINARY STATEMENT

        On August 20, 2009, a jury found defendant Arienne Irving guilty of five of the

twelve counts charged in the indictment against her.  Irving was convicted of conspiracy to

obstruct justice (Count One), two counts of attempted witness tampering (Counts Three and

Five, pertaining to David Clarke and Vijai Jaignarine, respectively), and importation and

possession of eavesdropping equipment (Counts Twelve and Thirteen, respectively).  The jury

acquitted Irving of six additional witness tampering counts (Counts Two, Four, Seven, Eight and

Nine, pertaining to Selwyn Vaughn, George Allison, Leslyn Camacho, Alicia Jagnarain and

Farrah Singh, respectively) and of bribing Leslyn Camacho (Count Ten)[1].  Irving moved for a

judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, or, in the alternative,

for a new trial pursuant to Federal Rule of Criminal Procedure 33.  On December 4, 2009, I

granted the motion for a judgment of acquittal, with a promise that this opinion would follow.

Though the details of the evidence are important, and they are discussed below,

the overview of the case is simply stated.  Irving, an attorney, worked for her co-defendant,

prominent criminal defense attorney Robert Simels.  The charges in the case arose out of their

representation of Roger "Shaheed" Khan in *United States v. Shaheed Khan*, 06-CR-255 (DLI-

VVP) ("*Khan*").  Khan, a citizen of Guyana with ties to high-ranking government officials in that

country, was indicted on narcotics trafficking charges in April of 2006.  He was arrested in June

2006 in Suriname and transported to the United States to face those charges before the

Honorable Dora L. Irizarry.  Simels first appeared as counsel for Khan in August of 2006.

Slightly more than two years later, while the *Khan* case was still awaiting trial, Simels, Khan and

Irving were arrested in this case and charged with conspiring to obstruct justice in the *Khan* case.

The evidence at trial showed that Simels, who is now 62 years old, was a gifted

criminal defense lawyer.  In exchange for the $1.4 million retainer Khan gave Simels, Khan got a

lawyer who immersed himself completely in the case and did all the things top-flight lawyers are

supposed to do.  Simels's encyclopedic knowledge of every aspect of the *Khan* case was

apparent from the evidence at trial.  He made multiple visits to Guyana, where most of the events

giving rise to the charges against Khan occurred and where much of Simels's investigative work

---

[1]     The remaining charge against Irving -- Count Six of the indictment -- was dismissed on the
government's motion at trial.

needed to be done.  Simels sought to learn every detail he could, not only about the prospective witnesses against Khan, but about anyone who knew those witnesses as well, as they could potentially become sources of impeachment material.  Because the information net was cast so widely by Simels, his work was labor intensive and required both organizational skills and record-keeping assistance.

Unfortunately, another thing the evidence proved -- just as convincingly as the first -- was that Simels supplemented his arsenal of investigative and forensic skills with illegal tactics.  The opportunity to do so in the *Khan* case presented itself in May of 2008 in the person of Selwyn Vaughn.  In less than four months' time, Simels and Irving would be arrested in this case.

Simels believed that Vaughn was still a loyal member of Khan's Guyanese paramilitary organization, when in fact Vaughn was a paid informant working with the Drug Enforcement Administration ("DEA").  Believing incorrectly that Vaughn would assist his corrupt efforts to undermine the *Khan* case, Simels, among other things:

-- made it clear that he would pay money to ensure that David Clarke, the key witness against Khan, "suddenly just g[o]t amnesia";

-- regarded the neutralization of Clarke by cross-examination as but one option, another being the illegal neutralization of him by bribery or intimidation;

-- authorized Vaughn to use all violent means necessary to silence Clarke, except murdering Clarke's mother;

-- authorized Vaughn to use all violent means necessary, without limitation, to silence or obtain the cooperation of George Allison;

-- agreed to bribe Clarke's girlfriend, Leslyn Camacho, to induce her to give false testimony, and had the bribe money and a false affidavit waiting for her on the day he was arrested.

Irving began her employment with Simels in December 2006, several months

after he was retained by Khan.  She was 28 years old at the time.  Irving was the last of a series

of relatively inexperienced associates hired by Simels to assist him in his practice. The trial

evidence shed enough light on her functions and salary to support the conclusion that she was

more of a paralegal than a law associate.  In any event, despite her close physical proximity to

Simels in his small law offices, and despite her close working relationship with him on the *Khan*

case, Irving was not present for the criminal interactions between Simels and Vaughn.  Rather,

the government sought to connect her to them through a handful of her actions during the

relevant time period.  Those actions are discussed in detail below.  They support an inference

that Irving was present at various times while Simels's criminal conduct was under way, and

even that Irving's own actions assisted Simels's crimes.  But the evidence fell considerably short

of proving beyond a reasonable doubt that Irving had the knowledge and intent necessary to

establish her *participation* in any of the attempted witness tampering offenses or in the

conspiracy to tamper with witnesses.

       Counts Twelve and Thirteen were unusual.  They charged Irving with importing

and possessing eavesdropping equipment Khan had owned in Guyana.  Khan had used it in

Guyana to intercept the telephone conversations of others.  The recorded conversations were

stored on a laptop Khan had previously provided to Simels.  When Simels told the *Khan*

prosecutors of his intention to offer the recorded conversations, they naturally wanted to inspect

the original recordings, and they inquired about the equipment that was used to make them.

Simels and Irving thus undertook to locate the equipment in Guyana and have it sent to them in

New York so it would be available in the event they needed it to offer the recordings in the *Khan*

case.  The government did not allege in this case that the equipment was obtained for any

purpose other than to ensure that Khan could successfully offer at trial in the *Khan* case the tape

recordings he intercepted in Guyana. Nevertheless, the government charged Simels and Irving with unlawfully importing and possessing the equipment that the prosecutors in *Khan*, in effect, caused them to import and possess. The evidence against Irving at trial was insufficient to prove beyond a reasonable doubt all of the elements of these offenses.

Finally, Rule 29(d) requires me to determine whether a motion for a new trial should be granted if the judgment of acquittal explained here is later vacated or reversed. I conclude that the alternative relief of a new trial is appropriate in this case, and conditionally grant Irving's Rule 33 motion.

## FACTUAL BACKGROUND

As mentioned above, Irving began her employment as an associate at the Robert Simels Law Firm in December 2006. The law firm's offices were housed in a converted three-bedroom apartment in the Upper East Side of Manhattan. At the time of Irving's arrest, two attorneys -- Simels and Irving -- worked at the office in addition to Simels's secretary Juanita Singh. Simels's and Irving's offices were next to each other.

Selwyn Vaughn, who is also known as "Fineman," approached Simels in the spring of 2008 and offered his assistance in preparing for Khan's trial. Vaughn recorded five meetings with Simels between May 13, 2008 and September 10, 2008. The first occurred in the conference room in Simels's offices and the rest were held in Simels's personal office. Irving attended the first meeting and portions of the third. In addition to those personal contacts with Vaughn, during the same period, Irving communicated with him electronically and telephonically.

There is an important and fairly distinctive aspect of the government's case against Irving that is obscured by the chronological description of the evidence set forth below.

The case did not turn on witness credibility in any meaningful way.  Neither of the two witnesses to the events giving rise to the charges -- Vaughn and Simels himself -- implicated Irving in Simels's crimes.  Nor did the tape recordings of the meetings between Vaughn and Simels (and, at times, Irving) establish her participation in those crimes.  Indeed, after hearing Vaughn's direct examination and all of the tapes, I asked the government if it had more evidence against Irving.  Tr. 496.  The following day, as the government's case was winding down, the obvious dearth of evidence against Irving caused me to ask the government again whether there would be more evidence against her.  Tr. 804-05.  The government's response to my inquiry accurately stated that there would be computer records and documents offered toward the end of its case from which it would argue that Irving knowingly, and with the requisite intent to obstruct the *Khan* case, assisted Simels and Khan in their crimes.

Thus, there is no danger here of intruding on a jury's credibility determinations. And though there are a few instances in which the government contends that Vaughn's recorded conversations support an inference of knowing participation by Irving, essentially, the question at hand is whether the documentary evidence, particularly Irving's memoranda to the *Khan* file after her visits with Khan in jail,[2] supports the jury's verdicts.

A.      *The November 8, 2007 Memorandum (Irving's Visit with Khan)*

Irving met with Khan at the MCC on November 8, 2007.  As was her practice, she drafted a memorandum to the file about the meeting.  The memorandum made clear that the meeting concerned telephone conversations intercepted by Khan in Guyana, and in particular the

---

[2]      Irving met with Khan -- who was detained pending trial in the Metropolitan Correctional Center ("MCC") in Manhattan -- on at least eight occasions, and her memoranda summarizing these meetings were admitted at trial.  The other evidence against Irving consisted of shipping invoices and eavesdropping equipment seized during a search of Simels's offices on September 10, 2008, and instant message conversations that were extracted from the computers in the office.

equipment he used for that purpose.  Khan's defense team was trying to obtain information about

the cost of the equipment, and how it was sold to the Guyanese government by the manufacturer,

Smith/Myers.[3]  In the memorandum, Irving wrote, *inter alia*, as follows:

- [Khan] said Nancy[4] is definitely lying about the amount paid on the new equipment.  He said that Nancy wanted $500,000 for the new equipment.  He worked out a deal saying he would pay $250,000 and then when the equipment was delivered he would give Nancy the old equipment, which she could sell for the balance.

- I showed [Khan] the info from the laptop, but he said, I need to go on the desktop and click on the Smith Meyers folder and then a screen with a grid will come up.  He said in the menus in that screen I should find something that says target list, he said I need to print out the target list and then he will be able to tell us which calls are relevant.

Gov't Ex. 532.  When the memorandum was seized, the words "Intercept Equip" had been

handwritten on the top of the document.

B.    *The March 19, 2008 Memorandum (Irving's Visit with Khan)*

Irving met with Khan again on March 19, 2008.  In her memorandum describing

the meeting, Irving wrote in the ninth bullet point:  "[Khan] says we need to find Leslyn

Camacho to get to David Clarke."  Gov't Ex. 807.  David Clarke was a witness who was

preparing to testify against Khan in his trial.  Camacho was Clarke's girlfriend.  Two bullet

points later, Irving wrote:  "[Khan] said [Simels] should call David Narine's attorney and see if

David will talk to us."[5]  *Id.*

C.    *The May 13, 2008 Meeting (Vaughn First Visits Simels and Irving)*

Khan was the leader of a paramilitary group in Guyana known as the Phantom

---

[3]        One of the arguments Khan intended to advance in defense of the charges at trial was that he was assisting the Guyanese government in fighting crime.  There was evidence that Simels intended to support this argument by contending that the recording equipment was actually purchased by the Guyanese government and given to Khan in order to assist him in his crime-fighting efforts.

[4]        "Nancy" appears to refer to Nancy Salvador, who was employed at the Spy Shop in Miami, Florida.  It appears that Simels had requested information from Salvador about the eavesdropping equipment used by Khan in Guyana.  *See* Tr. at 707-15.

[5]        The record does not indicate who David Narine is.

Squad.[6]  Several of its members were former members of the Guyana Police Force who had either committed crimes or had abandoned their police positions.  Selwyn Vaughn had become a member of that group in 2005.  Internecine conflict with other groups in Guyana led to the murder and torture of innocent people, and the following year Vaughn, who claimed that he grew tired of the violence, secretly became a paid informant for the United States law enforcement authorities.  By early 2008, Vaughn was in the United States.  He was instructed by members of Phantom Squad, who were still in Guyana, to contact Simels to assist in Khan's defense.

Upon receiving that instruction, Vaughn went first to his agent-handlers at the DEA.  He told them that in the past he had provided information to Khan about the whereabouts of people who were later threatened or murdered by Khan's paramilitary organization at Khan's direction.  Based on the request to contact Simels and his prior experience with Khan, Vaughn told the agents that he believed both Khan and Simels wanted his help to intimidate David Clarke and possibly other witnesses against Khan.  The agents, who had previously been informed that Simels had lied to a prison official in order to get a visit with Clarke, decided to use their informant to record his conversations with Simels.[7]

Vaughn contacted Simels by telephone and arranged to meet with him on May 13, 2008.  During the meeting, Simels gave Vaughn some background on Khan's case.  He explained that David Clarke was the government's "principal witness" against Khan.  Gov't Ex.

---

[6]      There was no dispute that Khan presided over such a group.  The defense at trial was going to be that it was sanctioned by the Guyanese government.  Gov't Ex. 554.  Indeed, Simels had met with at least one high-ranking government official, and was attempting to arrange a meeting with the President of Guyana.

[7]      Most of the facts set forth in this paragraph were not part of the record at the trial.  They are taken from the affidavit of Special Agent Cassandra Jackson dated July 7, 2008, submitted in support of the government's application for authorization to place a bug in the MCC to record conversations between Khan and either Simels or Irving.  They were relied on by me in connection with my denial of Simels's pretrial claim that the use of Vaughn to consensually record conversations with Simels violated Simels's constitutional rights.  *See* Transcript of Proceedings dated April 17, 2009.

401T3 at 9.  As Simels put it, the government's "whole case was based on [Clarke]."  *Id.*

   Simels asked Vaughn whether he would be willing to testify in Khan's case.
Vaughn responded that he wanted to speak to Khan before he gave an answer.  Upon the
suggestion that Vaughn would visit Khan in prison, Irving stated that Khan was allowed only one
person on the visiting list other than family.  When Vaughn stated that he might pass as a family
member, Irving repeated "I think he's only allowed one friend."  *Id.* at 29.

   During the meeting, Vaughn described himself as an "entrepreneur," *id.* at 30,
suggesting that he was involved in criminal activity.  Shortly thereafter, Simels stated that "if
you are gonna testify, we gotta say that you have some sort of job alright, whatever that may be,
laborer or, or anything."  *Id.* at 31.  Vaughn also described his relationship with Khan, whom he
referred to as his boss.  *Id.* at 11.  Simels later stated "So I know earlier you said that, that Roger,
you described him as the boss, um, but we certainly would not want to describe him as being a
drug dealer … We certainly don't want to describe him as the boss."  *Id.* at 36.

   At the end of the meeting, Vaughn offered to help with Khan's defense.  He
stated, "Well, finding people was my specialty, so if there is anything I can do to help, I'm here
… That is why he wanted me to talk to you in any case, I'm sure."  *Id.* at 50.  Simels stated that
he would send Vaughn a list of "who we may be looking for and where we think that they are
living."  *Id.* at 51.  Vaughn repeated that finding people was his specialty, after which Simels
joked that Vaughn's nickname should actually be "Findman" rather than "Fineman."  At no time
during this initial meeting did Vaughn discuss any of the violent acts he or others had committed
in Guyana.  Irving spoke only briefly during the meeting.

   Irving's memorandum about the interview contained the following information:

- [Vaughn] would get sources within the village and speak directly with Rawlings, Allison,

etc. … to find out information for [Khan].[8]

- [Vaughn] wants to try and visit [Khan] (NOTE: Check with [Khan] about visit capabilities).

- [Vaughn] said he can help locate people in the US.

Gov't Ex. 501.

D.     *The May 15, 2008 Email From Simels to Vaughn*

On May 15, 2008, following their initial meeting, Simels sent Vaughn an email, copying Irving.  The email stated:  "People we are looking for in NY are Leslyn Camacho, Clarke's girlfriend, and Farah Singh, used to work in the Tick Tavern on Rockaway, a hang out for Dave and Alicia.[9]  Obviously we are still looking for Alicia.  I can have Arienne send you whatever details we have on these individuals."  Gov't Ex. 200, Vaughn Testim. at 370.

E.     *The May 19, 2008 Memorandum (Irving's Visit with Khan)*

Irving met with Khan at the MCC on May 19, 2008.  In her memorandum about the meeting, Irving wrote:

- [Khan] still thinks there is an admissibility issue on the Persaud tapes.  He said the key tapes are the "Son"[10] calls b/c if he testifies, then the tapes can get in.

- [Khan] said he is not worried about the other witnesses, but Son, since we don't know anything about him and he doesn't remember meeting him.

- [Khan] said Son was involved in late 2003, and during that time Roger was working on getting the Timber company, and he would NEVER talk about drugs inside wood b/c "he wouldn't shit where he eats."

---

[8]     "Allison" refers to George Allison, a potential witness in Khan's trial.  "Rawlings" refers to Rondell Rawlings, who also had the nickname "Fineman" and was a member of a rival gang in Guyana.

[9]     "Dave" refers to David Persaud, a drug dealer who was killed in Guyana.  "Alicia" refers to his girlfriend, Alicia Jaignarin, a possible government witness at Khan's trial.

[10]    "Son" was the nickname for Vijai Jaignarine, another witness Khan and his defense team believed was planning to testify against Khan.   The Persaud tapes were tape recordings of Persaud's drug trafficking conversations in Guyana.

Gov't Ex. 551.

F.      *The May 20, 2008 Memorandum (Irving's Visit with Khan)*

        Irving met with Khan again on May 20, 2008.  In her memorandum about the

meeting, she wrote:  "[Khan] said why doesn't [Vaughn] try and go see David Clarke in Queens

facility, since they know each other."  Gov't Ex. 808.  Earlier in the memorandum, Irving also

wrote:

- [Khan] wants [Simels] to tell Kevin (Ledge) to find Son's brother in [Georgetown, Guyana], so [Simels] can meet him, or we can get his brother to call Son and see if Son will speak with [Simels].  ([Khan] said to see what [Simels] says about that b/c if Son tells Government that Ledge contacted him or his brother said Ledge told him to speak with [Khan's] lawyer then it may not be good as it will connect [Khan] and Ledge).

Gov't Ex. 808.

G.      *The May 20, 2008 Email From Irving to Vaughn*

        On May 20, 2008 Irving emailed Vaughn to let him know that she had met with

Khan and had brought back a letter from Khan telling Vaughn that he should trust Simels and

Irving because they were his lawyers.  She added, "Also, I am working on the visit," presumably

referring to the prospect of Vaughn visiting Khan in the MCC, which was discussed on May 13.

Gov't Exs. 203 & 809.

H.      *The May 23, 2008 Letter from the Prosecutors in* Khan *to his Counsel*

        On May 23, 2008, the prosecutors responsible for prosecuting the *Khan* case

faxed a letter to Simels's co-counsel, Diarmuid White, which he then sent to Simels.  The

prosecutors inquired about the conversations Khan recorded in Guyana, which Khan's defense

team had indicated it may seek to introduce at his trial.  Specifically, the prosecutors asked for a

description of "how each of the recordings were made, including the equipment used.  In

addition, the government requests that a computer expert inspect the original recordings at a

mutually convenient time."  Def. Ex. 308-C.

11

I.       *The June 11, 2008 Meeting (Vaughn Visits Simels)*

Simels and Vaughn met a second time at Simels's offices on June 11, 2008. Irving did not attend this meeting.  She was on jury duty in New York State court.  Accordingly, other than the phone call made to Irving during the meeting, which is described below, she had no participation in the meeting.

Simels and Vaughn discussed George Allison, another potential witness against Khan.  Simels told Vaughn that they did not know where Allison was, but that Khan wanted Vaughn to see if he could find Allison or his family and see "if he'll talk to us."  Gov't Ex. 401T10 at 6.  Simels and Vaughn also discussed another prospective witness, Alicia Jagnarain. Simels stated that "I'm prepared to handle her in my cross-examination … I'm hoping she won't be a major factor in the case after we're finished with her." *Id.* at 7.

Simels and Vaughn discussed Clarke as well.  Simels said, "So Clarke is the guy we need to nail.  Now either we need to have him desire not to testify, which is unlikely.  He's made whatever deal he's made.  He's gonna get a visa to stay here permanently, I believe.  I don't know whether if they [sic] boys down there will be able to get me his wife, not be able to get me his wife to talk to me." *Id.*  Simels stated that Khan needed to get Clarke not to testify or for the defense team to know everything about him.  He said they were trying to find Clarke's girlfriend, Camacho, and that he would try to get Vaughn details on where she was living by putting Vaughn in touch with Simels's investigator.

Later in the conversation, Vaughn suggested influencing Clarke by appealing to his natural concern for her mother:  "One thing I've learned is that a man, whether he's a criminal, he's a preacher, he always values his mother, because if you're not certain with anyone else to be at your side, your mother very likely will be there.  You don't want anything to happen

to her." *Id.* at 13.  After some additional discussion of Leslyn Camacho, Simels said, "we want

to get to Clarke.  I think their whole case falls apart if Clarke is either neutralized by us, or

neutralized by us by cross-examination." *Id.* at 14.  A few minutes later, after Simels said

"[t]here is money that is available" to help Clarke "resolve these issues," Vaughn suggested that

if they arranged for Clarke to be spoken to by his relatives, Clarke "can probably suddenly just

get amnesia." *Id.*  Simels responded, "That's a terrible thing, but if it happens, it happens." *Id.*

at 21.

        Toward the end of the meeting, Simels called Irving to ask her where he could

find Leslyn Camacho's address.  Irving directed him to a computer file for the address, and

Simels then explained that he needed the information because he was in a meeting with Vaughn.

        At the end of the meeting, Vaughn said Khan would have to provide him an

expense allowance.  Vaughn explained that  he would have to "scale down my business

operations" in order to prepare for Khan's October 2008 trial, and he would need money to pay

for unregistered pre-paid cell phones that could be thrown away.  *Id*. at 36.  Simels stated that he

understood, and that he would get Khan the message by sending Irving down to the MCC to see

him.

J.     *The June 13, 2008 Memorandum (Irving's Visit with Khan)*

        On June 13, 2008, Irving again met with Khan at the MCC.  Simels was not

present.  Afterward, Irving drafted a memorandum summarizing the meeting.  It contained the

following relevant bullet points:

- [Khan] told [Simels] to use his discretion in giving money to [Vaughn] for his investigation.  He said start with $1000 and see if he gets some results and then [Simels] can decide if he wants to give more.

- [Khan] said to make sure to tell [Vaughn] to not do anything stupid in terms of Clarke's mother, and that he will leave it to [Simels] to decide if someone should go speak to her.

He leaves it to [Simels's] legal opinion about any ramifications.

- [Khan] said he wants to wait until the Judge rules on the 404b motion before writing down what [Vaughn] should testify too [sic], as we may not need everything if the judge doesn't let it in.

- [Khan] says that the questions he is most worried about on cross for the [Georgetown] witnesses, is the government saying, 'do you know Ricardo?' [Khan] says the witnesses responses shouldn't be to deny it, but instead should yes of course I do, as part of our "intelligence gathering."

Gov't Ex. 554.

K.    *The June 17, 2008 Telephone Call From Vaughn to Irving*

On June 17, 2008, Vaughn called Simels's offices and asked to speak with

Simels.  He was told Simels was in Guyana.  The transcript reads in part:

VAUGHN:    Selwyn.  Actually, um I received an email from Mr. Simels.  I'm calling to find out when he might be back so I can hook up to see him.

Unidentified Female:  Um.  Do you want to talk to Arienne?

VAUGHN:    No, not necessarily.  I don't have to talk to her.  If you can just give me an idea if he is going to be back tomorrow, whenever, so I can call him you know?

\*            \*            \*            \*            \*

Unidentified Female:  Ok, um, wait hold on one second ok … She wants to talk to you ok?

VAUGHN:  Alright, no problem, let me talk to her.

\*            \*            \*            \*            \*

IRVING:    Selwyn?

VAUGHN:    Hello?

IRVING:    Hi. It's Arienne.  I met you before.

VAUGHN:    Yeah, it's Fineman here.

IRVING:    Yeah, how you doing?

14

VAUGHN:    Not too bad.

IRVING:    He's still in Guyana and he's, he said that he's either coming back tomorrow night or Friday depending on how well it goes.

VAUGHN:    Alright … I know he was going down there because he, um, he sent me a mail before he left right?

IRVING:    Ok.

VAUGHN:    So I said just to check when he was going to be back so I can hook up with him.

IRVING:    Right, right.  'Cause he sent you in relation to some of the people.  I saw, I saw the email he sent to you, um.  'Cause I had met with Roger.

\*          \*          \*          \*          \*

IRVING:    Yeah, what, what I can do is when he, um, gets back because I know he definitely wants to meet up with you again, talk about everything and give you some money because I know you need some money to get started and everything.

Gov't Ex. 401T11 at 1-3.

L.    *The June 18, 2008 Memorandum (Irving's Visit with Khan)*

Irving met Khan again on June 18, 2008.  Simels was in Guyana at the time.  In her memorandum of the meeting, Irving wrote:  "[Khan] said that the small laptop has more calls from David Clarke, so we should get into that one and look at those calls."  Gov't Ex. 540.  The memorandum also states:  "[Khan] says that Limpy operated the equipment in the beginning and then after [Khan] was arrested in December 2002 that was the end of Limpy working with the system."  *Id.*  She also wrote:  "[Khan] would rent houses in his name, and then have the equipment set up there, and if there was a power outage or something like that he would talk Brian through restarting the system, but Brian never listened to calls or set up the tap."  *Id.*

M.    *The June 20, 2008 Meeting (Vaughn Meets with Simels and Irving)*

Simels traveled to Guyana between June 14 and June 19, 2008.  When he

15

returned, he arranged to meet with Vaughn on June 20, 2008.  During the meeting, Simels discussed Vijai Jaignarine (also known as "Son").  Simels stated that Jaignarine had been arrested and that he was cooperating with the government.  Simels also discussed George Allison, stating that they were not sure whether Allison would be a witness against Khan, but he may be cooperating with the government.

Irving is heard on the recording a few times at the beginning of the meeting. However, when Mark Reagan, an employee of Khan's timber company in Guyana, called the office, Irving left the meeting to take the call.  Thereafter, Irving had an instant message conversation spanning about 40 minutes with Reagan.  The following is an excerpt of that conversation:

| | |
|---|---|
| IRVING: | on the equipment, did that sound familiar? |
| REAGAN: | yes, i know about what he was speaking |
| IRVING: | ok, so then is was [sic] the person he thought it was running it |
| REAGAN: | yes i was only security for the equip |
| IRVING: | one thing [Khan] asked me was, do you still have the base for the equipment |
| REAGAN: | I was never shown how work it |
| IRVING: | ? |
| IRVING: | or, do you know who has it, so we can get it? |
| REAGAN: | does he need that base |
| IRVING: | yes |
| IRVING: | can you get it for us, and Robert will get it when he is there next |
| IRVING: | ? |
| REAGAN: | i will do my best to get it |

16

| | |
|---|---|
| IRVING: | ok |
| IRVING: | thanks |
| REAGAN: | i will get it no matter what it takes |
| IRVING: | thank you |
| REAGAN: | ill find it |
| REAGAN: | promise |
| IRVING: | thanks |

Gov't Ex. 804 at 4.

After Irving left Vaughn and Simels, they continued their meeting and engaged in a conversation that was devastating evidence against Simels. As discussed above, in their previous meeting, Vaughn had suggested influencing Clarke by getting him to fear for his mother. He had also requested some money to cover his expenses in assisting Khan. Simels resumed that conversation on June 20 after Irving left the room:

| | |
|---|---|
| SIMELS: | Here's a thousand dollars to, to get started. |
| VAUGHN: | Alright. No problem. |
| SIMELS: | Um, all he says is be careful. He says, "Don't kill the mother." |
| VAUGHN: | Don't kill the mother? |
| SIMELS: | He said, you know, just, just -- |
| VAUGHN: | So what other option would he prefer? |
| SIMELS: | He doesn't want you anywhere near it. |
| VAUGHN: | No, no, no, no, no. No, no, no, I can't get anywhere near it cause that's why I'm asking about options he'd prefer you know? So I can know what I'm doing, I do exactly, so what you know, he can't say well I didn't approve it. |
| SIMELS: | Well, he'd like as much pressure being put on Clarke as possible, but he thinks if Clarke's mother gets killed, that the government |

17

will go crazy.

Gov't Ex. 401T13 at 21-22. As the last remark suggested, Simels's prohibition of the murder of

Clarke's mother was hardly altruistic. As he explained a few moments later, his concern was

that the murder of the mother of the linchpin witness against Khan would land Khan in the

Special Housing Unit in the MCC, making it far more difficult to prepare for trial. When his

discussion with Vaughn turned to a lesser witness, that concern disappeared, and Simels placed

no limit on the violence Vaughn could use:

| | |
|---|---|
| SIMELS: | Yeah, he wants you to do whatever's has to be done, he said obviously if you can find George [Allison], great. If you can find Leslyn Camacho who was -- |
| VAUGHN: | So you want, what you want me to go with them now, George and these other people? |
| SIMELS: | What's that? |
| VAUGHN: | What, will he want me to do now with them, George and the other people? |
| SIMELS: | With George he said you can deal with George however you think that George has to be dealt with in terms of finding out where he is in this thing. If he's cooperating, that, it's a bad thing. Um, if he's not cooperating and he wants to talk about Clarke, um, then we want him to talk to us about Clarke. I, I don't think he cares about Chinaman [George Allison] in terms of, cause I don't think they'll put the, the, the heat on him that, that screwing around with the mother would. I mean doing something violent to her. |

Gov't Ex. 401T13 at 22-23. The jury could readily infer from Simels's words, the context in

which he used those words, and his tone that he and Khan were authorizing Vaughn to take

whatever steps were necessary, including acts of violence, to silence George Allison.

Irving later returned to the meeting to inform Simels that the secretary was

printing out photographs, as Simels had earlier requested. The conversation between Simels and

Vaughn continued, this time with Irving present:

18

| IRVING: | And we were told that Chinaman [George Allison], maybe like with like hanging out, living with her in Brooklyn. |
| VAUGHN: | Alright.  No problem. |
| IRVING: | So. |
| SIMELS: | But you know what happens when you send a white investigator over there to look for them, nobody -- |
| VAUGHN: | But quite obvious, how could you do that?  You can't do that. |
| IRVING: | You know, let me make a copy of that just so I can be sure which ones I gave you. |
| VAUGHN: | Exactly, you know.  You can't do that.  You know.  Nobody would want to talk to him. |
| SIMELS: | Can't find a Guyanese investigator up here. |
| VAUGHN: | Well, you've got one now. |

Gov't Ex. 401T13 at 35.

N.     *The June 23, 2008 Instant Message Conversation Between Irving and Reagan*

On June 23, 2008, Irving and Reagan had another instant message conversation. Reagan stated he had some pictures "on a flash drive" and that he would send it by Federal Express that day.  Gov't Ex. 804 at 6.  Reagan also stated that he had "the base."  Irving asked whether Reagan could also include some documents in the package, and gave Reagan the law firm's Federal Express account number.

O.     *The July 1, 2008 Email From Simels[11] to Vaughn*

On July 1, 2008, Simels wrote an email to Vaughn stating: "[Khan] wants you to try and see Clarke.  We are checking to see what you have to do to be able to get in.  When you call I hope to have an answer.  I will explain the approach when you call."  Gov't Ex. 211.

---

[11]     In its opposition to the motion, the government incorrectly identifies Irving as the sender of this email.  Gov't Opp. at 24.

P.      *The July 2, 2008 Telephone Call From Vaughn to Simels*

Simels spoke to Vaughn on the telephone on July 2, 2008 to explain the approach

Vaughn should take if he gained entry to the Queens detention facility to meet with Clarke.

Simels stated:

> [Khan's] view is that if you can go see [Clarke], even if you just talk about
> bullshit, nothing related to the case, if, when you testify, we can demonstrate that
> he has been meeting with you, right?  It will give you more credibility on the
> witness stand that he's you know, ah, been seeing you, right?

Gov't Ex. 401T14 at 1-2.

Q.      *The July 8, 2008 Email From Irving to Vaughn*

On July 8, 2008, Irving sent an email to Vaughn with "Clarke visit" in the

"subject" line.  The body of the message was as follows:

> I spoke to the jail where David Clarke is housed to find out about you being able
> to visit him.  I actually got two different answers, one saying you could just show
> up any time when they allow visits (Monday through Friday 2-4 and 4-6pm) with
> just a picture ID and you can get in.  Another person told me the inmate has to put
> your name on his list first.  So [Simels] and I think you should head over to the
> jail and try and visit David Clarke (without being put on the list) and act dumb
> about the list thing, and see if you can get in.  If you can't, you will have to
> approach David's mother and see if she will contact him about putting you on the
> list.

Gov't Ex. 214.

R.      *The July 10, 2008 Letter from the* Khan *Prosecutors to Simels's Co-Counsel*

On July 10, 2008, the prosecutors in the *Khan* case sent another letter to Simels's

co-counsel about the electronic eavesdropping equipment Khan had used to intercept

conversations in Guyana.  Co-counsel forwarded the letter to Simels.  The letter stated:

> First, on May 23, 2008, the government wrote [the co-counsel] regarding the four
> CD's produced by the defense.  By letter dated June 11, you responded to some
> but not all of the questions contained in that letter.  For example, we requested
> information regarding how the recordings were made, including the equipment
> used.  That information has not been provided.

Gov't Ex. S-308-E.

S.      *The July 18, 2008 Meeting (Vaughn Meets with Simels)*

        On July 18, 2008, at Simels's office, Vaughn and Simels met for the third time.

Irving was not present; she was traveling in Ireland.  Prior to the meeting, and after the June 20

meeting, Vaughn's government handlers decided to steer Vaughn's discussions with Simels

away from acts of violence and toward the bribery of witnesses.  Thus, on July 18 Vaughn told

Simels that Clarke and Camacho were willing to testify falsely in exchange for money.  This

prompted another conversation that was extremely powerful evidence against Simels.

        Vaughn told Simels he had been in contact with Camacho and, through Camacho,

with Clarke as well.  Vaughn said Clarke was "willing to play," but he wanted to know "what

he'd be required to do and what's in it for him."  Gov't Ex. 401T18 at 3.  Simels cautioned

Vaughn to portray himself as interested in the truth and to be careful; if Vaughn were to come

out and offer something to Clarke and Clarke were to be wired, then "[Khan's] in trouble."  *Id.* at

4-5.  Later in the meeting, Simels and Vaughn discussed possible testimony by Camacho.

Simels stated that Camacho could say "David [Clarke] told me he was gonna lie about [Khan].

I've been his girlfriend for years.  He told me he was gonna lie and say [Khan] was involved

when he wasn't, that David hates America."  *Id.* at 10.  Vaughn suggested drafting a script and

having Camacho sign it, to which Simels replied, "Ok."  Vaughn then asked Simels what he

could offer Camacho.  Simels asked "are they talking about a, they talking about five thousand

dollars, ten thousand dollars, twenty thousand dollars, what are they talking about?"  *Id.* at 13-

14.[12]

---

[12]      A government agent testified that there were no emails, phone calls, instant message conversations
or other evidence in which Irving discussed payments to Camacho.  Simels testified that he never discussed with
Irving the conversation he had with Vaughn on July 18.  Further, he stated that he never discussed paying Clarke or
Camacho with Irving.

T.    *The July 21, 2008 Phone Call From Vaughn to Simels*

On July 21, 2008, Vaughn and Simels spoke by the telephone.  Vaughn told Simels that Camacho was prepared to sign an affidavit prepared by Simels, but that "she wants ten for herself."  Gov't Ex. 401T21 at 1.

U.    *The July 30, 2008 Meeting (Vaughn Visits Simels)*

Vaughn and Simels met again on July 30, 2008 in Simels's office.  They discussed Vaughn's contacts with Camacho.  Vaughn told Simels that Camacho would sign the affidavit no matter what it contained.  Simels asked how much money Camacho wanted simply to meet with Simels.  Later in the meeting, Simels made it clear he had discussed the bribe with Khan, who wanted to pay less than $10,000 for Camacho's false tesitmony.  Simels told Vaughn: "And he said, 'Try to get the numbers down.'  Whatever you save him on the $10,000, ah, he'll make up to you."  Gov't Ex. 401T26 at 11.

Vaughn and Simels then discussed Vijai Jaignarine.  Simels told Vaughn that they needed Jaignarine's brother to help them to get Jaignarine to "back off."  *Id.* at 15.

Irving was not present for the July 30 meeting.  Toward the end of the conversation, Simels spoke to her by telephone, and they had the following exchange:

| | |
|---|---|
| IRVING: | Yeah? |
| SIMELS: | What's the name of the fellow, if you recall, off the top of your head, who introduced Kevin to Son? |
| IRVING: | Um, I don't know if, I don't know the answer.  I know his brother, some brother, lives in Guyana and he knew his brother, but I'm not sure who introduced him to the brother, actually.  What, did you learn that when you talked to him down in Guyana? |
| SIMELS: | Yeah. |
| IRVING: | I could look in the memo. |

22

| | |
|---|---|
| SIMELS: | I think it's, uh – |
| IRVING: | Anand Sanesie Ricky.  A-N-A-N-D S-A-N-E-S-I-E Ricky R-I-C-K-Y. |
| SIMELS: | Say it again. |
| IRVING: | Anand A-N-A-N-D Sanasie S-A-N-E-S-I-E Ricky R-I-C-K-Y. |
| SIMELS: | Yea, Ricky's his call name. |
| VAUGHN: | Ricky? |
| IRVING: | Oh, Ricky's his call name?  Okay. |
| SIMELS: | Do you have any idea who that is?  Call Sean Bellfield, alright? |
| IRVING: | Are you talking to me? |
| SIMELS: | Yeah, you. |
| IRVING: | Okay. |
| SIMELS: | Thanks.  And ask him and ask Reagan to see if they can find this guy to find out, ah, ship, them off, ah, a copy of the transcript with Son, and tell them to find this guy's brother. |
| IRVING: | Okay.  I will do that right now. |
| SIMELS: | And, and, and, um, then tell Sean, when he locates him, to speak to me personally and I'll tell him what I want done.  Alright? |
| IRVING: | Okay. Bye. |

*Id.* at 16-17.  After the call ended, Vaughn said the people in Guyana should be able to just pick up Son's brother.   Simels said he was told that everyone was afraid, but he was not sure why they would be.  Vaughn stated, "They gonna pick them up and what?  They might ask you a few questions."  *Id.* at 17.

Several minutes later, Simels and Irving had the following exchange outside of the office in which Simels was meeting Vaughn:

| | |
|---|---|
| IRVING: | Transcripts or the actual recordings? |

23

| | | |
|---|---|---|
| SIMELS: | Transcripts … we just want them to see the name of this guy. |
| IRVING: | The name of Son? |
| SIMELS: | Right.  And let them grab up, ah, Kevin and Anand – |
| IRVING: | Okay. |
| SIMELS: | - and the brother. |
| IRVING: | Okay. |
| SIMELS: | So - |

Gov't Ex. 401T26 at 20.  At this point, Irving apparently came to the door of Simels's office and saw Vaughn; Irving stated, "Hey, how you doin'?"  *Id.* at 20.

V.      *The July 30, 2008 Email From Irving to Vaughn*

On July 30, 2008 Irving sent an email to Vaughn, copying Simels, with the subject line "Investigation."  In the email, Irving wrote:  "[Simels] meant to tell you today, but he also wants you to try and talk to Vijai Jaignarine aka Son.  He is living near Washington, DC. His address is 4011 36th Street, Mt. Ranier, MD 20712.  He may be a witness against [Khan] and is on several wiretap conversations with Dave Persaud."  Gov't Ex. 217.  A few days later, Simels replied only to Vaughn, *i.e.*, without copying Irving.  Referring to Leslyn Camacho, Simels wrote, "Did you get to girl?  Is she going to meet me?"  *Id.*

W.      *The August 5, 7 and 24, 2008 Phone Calls Between Vaughn and Simels*

On August 5, 7 and 24, 2008, Vaughn and Simels spoke by telephone about Camacho.  They discussed how much Camacho wanted to be paid and her insistence on getting the money up front.  Irving did not participate in these conversations.

X.      *The August 14, 2008 Letter from the* Khan *Prosecutors to Simels*

On August 14, 2008, the prosecutors in *Khan* sent Simels a letter stating, *inter alia*: "Dear Mr. Simels:  In the government's prior requests regarding the recordings produced by

24

the defense, we requested information regarding how the recordings were made, including the

equipment used."  Def. Ex. S-308-I.  Simels testified at trial that he was trying to arrange an

inspection with the prosecutors before he was arrested.

Y.      *The September 5, 2008 Memorandum*

          After visiting Khan at the MCC, Irving drafted a memorandum of her September

5, 2008 meeting with him.  In it, she stated:  "Discussed fees.  Explained to [Khan] his two

options (delay trial or [Simels] out).  [Khan] doesn't want either, so is going to call around this

weekend and try to get a solution."  Gov't Ex. 538.  She also wrote "Leslyn Camacho is going to

come see us next week."  *Id.*  Irving indicated that Khan had wanted to know "if we could record

Leslyn's meeting with us."  *Id.*

Z.      *The Testimony of Peter Myers*

          Peter Myers, co-owner of Smith/Myers Corporation, which manufactured the

eavesdropping equipment seized during the search of Simels's offices, testified at trial.  Myers

testified that the equipment is controlled by a laptop, which can be a standard laptop.  Indeed, the

laptop that accompanied the equipment at the point of sale looks virtually indistinguishable from

a standard laptop.  The equipment also has a base, which processes radio waves created by cell

phones and sends data to the laptop.  The laptop stores the data, and the calls that are recorded in

this fashion can be retrieved by the laptop without using the base.  When the base was first

seized, Agent Maher, who executed the search warrant, described it as a "power module."

Myers testified that there was nothing on the equipment that denoted "what the purpose or design

of the various pieces are for."  Tr. at 701.

AA.     *The Testimony of Justin Kern*

          Justin Kern, the IT consultant for Simels's office, testified at Irving's trial.  He

had visited Simels's law office in April 2008 to examine the systems there.  Kern viewed a

photograph of the base and described it as an "uninterruptible power supply," which would keep equipment plugged into it sustained during a power outage.  Kern further testified that there was a similar unit in Irving's office.

BB.   *The Additional Documents*

       1.   *The May 13, 2007 Letter from Khan to Paul*

During the search of Simels's law offices and computers, the government found a letter dated May 13, 2007 from Khan to Paul (presumably Paul Rodrigues in Guyana) about the work Khan and his lawyers were doing in Khan's defense.  Khan asked why Paul did not "slap" an individual named Mike Shadeo when he lied to Khan's lawyers.  Gov't Ex. 810.  In addition, Khan instructed Paul to go to Alicia's parents and tell them they have proof she laundered money and that she lied about it to the government.  He further wrote that other information would come out and that it would be "real risky business."  *Id.*

       2.   *The "To Do" List*

In the course of the government's search of Simels's office, it seized a "to do" list, which included tasks to be completed by Irving.  One task, which was marked as having been completed on August 1, 2008, was to send the Persaud tapes and transcripts to Paul Rodrigues in Guyana.  Gov't Ex. 520.

       3.   *The Federal Express Documents*

Federal Express documents that were received in evidence at trial revealed that on October 11, 2007, Simels sent a package from Georgetown, Guyana to his offices in New York. The contents of the package were listed as "Panasonic Laptop."

On June 25, 2008, a package was shipped from Guyana to Simels's offices in New York.  Irving signed the "Commercial Invoice" and declared the information contained therein to be true and correct.  In this document, Irving listed the contents of the package as

documents, a computer base power supply valued at $40 and a flash drive containing pictures only, valued at $1000.

DISCUSSION

A.      *The Rule 29 Motion*

        1.      *The Legal Standard*

        Federal Rule of Criminal Procedure 29(a) provides:  "After the government closes its evidence or after the close of all evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."[13]  "A defendant challenging the sufficiency of the evidence supporting a conviction faces a 'heavy burden.'"  *United States v. Glenn,* 312 F.3d 58, 63 (2d Cir. 2002)(quoting *United States v. Matthews,* 20 F. 3d 538, 548 (2d Cir. 1994)).  I may overturn a conviction on that basis "only if, after viewing the evidence in the light most favorable to the Government and drawing all reasonable inferences in its favor," I find that, "'no rational trier of fact' could have concluded that the Government met its burden of proof."  *Id.* (quoting *United States v. Morrison,* 153 F.3d 34, 49 (2d Cir. 1998)).  "'[T]he relevant question is whether … *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see also e.g., United States v. Desena,* 260 F.3d 150, 154 (2d Cir. 2001) (same)); *United States v. Strauss,* 999 F.2d 692, 696 (2d Cir. 1993)("[A] defendant must demonstrate that there was no evidence from which a reasonable mind might fairly conclude guilt beyond a reasonable doubt." (quotation marks omitted)).  My evaluation considers "'the evidence in its totality,' and the Government 'need not negate every theory of innocence.'"  *Glenn,* 312 F.3d at 63 (quoting *United States v. Autuori,* 212 F.3d 105, 114 (2d Cir.

---

[13]      Federal Rule of Criminal Procedure 29(b) allows the court to reserve decision on the motion, let the trial proceed, submit the case to the jury and decide the motion after the jury returns a verdict of guilty.

2000)); *see also, e.g., United States v. Thai,* 29 F.3d 785, 817 (2d Cir. 1994)("We must view the pieces of evidence not in isolation but in conjunction…."). Moreover, "the prosecution may prove its case entirely by circumstantial evidence so long as guilt is established beyond a reasonable doubt." *Glenn,* 312 F.3d at 64.[14]

2. *The Obstruction Counts*

Irving was convicted of conspiring to tamper with witnesses against Khan and with attempting to tamper with David Clarke and Vijai Jaignarine. To prove the conspiracy charge, the government was required to prove beyond a reasonable doubt that: (1) two or more persons entered into the criminal agreement charged and (2) Irving became a member of the conspiracy, with knowledge of its criminal goal and intending by her actions to assist in the

---

[14]   Though it has no effect on the outcome here, I have found the Second Circuit's guidance in this area ambiguous. Specifically, *Glenn,* borrowing from a decision of the Fifth Circuit, stated as follows: "[I]f the evidence viewed in the light most favorable to the prosecution gives 'equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence,' then 'a reasonable jury must necessarily entertain a reasonable doubt.'" *Glenn,* 312 F.3d at 70 (quoting *United States v. Lopez,* 74 F.3d 575, 577 (5th Cir. 1996)). That direction is in tension with the following direction, first adopted by Judge Friendly in *United States v. Taylor,* 464 F.2d 240 (2d Cir. 1972), and borrowed from Judge E. Barrett Prettyman's decision in *Curley v. United States,* 160 F.2d 229 (1947): "If [the judge] concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, he must let the jury decide the matter." *Taylor,* 464 F.2d at 243 (quoting *Curley,* 160 F.2d at 233).

There are parallel lines of Second Circuit authority following these formulations. *Glenn*'s formulation has been cited, for example in *United States v. Hawkins,* 547 F.3d 66, 71 (2d Cir. 2008), *United States v. Huezo,* 546 F.3d 174, 192 (2d Cir. 2008), and *United States v. Triumph Capital Group, Inc.,* 544 F.3d 149, 159 (2d Cir. 2008). The "let the jury decide" formulation has been followed, for example, in *United States v. Santos,* 541 F.3d 63, 70 (2d Cir. 2008), *United States v. Temple,* 447 F.3d 130, 137 (2d Cir. 2006), *United States v. MacPherson,* 424 F.3d 183, 190 (2d Cir. 2005), and *United States v. Autuori,* 212 F.3d 105, 114 (2d Cir. 2000). Except for Judge Raggi's observation in her dissenting opinion in *United States v. Cassese,* 428 F.3d 92, 104 (2d Cir. 2005) that *Glenn* "did not … abrogate the holding in" *Autuori,* the two lines of authority do not intersect.

This guidance could be clearer, but in any event I apply here the *Autuori* formulation of the rule, which requires deference to the jury's verdict even where a verdict of not guilty would have been equally supported by the evidence at trial. Further, I am mindful of the fact that courts undertaking a sufficiency review of the evidence at trial may not properly divide and conquer that evidence. Specifically, if a particular item of evidence fairly supports multiple inferences, only one of which suggests guilt, the court must draw the inference that suggests guilt. However, after viewing all the evidence in this manner, that is, after drawing all reasonable inferences in favor of the government, the evidence must warrant a rational juror in finding each element of the crime charged *beyond a reasonable doubt.* Accordingly, the Second Circuit has emphasized that where a fact to be proved is also an element of the offense, "it is not enough that the inferences in the government's favor are permissible." *Triumph Capital,* 544 F.3d at 159(quoting *United States v. Martinez,* 54 F.3d 1040, 1043 (2d Cir. 1995)). The court "must also be satisfied that the inferences are sufficiently supported to permit a rational juror to find that the element, like all elements, is established beyond a reasonable doubt." *Id.* (quoting *Martinez,* 54 F.3d at 1043).

accomplishment of that goal.  The elements of the attempt charges were (1) Irving attempted to threaten, use intimidation on, or corruptly persuade Clarke and Jaignarine (or aided and abetted Simels in doing so), and (2) she acted with the intent to influence or prevent the testimony of Clarke and Jaignarine against Khan.

With respect a conspiracy charge, a defendant's "mere association with those implicated in an unlawful undertaking is not enough to prove knowing involvement." *United States v. Lorenzo,* 534 F.3d 153, 159 (2d Cir. 2008)(quoting *United States v. Nusraty,* 867 F.2d 759, 764 (2d Cir. 1989)).  Furthermore, a defendant's mere presence at the scene of a criminal act, or mere association with others who are committing a crime, does not constitute participation in the conspiracy, even if the defendant has knowledge of the offense.  *Id.* at 159-60 (quoting *United States v. Samaria,* 239 F.3d 228, 235 (2d Cir. 2001)).  These same principles apply to the substantive offenses of attempted witness tampering of which Irving was convicted.  *See United States v. Cruz,* 363 F.3d 187, 198 (2d Cir. 2004).  Specifically, Irving's association with Simels and her presence in his law offices were insufficient to establish that she aided and abetted his crimes, even if her actions assisted him and indeed even if she were aware that he was committing a crime.  As I instructed the jury at trial, the government was required to prove beyond a reasonable doubt that Irving herself acted with the specific intent to influence or prevent the testimony of the witnesses through intimidation, threats or corrupt persuasion.

For the reasons set forth below, I find that no rational juror could have found beyond a reasonable doubt that Irving knowingly and intentionally joined a conspiracy to tamper with witnesses, or that she knowingly and intentionally attempted to influence or prevent the testimony of Clarke or Jaignarine through the use of intimidation or threat.

The government relies heavily on Irving's June 13, 2008 memorandum about her

meeting with Khan to establish her participation in the plan to tamper with Clarke.  As set forth above, the memorandum contained the following statement:  "[Khan] said to make sure to tell [Vaughn] to not do anything stupid in terms of Clarke's mother, and that he will leave it to [Simels] to decide if someone should go speak to her.  He leaves it to [Simels's] legal opinion about any ramifications."  Gov't Ex. 554.  The government contends that this statement establishes that Irving knew of the plan by Simels and Khan to "neutralize" Clarke, by illegal means, and intentionally facilitated the plan by acting as a messenger to and from Simels and Khan.

I disagree.  In assessing the inferences to be drawn about Irving from her June 13 memorandum, it is important to bear in mind that she was not a participant in either of the June 11 or June 20 conversations between Vaughn and Simels, in which *they* discuss possibly harming Clarke's mother.  Without those conversations to shed further light on Irving's state of mind, the text of her memorandum is all the more important, and all the text expresses is Khan's hesitance to allow anyone, specifically Vaughn, to *speak* with Clarke's mother unless Simels deemed it appropriate.  The memorandum does not support the "sizable inferential leap required to conclude" that Irving knew that Khan meant to convey that Vaughn could do anything short of *killing* Clarke's mother in order to tamper with Clarke's testimony.  *Glenn,* 312 F.3d at 67.

The government argues that the chronology of events nevertheless supports an inference that Irving knowingly communicated Khan's instructions regarding witness tampering to Simels, so he could pass them along to Vaughn.  The argument goes as follows:  (a) on June 11, Vaughn suggested that Clarke could be reached via his mother; (b) on June 20, Simels told Vaughn not to kill Clarke's mother (suggesting that other acts of violence to influence Clarke were permissible); (c) in between those dates, only Irving visited Khan in the MCC; and,

therefore, (d) Irving must have been a key (and knowing) player in the conspiracy and the attempts to tamper with witnesses.

There is some superficial appeal to the government's reasoning, but it has numerous serious flaws.  For example, Simels himself met with Khan in the MCC on June 10.  Thus, the evidence fully supports the inference that when Khan met with Irving three days later, he was following up through her on issues he had discussed with Simels, and that she passed his information back to Simels without knowledge of any illegal scheme to tamper with witnesses.

The government's argument is further undermined by what is *not* in Irving's June 13 memorandum.  The government contends that Simels's instructions to Vaughn during the June 20 meeting regarding Clarke, Alicia Jaignarine, George Allison, Leslyn Camacho and others came from Khan via Irving.[15]  But Irving's June 13 memorandum makes no mention of Jaignarine, Allison, or Camacho.  If Irving were indeed an indispensable, fully informed messenger on the subject of illegally influencing witnesses, as the government portrays her, it would be odd indeed for her to have memorialized in writing only Khan's instruction regarding Clarke.  Rather, the lengthy list of instructions and information she conveyed from Khan to Simels in her June 13 memorandum reveal that Khan was fully engaged in numerous entirely legitimate ways in the defense of his case.  Read in context, the notation regarding Clarke's mother is simply another of those instructions.

It bears emphasis that even when it is read in isolation, Irving's notation about Clarke's mother is not incriminating.  I recognize that Vaughn first mentioned reaching Clarke through his mother on June 11, supporting the inference that Simels had not discussed that

---

[15]     *See* Gov't Opp. at 20 ("Thus, it was certainly reasonable for the jury to infer that the only way Simels knew what to tell Vaughn at their June 20, 2008 meeting concerning what Khan wanted done, was because Irving had received that information from Khan … on June 13, 2008.")

subject with Khan when they met on June 10.  Thus, the jury could easily have inferred that Simels tasked Irving with raising that subject with Khan in their meeting on June 13.  And the inference that she reported back Khan's answer in the memorandum regarding the meeting is virtually inescapable.  But those inferences do not make the government's case.  Even assuming Simels told Irving that Vaughn said Clarke could be influenced through his mother, and asked her to pass that along to Khan and get his instructions, Irving's conveyance of Khan's instruction that no one should even *speak* to Clarke's mother unless Simels approved it cannot reasonably support an inference that Irving was participating in a crime.  In short, the message Irving brought back delegated to Simels the question of how to deal with Clarke's mother.  It is true that Simels exercised that authority on June 20 in a manner that was hair-raisingly criminal, but Irving was not present when that occurred and there is no evidence she even became aware of it.

        The government seeks additional support from other facts that do not provide it. For example, the June 13 memorandum reports to Simels Khan's approval of a $1000 payment to Vaughn "for his investigation," Gov't Ex. 554, and Simels paid that amount to Vaughn on June 20.  But those facts are not indicative of guilt.  There is no dispute that Vaughn (whom Simels jokingly referred to as "Findman" rather than by his true nickname "Fineman" because he was using Vaughn to locate so many people) was performing work for the defense team in *Khan* for which he could legitimately be paid.  During one of the portions of the June 20 conversation for which Irving was present, Simels explicitly said he needed a Guyanese investigator to go to certain places in New York, and Vaughn said "you've got one now."  Gov't Ex. 401T13 at 35. There was no basis for Irving to believe the $1000 payment to Vaughn was for an illegal purpose.

Similarly, it is true that Irving reported in her May 20 memorandum that Khan wanted Vaughn to try to visit Clarke in jail "since they know each other," Gov't Ex. 808**,** and then in July she emailed Vaughn with her suggestions as to how he might gain entry to the jail for such a visit, but that conduct was not even remotely criminal in nature.  To the contrary, it was consistent with what the evidence revealed to be one of Irving's principal duties as Simels's "associate" -- to enable others to gather information that could be helpful to Khan's defense.

Finally, the government contends that Irving's guilt was proved by her July 1, 2008 email to Vaughn telling him that she would "explain the approach [to be used with Clarke] when you call."  Gov't Ex. 211.  The government argues that "[s]ince Irving informed Vaughn that she was ready to 'explain the approach' to him, it is evident that she already knew the intended scheme, as Simels would described [sic] it the next day on the telephone to Vaughn."  Gov't Opp. at 24.  The main problem with this argument is that it has the facts wrong:  *Simels* sent the "explain-the-approach" email on July 1, not Irving.  A secondary problem is that when Simels explained the approach the following day, there was nothing criminal about it.[16]

In addition to the conspiracy charge and the charge of attempting to tamper with Clarke, Irving was convicted of attempting to tamper with Vijai Jaignarine.  The evidence against Irving on this count was especially weak, and I conclude it is insufficient to sustain the jury's verdict.

The government's theory at trial was that Khan wanted to pressure both Jaignarine and his brother in Guyana in order to get Jaginarine to change his testimony at Khan's trial.  *See* Gov't Opp. at 27.  In its opposition to this motion, the government contends that

---

[16]     The "approach" described by Simels on July 2 was that Vaughn should "just talk about bullshit" with Clarke, as the mere fact that Clarke had met with Vaughn would lend Vaughn credibility when he testified about Clarke in the *Khan* case.  Gov't Ex. 401T14.  That may not be a case-winning strategy, but there is nothing inappropriate in it.

several pieces of evidence establish that Irving had knowledge of the plan to tamper with Jaignarine.

      First, the government argues that Simels told Vaughn on July 30, 2008 about the damaging testimony Jaignarine could offer at Khan's trial -- specifically, testimony connecting Khan to a drug trafficking business.  Irving was not at this meeting, but the government argues that she must nevertheless have known about the plan to put pressure on Jaignarine because in an email later that day she gave Vaughn Jaignarine's address in Maryland.  This argument makes no sense.  There is nothing remotely criminal about a defense attorney telling a defense investigator that a particular witness could offer damaging testimony against the defendant at trial.  And Irving's act of giving Jaignarine's address to a person acting as an investigator for the defense is innocuous.

      Second, the government argues that Irving was aware of Simels's and Khan's direction to Sean Bellfield, Paul Rodrigues and others to kidnap Jaignarine's brother in Guyana and pressure him to get Jaignarine to refuse to testify for the government.  As evidence of Irving's knowledge, the government relies on the conversation between Simels and Irving over the intercom on July 30.  Simels told Irving to send Sean Bellfield and Reagan a copy of the transcript of the Jaignarine calls and "see if they can find this guy … and tell them to find this guy's brother."  Gov't Ex. 401T26 at 16-17.  Simels instructed tells Irving to "tell Sean, when he locates him, to speak to me personally and I'll tell him what I want done."  *Id.* at 17.  These instructions did not apprise Irving of a plan to kidnap Jaignarine's brother.

      Later in the conversation, Irving entered Simels's office briefly and asked for clarification:

      IRVING:       Transcripts or the actual recordings?

| | |
|---|---|
| SIMELS: | Transcripts … we just want them to see the name of this guy. |
| IRVING: | The name of Son? |
| SIMELS: | Right, and let them grab up, ah, Kevin and Anand - |
| IRVING: | Okay |
| SIMELS: | - and his brother. |
| IRVING: | Okay. |

Gov't Ex. 401R26 at 20.  The government argues that this conversation shows "that Irving was

involved of [sic] these discussions between Simels, Vaughn and Khan about how they would

*eliminate Jaignarine as a witness.*"  Gov't Opp. at 29 (emphasis added).  I find that to be a *non*

*sequitur*.  In my view, the conversation is completely consistent with Irving's belief -- based

squarely on a message she delivered from Khan -- that Simels, Khan and Vaughn wanted Simels

to *speak* to Jaignarine, and wanted Jaignarine's brother to facilitate that goal.  Specifically, in her

May 20 memorandum, Irving wrote:  "[Khan] wants [Simels] to tell Kevin (Ledge) to find

[Jaignarine's] brother in [Georgetown, Guyana], so [Simels] can meet him, or we can get his

brother to call [Jaignarine] and see if [Jaignarine] will speak to [Simels]."  Gov't Ex. 808.  The

only reasonable inference from all of the evidence presented is that Irving believed investigators

were trying to find and speak to Jaignarine or his brother with the hope that Jaignarine would

speak to Simels.  A rational juror could not have concluded that Irving knowingly acted to

influence Jaignarine's testimony.

I am mindful of the fact that in addition to the evidence as to Clarke and

Jaignarine, the jury could have properly considered the evidence regarding other potential

witnesses even though it acquitted Irving of the substantive counts of attempting to tamper with

those individuals.  However, this additional evidence need not detain me long.  It is comprised

principally of Irving's relationship with Simels and Khan. The government argues, essentially, that Irving's memoranda of her meetings with Khan demonstrate that she had knowledge about the conspiracy to tamper with several potential witnesses.  According to the government, Irving communicated Khan's criminal directions to Simels, who passed them on to Vaughn.  But Irving's memoranda never mention or acknowledge an effort to intimidate any witnesses.[17]  The government's emphasis on Irving's importance as an intermediary is belied by the substantial number of meetings Simels had with Khan and without Irving.

The government contends that Irving's memorandum following her June 13 meeting with Khan evidences her intention to suborn perjury by Vaughn.  Specifically, Irving wrote that "[Khan] said he wants to wait until the Judge rules on the 404b motion before writing down what [Vaughn] should testify too [sic], as we may not need everything if the Judge doesn't let it in."  Gov't Ex. 554.  But there is nothing sinister about Irving's memorandum.  She reported the client's message that he would await the outcome of the 404(b) motion before telling Simels what, in Khan's view, Vaughn's testimony should cover.  It would not be reasonable to interpret the text of the June 13 memorandum as evidence that Irving knew Khan and Simels were planning to script perjurious testimony by Vaughn.

The government also argues that Irving's September 5, 2008 memorandum demonstrates that Irving played a pivotal role in Khan's defense.  Irving wrote that she discussed fees with Khan and communicated that if Simels's fees were not paid Khan could either delay the trial or find new counsel.  Gov't Ex. 538.  There is nothing suspicious about Irving's discussion with Khan about the future of his representation.  A juror could not rationally infer from Irving's speaking to Khan about paying his legal fees that she had knowledge of the illegal

---

[17]     In addition, Investigator Mazella testified that there was no evidence of any mention by Irving of the plan to bribe Camacho.

conspiracy to tamper with and bribe witnesses.

In addition, the government argues that the handwritten letter from Khan to Paul dated May 13, 2007 demonstrates Irving's membership in the conspiracy.  Gov't Opp. at 10. However, there is no evidence that Irving saw the letter or even knew about it.  Similarly, there is no evidence to support the contention that Simels kept Irving updated about his plans.  A jury could not reasonably infer from Irving's association with and proximity to Simels and Vaughn that she knew of the conspiracy.  *See Lorenzo*, 534 F.3d at 159-60.  In fact, the evidence suggests the opposite.  When Vaughn called, he asked to speak to Simels, not Irving, and in one instance he affirmatively stated it was not necessary for him to speak to Irving.   Irving attended only one full meeting with Vaughn.  The remaining meetings occurred in Simels's private office, and she was present for just one of them, and for just a few minutes.

It often happens that the whole of the government's case is greater than the sum of its parts.  Thus, the foregoing focus on the particular items of evidence relied on by the government does not preclude the possibility that the evidence viewed as a whole supported a finding of guilt beyond a reasonable doubt.  *See United States v. Wexler*, 522 F.3d 194, 207 (2d Cir. 2008)("[O]ur sufficiency of the evidence test must consider the Government's case in its totality rather than in its parts, … and may be satisfied by circumstantial evidence alone." (citations omitted)).  However, that is not the case here.  Indeed, when the evidence against Irving is viewed from a broader perspective, it is arguably less than the sum of its parts, for the theory that Simels implicated Irving in his crimes made no sense.  Simels had been a criminal defense attorney for more than 30 years.  Irving was a young, inexperienced attorney.  When she began working for him in December 2006, Simels had already begun defending Khan.  Simels had numerous reasons to involve Irving in his many legitimate lawyering functions but none to

involve her in his illegal activity.  Simels had access to Khan and ample opportunity to conspire

with him and the members of his paramilitary group in Guyana.  Irving was not present for any

of the conversations with Vaughn in which Simels freely discussed illegal witness tampering and

witness bribery.

On this latter point, the government makes the following argument: "Most

important, at no point during any of the recorded conversations between Simels and Vaughn, did

Simels ever indicate or hint to Vaughn that certain topics should be kept from Irving."  Gov't

Opp. at 18.  This argument misapprehends the inquiry here and the government's burden at trial.

It was not enough for the government to prove that Simels, Khan and others committed crimes

and failed to say to each other that Irving should be isolated from the crimes.  The evidence at

trial had to prove beyond a reasonable doubt Irving's *participation* in those crimes.  Because it

did not, her convictions must be set aside.

3.      *The Importation and Possession of Eavesdropping Equipment*

Title III's comprehensive scheme to regulate the nonconsensual electronic

surveillance of wire and oral communications includes a criminal prohibition of, *inter alia*, the

importation and possession of equipment designed to intercept such conversations.  *See* 18

U.S.C. § 2512(1).  There are some obvious exceptions to the prohibition, including one for law

enforcement and one for providers of communication services.  *See* § 2512(2).

Simels and Khan had determined that they would offer at Khan's trial

conversations that Khan had intercepted in Guyana.  To that end, Simels had disclosed those

recordings to the *Khan* prosecutors.  The prosecutors responded by repeatedly pressing Simels

for information regarding how the recordings were made, including information about the

equipment Khan used in Guyana.  These requests were understandable; to the extent Khan

offered exculpatory conversations purportedly intercepted by him in a foreign country, his prosecutors would naturally be skeptical of the authenticity of the recordings.  Any good lawyer in Simels's circumstances would understand that the admissibility of the recordings at trial would turn on defense counsel's ability to prove their authenticity, which in turn would depend on counsel's ability to produce the equipment used to make them.  Simels therefore sought to have Khan's recording equipment in Guyana sent to him in New York in order to prepare for the trial in the *Khan* case.  After considerable effort, he finally succeeded.

Unfortunately for Simels and Irving, when Congress enacted § 2512, it did not build in an exception for defense counsel who import and possess interception devices solely for the purpose of defending their clients.  Perhaps it thought prosecutors would never exercise their discretion to bring such a charge.  If so, it thought wrong, as Simels and Irving were indicted for obtaining and possessing the very equipment the *Khan* prosecutors had repeatedly inquired about.

In order to convict Irving of importation of eavesdropping equipment, the jury was required to find beyond a reasonable doubt that:  (1) Irving intentionally sent a device through the mail; (2) the device, when it was sent, rendered it primarily useful for the surreptitious interception of oral or electronic communications; and (3) when Irving sent the device, she knew or had reason to know that the design of the device rendered it primarily useful for that purpose.   I conclude that no rational juror could have found that Irving knew or had reason to know that what was referred to at trial as "the base" was designed to be primarily useful for the interception of oral communications.

The evidence at trial demonstrated that the only piece of eavesdropping equipment Irving caused to be mailed was the base.  It is inferable from the evidence that Irving

39

knew the base was part of the intercept equipment used by Khan.  Specifically, Irving had the base sent to Simels's offices after two requests from the *Khan* prosecutors asking for more information about the equipment that had been used in Guyana.  However, the record is devoid of evidence showing that Irving knew the base itself was (or was designed to be) "primarily useful for the purpose of surreptitious interception."  18 U.S.C. § 2512(a), (b).

In fact, the evidence supports the inference that Irving thought the base served an entirely different purpose -- power supply.  On the Federal Express package containing the base, Irving described the base as a "computer base power supply."  Gov't Ex. 602.  She stated the value to be $40.  Even inferring from the evidence presented by the government that Irving intended to value it at $1,000 (the value she attributed to the flash drive), this evidence undermines the government's theory.  Irving's November 2007 memorandum indicates her belief that the interception equipment had a value of at least $250,000.  Thus, the evidence demonstrates that Irving thought the base was exactly what she described it to be -- a computer power supply.  The statute requires proof beyond a reasonable doubt of Irving's knowledge that the device she imported had a design that rendered it primarily useful for the purpose of surreptitiously intercepting wire or oral communications.  There was no such proof in this case.

The government argues that Irving's use of the laptops in November 2007 was sufficient to show that she had assisted Simels in importing wiretapping equipment.  However, there was no evidence introduced at trial that Irving played any role in sending or importing the laptops in October 2007.  Therefore, a rational juror could not have found beyond a reasonable doubt that Irving imported a device while knowing or having reason to know that its design rendered it primarily useful for surreptitiously intercepting communications.

In order to convict Irving of possessing eavesdropping equipment, the jury was

required to find beyond a reasonable doubt that:  (1) Irving intentionally possessed a device; (2) at the time of possession, its design rendered it primarily useful for the surreptitious interception of oral or electronic communications; (3) at the time of possession, she knew or had reason to know that the design of the device rendered it primarily useful for that purpose and (4) at the time of possession, the defendant knew or had reason to know that the device had been sent through the mail or sent in foreign commerce.

        The government argues that Irving constructively possessed a device she knew to be primarily useful for intercepting oral communications.  As discussed above, the only device the government proved Irving knowingly imported and possessed was the base -- and the evidence was insufficient to establish beyond a reasonable doubt that Irving knew at the time she caused it to be mailed that its design rendered it primarily useful for intercepting communications.  The failure of proof of Irving's knowledge is not altered by the fact that she actually received the base.  The IT specialist who visited Simels's offices in April 2008 testified that the base appeared to him to be an uninterruptable power supply ("UPS").  Tr. at 1582-83.  He also testified that Irving had a similar UPS device in her office, rendering the inference that Irving thought the base supplied power to the equipment even stronger.  Similarly, the agent responsible for executing the search warrant on Simels's law offices also testified that he described the unit as a power module.  Furthermore, it is undisputed that the base was inoperable -- there was no evidence at trial that Irving or any other party attempted to use the base to actually intercept communications.  As a result, there was no additional evidence adduced at trial to establish that at any time after she caused the base to be mailed, Irving learned that the base was designed in such a way as to render it primarily useful for intercepting communications.

        The government relies on two pieces of evidence to support the argument that

41

Irving possessed a device she knew to be primarily useful for intercepting communications.

First, it argues that in her November 8, 2007 memorandum, Irving wrote that she reviewed the

intercept data on a laptop with Khan during a jail visit.  Gov't Opp. at 36.  Irving's memorandum

reads:

- I showed [Khan] the info from the laptop, but he said, I need to go on the desktop and click on the Smith Meyers folder and then a screen with a grid will come up.  He said in the menus in that screen I should find something that says target list, he said I need to print out the target list and then he will be able to tell us which calls are relevant.

Gov't Ex. 532.  The words "Intercept Equip" were written on top of the memorandum.  *Id.*

There is no evidence, however, that Irving knew or should have known that the laptop itself was

designed to intercept communications.  To the contrary, the testimony of the manufacturer of the

equipment makes clear that the laptop merely stored the data, and could not intercept calls on its

own.  The base was not sent to New York until June 2008, seven months later.

Myers also testified that a standard laptop could be used for this function and that

by looking at the laptop he could not tell whether it was the laptop originally issued with the

equipment or an ordinary laptop.  As a result, the evidence demonstrated that the laptop's design

did *not* render it primarily useful for intercepting data and thus, Irving's possession of the laptop

and software is insufficient for a conviction on this count.  Moreover, it is not clear from the

record that the laptop Irving used in the meeting with Khan was even the original laptop, as

opposed to a laptop containing a copy of the data intercepted in Guyana.

Second, the government argues that once the base was received, the separate

pieces of the equipment -- the laptops, the software and the base -- were kept together in the copy

room, supporting an inference that Irving constructively possessed the equipment.  In order to

establish constructive possession, the government must prove beyond a reasonable doubt that

Irving had "the power and intention to exercise dominion and control over" the equipment.

*United States v. Rodriguez,* 392 F.3d 539, 548 (2d Cir. 2004).  Apart from her use of the laptops

in November 2007, which, as described above, was insufficient to support a conclusion that she

constructive possessed eavesdropping equipment, there is no evidence in the record that Irving

knowingly had the power or the intention to exercise control over the equipment.  Evidence that

the equipment was kept in a copy room near her office is insufficient to support a finding that she

possessed the equipment.  *See id.* ("[M]ere presence at the location of contraband does not

establish possession.")(quoting *United States v. Rios,* 856 F.2d 493, 496 (2d Cir. 1988)(*per

curiam*)).  There is "no evidence that [Irving] handled [the equipment] or directed where [it was]

to be taken or what was to be done with [it]." *Id.* (quoting *Samaria,* 239 F.3d at 239).  The only

evidence presented by the government was that Irving knowingly imported the base, which is

insufficient to support this conviction.  I find that a rational juror could not conclude beyond a

reasonable doubt that Irving knowingly possessed a device rendered primarily useful for

intercepting communications.

B.     *The Rule 33 Motion*

        Federal Rule of Criminal Procedure 33(a) reads, in pertinent part:  "Upon the

defendant's motion, the court may vacate any judgment and grant a new trial if the interest of

justice so requires."  "Generally, a motion for a new trial 'should not be granted unless the trial

court is convinced that the jury has reached a seriously erroneous result or that the verdict is a

miscarriage of justice.'"  *Smith v. Carpenter*, 316 F.3d 178, 183 (2d Cir. 2003)(quoting *Atkins v.

New York City*, 143 F.3d 100, 102 (2d Cir. 1998)).  I have "broad discretion . . . to set aside a

jury verdict and order a new trial to avert a perceived miscarriage of justice." *United States v.

Ferguson*, 246 F.3d 129, 133 (2d Cir. 2001)(quoting *United States v. Sanchez*, 969 F.2d 1409,

1413 (2d Cir. 1992)).  Though I am entitled to "weigh the evidence and in so doing evaluate for

43

[my]self the credibility of the witnesses," *Sanchez*, 969 F.2d at 1413 (quoting *United States v. Lincoln,* 630 F.2d 1313, 1319 (8th Cir. 1980)), I "must strike a balance between weighing the evidence and credibility of witnesses and not 'wholly usurping' the role of the jury," *Ferguson*, 246 F.3d at 133 (quoting *Autuori*, 212 F.3d at 120).

Though the power to grant a new trial under Rule 33 must be exercised sparingly, and only in the most extraordinary of circumstances, it is nonetheless broader than the power to grant a motion for acquittal under Rule 29. *Ferguson*, 246 F.3d at 134. It therefore follows that for all the reasons set forth in the foregoing discussion of the Rule 29 motion, I am not "satisfied that competent, satisfactory and sufficient evidence [is] in the record [to] support[] the jury verdict." *Id.* (quoting *Sanchez,* 969 F.2d at 1414). Indeed, I am left with a very "real concern that an innocent person may have been convicted." *Id.* (quoting *Sanchez*, 969 F.2d at 1414). Accordingly, I also grant, in the alternative to the relief granted under Rule 29, Irving's motion for a new trial in the interest of justice.

## CONCLUSION

I find that a rational trier of fact could not have found that the government proved beyond a reasonable doubt that Irving was guilty of: (1) conspiracy to obstruct justice; (2) attempted tampering as to Clarke or Jaignarine; and (3) the importation and possession of eavesdropping equipment. Accordingly, the Clerk of the Court is directed to enter a judgment of acquittal on these five counts.

In the event that judgment is vacated or reversed by the Court of Appeals, a new trial will be scheduled.

So Ordered
John Gleeson, U.S.D.J.

Date:   February 8, 2010
        Brooklyn, New York