```
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 2   ----------------------------------------x
     UNITED STATES OF AMERICA,
 3
                                          08 cr 640
 4

 5          versus                 United States Courthouse
                                   225 Cadman Plaza East
 6                                 Brooklyn, N.Y.  11201

 7   SHAHEED KHAN, ARIENNE IRVING
     AND ROBERT SIMELS,
 8
                   DEFENDANTS.
 9
     ----------------------------------------x
10
                                   February 13, 2009
11                                 9:30 a. m.
               TRANSCRIPT OF MOTION
12   Before:  HONORABLE JOHN GLEESON
                   UNITED STATES DISTRICT JUDGE
13

14                    APPEARANCES
15
     BENTON J. CAMPBELL
16   United States Attorney – Eastern District of New York
     271 Cadman Plaza East
17   Brooklyn, New York  11201
     BY: STEVEN L. D'ALESSANDRO, ESQ.
18       JACQUELYN RASULO, ESQ.
         MORRIS FODEMAN, ESQ.
19       JAMES MCMAHON, ESQ.
         MICHAEL TREMONTE, ESQ.
20
     Assistant United States Attorneys
21

22   ATTORNEY FOR DEFENDANT SIMELS:

23   LAW OFFICE OF GERALD SHARGEL
     570 Lexington Avenue
24   NEW YORK, NEW YORK 10022
     BY: GERALD SHARGEL, ESQ.
25       EVAN LIPTON, ESQ.
```

1    **ATTORNEY FOR DEFENDANT KHAN:**

2    **PAPA, DEPAOLA & BROUNSTEIN**
     **42-40 Bell Boulevard**
3    **Suite 500**
     **Bayside, New York 11361**
4    **BY:  STEVEN L. BROUNSTEIN, ESQ.**

5

6    **ATTORNEY FOR DEFENDANT IRVING:**

7    **LAW OFFICE OF JAVIER SOLANO**
     **Empire State Building**
8    **350 Fifth Avenue**
     **New York, New York 10118**
9    **BY:  JAVIER A. SOLANO, ESQ.**

10

11

12

13

14

15

16

17

18

19

20

21

22   **Reporter:        LISA SCHMID, CCR, RMR**
                        **225 Cadman Plaza East Rm N120**
23                      **Brooklyn, New York  11201**
                        **Tel: (718) 613-2644  Fax: (718) 613-2379**
24   **Proceedings recorded by mechanical stenography, transcription**
     **by CAT.**

25

1          THE COURT:  Counsel, please state your appearances.

2          MR. D'ALESSANDRO:  Good morning, Your Honor.  For the

3     United States, Steven D'Allesandro.

4          MR. FODEMAN:  Mo Fodeman.

5          MS. RASULO:  Jacquelyn Rasulo.

6          MR. FODEMAN:  Good morning, Judge.

7          MR. SHARGEL:  Gerald Shargel and Evan Lipton for Mr.

8     Simels.

9          MR. SOLANO:  Javier Solano for Ms. Irving.  Good

10    morning, Your Honor.

11         THE COURT:  Good morning.

12         MR. BROUNSTEIN:  Steven Brounstein for Mr. Khan, who I

13    believe is being brought out now, Your Honor.

14         THE COURT:  Okay.  Wait for him.

15         (Pause in proceedings.)

16         THE COURT:  Good morning, Mr. Khan.

17         DEFENDANT KHAN:  Good morning, sir.

18         THE COURT:  Okay.  We're back on this electronic

19    evidence review protocol.  I got your letter.  Thank you.  I

20    might have misunderstood it though, Ms. Rasulo.  Okay?  Anyway,

21    the mistake might be mine.  It suggests -- it says that

22    Mr. Wikstrom is going to send the results of his review back to

23    the forensic lab, and then they'll be file extraction.

24         MS. RASULO:  Correct.

25         THE COURT:  For some reason, I was under the

1    impression that was a step that we had collapsed into one.  He

2    was going to do his review and get from the lab the image

3    version of the documents within which those key words were

4    located.

5         MS. RASULO:  For clarification, Your Honor,

6    Mr. Wikstrom received the results of the key word searching

7    process.  He then had to review those documents to determine

8    which of those were Khan-related and not Khan-related.  So what

9    he's done is isolated the Khan-related documents.

10         THE COURT:  Oh, he has done that?

11         MS. RASULO:  Yes.  Then that's the next step, is he

12    then needs to send that back, those documents.  He's flagged

13    them.  He sends those back to the DEA lab, who can then extract

14    them and isolate them as being solely the Khan-related

15    documents which can then be reviewed.

16         THE COURT:  Gotcha.  As I read the last line of your

17    letter, I see where I went wrong.

18         How long is that going to take?

19         MS. RASULO:  It's a good question.  Mr. Wikstrom last

20    evening sent the DEA the first set of documents for which he'd

21    like those to be extracted.  The next, you know, question is

22    just how long will that take?  We'll have a better sense of

23    that in the next week to two weeks, so that they can have some

24    time to actually do the extraction process.  I don't know what

25    Mr. Wikstrom has sent them, and what exactly that process will

1    be, if they'll be any complications.

2         So I think, Judge, in the next at least couple of

3    weeks, week to two weeks we'll have a better sense of how long

4    that process will that actually take.

5         THE COURT:  Okay.  Why does it take that long?

6         MS. RASULO:  I don't know if it will, to be honest

7    with you.  It could just be -- I think my concern is that I

8    don't know if there are going to be any unforeseen

9    complications in what Mr. Wikstrom has sent to the DEA lab.

10   There may be something with respect to the extraction that

11   could cause some problems.  I just don't know that right now.

12   It could very smoothly and it could take a day to two days.

13   But I'm not in a position at this moment, because we're only

14   just now at that first extraction, to give you, I think, a

15   reasonable estimate.

16        THE COURT:  How much more is left?  I saw Mr. Wikstrom

17   came.

18        MR. WIKSTROM:  Good morning.

19        THE COURT:  Good morning.

20        How much more is left for him to perform that first

21   stage review on?

22        MS. RASULO:  With respect to Mr. Wikstrom?

23        THE COURT:  Yes.

24        MS. RASULO:  My understanding is that both servers'

25   review has now been completed, and that Mr. Wikstrom sent the

1     results of his review to the DEA lab last night, along with a

2     couple of those computers.  So he has sent his first set of

3     documents to be extracted to the DEA.  They're just receiving

4     that today.

5           So I'll have a better sense, once they take a look at

6     it and they start to process the extraction, of how long it's

7     actually going to take -- because again, just because we're at

8     that first set of extractions.  I don't know if there are going

9     to be any complications that we just didn't anticipate.

10          MR. WIKSTROM:  Your Honor, I think it will go actually

11    quite quickly.  I believe -- what my sense, anyway, is that

12    95 percent of the universe of material is contained on one

13    server, and that has been sent to Virginia already.  The

14    laptops and PCs have a very small number of relevant documents,

15    and I can turn those around in matter of hours.

16          So I believe most of the documents, anyway, are done.

17    The only outstanding issues will be -- there are number of

18    audio CDs that I received copies of the audio portion.  I'm

19    going to have to determine the source of that, and I've asked

20    the DEA to provide me with the labels on the CDs, so I'll know

21    what I'm listening to, but I believe it's going to be very

22    swift.

23          THE COURT:  All right.  Thank you.

24          And I just want to make sure I understand what the

25    word extraction means.  That's just taking a file that Mr.

1    Wikstrom says is Khan-related, and separating it from files

2    that are not Khan-related?

3         MS. RASULO:  That's correct.  The only potential

4    complication is that they sent Mr. Wikstrom his set.  He then

5    created folders and my understanding is that he copied those

6    documents into folders, then burned them on a CD and sent them

7    back.

8         The only concern I may have is that there could be

9    some potential problems with relating some of those copies back

10   to their originals on the servers.  So that would be the only

11   potential complications for the DEA.  We want to make sure that

12   we keep the chain of custody of the document, so just the

13   document alone is not necessarily enough.  You want to make

14   sure that you're able to relate it back to the exactly where it

15   came from, on a server, on a computer, et cetera, for chain of

16   custody concerns.

17        THE COURT:  But the documents themselves were burned

18   onto a disk by you?

19        MR. WIKSTROM:  Yes.

20        THE COURT:  Is there -- I understand your chain of

21   custody concerns, but is there some reason why copies of those

22   documents aren't just given to Khan's lawyers now?

23        MS. RASULO:  I think the only -- the reason why

24   they're not is that we have no way of relating them at this --

25   the way that they're burned onto a CD, we have no way of

LISA SCHMID, CCR, RMR
OFFICIAL COURT REPORTER

1    relating them back to where they actually came from, but for

2    just they came from that server, they came from that computer.

3    But in terms of them being able to trace them back, I think

4    that if we were just able to forward them on, we wouldn't then

5    be able to -- be able to relate them back to directly where

6    they came from.

7           THE COURT:  Well, you can relate them back -- the

8    forensic people are going to relate them back now or in the

9    next week or two, because of what Mr. Wikstrom says he is going

10   to send back to you, right?

11          MS. RASULO:  Correct.

12          THE COURT:  I was just thinking out loud, but if it

13   takes a long time, he does have this other trial, an order in

14   this case, respectfully directing to you make sure that once

15   you turn stuff over to Khan's lawyers, as I understand it, it's

16   going to be turned over to the conflict counsel or whatever

17   we're calling these people over here, and to Khan's lawyers.

18   Because there is this other case, and I have asked

19   Mr. Wikstrom, directed him to turn the copies over to Mr.

20   Khan's lawyers in the other case, immediately.

21          Any reason you shouldn't just make another copy of

22   that and give it to them now?  What would be the purpose of

23   incurring any more delay?  It's not going to deprive you of the

24   opportunity to link them up or trace them back or whatever it

25   is you said you're going to do.

1          MS. RASULO:  Meaning that -- just that I understand

2     your suggestion, Judge, if that Mr. Wikstrom was to, in some

3     sense, extract the documents himself, which he's done by

4     isolating the ones he says are Khan-related, and then

5     forwarding them onto the team, as opposed to the DEA, then

6     making their own set of extractions and forwarding them on?

7          THE COURT:  No.  You do what you intend to do, but

8     make another set of --

9          These are actual documents --

10         MR. WIKSTROM:  Yes, Your Honor.

11         THE COURT:  -- from the files?

12         I might be missing something, but if I am, you'll tell

13    me.  Make another set and give them to Khan's lawyers, so that

14    in the other case, just in the event there's material in there

15    that's useful to the preparation of a defense in Khan's case

16    before Judge Irizarry, he gets them now, as opposed to two

17    weeks from now.

18         MS. RASULO:  (Consults Mr. D'Allesandro, Mr. Tremonte

19    and Mr. Fodeman.)

20         I think that makes sense, Judge.  I think we can do

21    that.  We might as -- what I was starting to go torwards is

22    even providing a set to the privilege team, as well, to even

23    just begin that review.  There might be some unforeseen

24    complications to that, but I will speak with the DEA first

25    before doing that, but I think there's absolutely no reason we

1    couldn't do what Your Honor suggested that we do with respect

2    to the separate team.

3            THE COURT:  All right.

4            MR. SHARGEL:  Your Honor --

5            THE COURT:  Just a second.  Do you see any problem

6    with that?

7            MR. WIKSTROM:  No.  It's a good idea, Your Honor.  I

8    don't understand -- I mean, I understand in terms of chain of

9    custody why you would want the actual exhibit to be produced

10   from a DEA lab, which has the original piece of equipment, but

11   I did nothing more than copy it, and that's what the DEA

12   presumably is going to do, as well -- copy it and provide it --

13   so I'm happy to do that.

14           THE COURT:  And is there anything that would undermine

15   the purpose of all this by also giving copies to the privilege

16   team and Mr. Shargel, and Mr. Solano now?

17           MS. RASULO:  From my understanding, this is my limited

18   knowledge of the electronics, I mean, in terms of how this

19   would actually work in processing.  I don't think so, but I

20   would need to check with the DEA to see if there is anything

21   that I'm considering with respect to -- you know, I don't want

22   everyone to be reviewing a bunch of documents, then there is no

23   way to relate those documents back to where they came from, et

24   cetera.  And so, in some ways, we would have to then do

25   duplicate working.

                    LISA SCHMID, CCR, RMR
                    OFFICIAL COURT REPORTER

1          So, I don't, you know, I just -- I can't, standing

2    here, I have, you know, I'm concerned about just being able to

3    say, yes, we can go ahead and do that.  I think we can provide

4    the copies, but I want to confirm with the DEA that that's not

5    going to cause the complications that I just don't have the

6    knowledge right now to know.

7          THE COURT:  Okay.  I understand.

8          MR. SHARGEL:  That was my question.  I was going to

9    ask that we have a copy, as well.

10         THE COURT:  It sounds, I mean, if it's a matter of

11   just making an extra set of what Mr. Wikstrom has, it's kind of

12   hard to figure why that would disable them from doing what you

13   need to do for chain of custody, but you'll find out.

14         MS. RASULO:  Yes.

15         THE COURT:  Why don't we let me know by letter by, you

16   know, end of the day Monday, and unless there is some reason

17   that there's some impediment, then we'll just get the process

18   rolling, assertions of attorney/client and work product

19   privilege on a rolling basis.

20         Did we set a schedule for that?

21         MS. RASULO:  I don't believe we have, Judge.

22         THE COURT:  I've forgotten.

23         MR. BROUNSTEIN:  I don't believe so with regard to the

24   assertion privilege.  It was just giving the stuff to Mr.

25   Wikstrom.

```
 1              THE COURT:  Right.  Maybe we have to set a schedule.
 2    Otherwise, we might not have the opportunity to go through this
 3    again.
 4              The outstanding document -- I think we can do this
 5    here -- I'm just going to refer to a Bates number.  We had an
 6    outstanding issue with regards to Bates 850.  I've got an
 7    additional submission in the government, as anticipated, in our
 8    sealed proceeding.  You have got the objection you have already
 9    preserved in the sealed proceeding?
10              MR. BROUNSTEIN:  (Nods head affirmatively.)
11              THE COURT:  I understand.  It's overruled.  And the
12    redactions consistent with what we discussed earlier will be
13    done on this lengthy document, but just that one entry on it,
14    on 850, will be disclosed over the unsuccessful claim of
15    privilege.
16              I guess we should set a schedule for this privilege
17    claim.  And again, I know you're working together to minimize
18    the amount of litigation.
19              MR. BROUNSTEIN:  Your Honor, I do have one question of
20    Mr. Wikstrom, in terms of the volume of documents that's he's
21    flagged so far.
22              THE COURT:  Yes.  Good question.
23              MR. BROUNSTEIN:  What does that look like?
24              MR. WIKSTROM:  Almost all of the documents were on one
25    server.  There were approximately ten thousand files on that;
```

```
1    7700 are audio files, wiretaps, and about 1800 or so are

2    documents in the form forms of PDFs, Word Perfect texts and

3    Microsoft Word files, as well as some instant messaging

4    appearing text files.  So about 1800.

5            THE COURT:  The computer files, is that the Khan

6    subset?

7            MR. WIKSTROM:  That's the Khan subset.

8            MR. BROUNSTEIN:  I imagine probably some of those

9    documents are documents that you have already seen, as well?

10           MR. WIKSTROM:  I'm sorry?

11           MR. BROUNSTEIN:  I would imagine that some of those

12   documents are documents that you have already seen?

13           MR. WIKSTROM:  They are documents filed in court or

14   correspondence back and forth between Mr. Khan and the

15   government.

16           THE COURT:  Let me think about a schedule, and I'll

17   post one.

18           MR. BROUNSTEIN:  Fine.

19           THE COURT:  All right?  Just for certain -- the same

20   drill, assertion of a privilege, little back and forth, and

21   then we'll have an in camera session.

22           In the meantime, we have a motion schedule, correct?

23           MR. SHARGEL:  We do, Judge.  I wanted to raise

24   something with respect to the motion schedule -- actually, two

25   matters I want to raise.
```

LISA SCHMID, CCR, RMR
OFFICIAL COURT REPORTER

1          But on the motion schedule, we're working straight

2    ahead.  We've got some more discovery today.  Some of what's

3    going to be produced may be relevant, but in all events, I need

4    an extra week.  It's February 20th is the due date for filing

5    defense motions.  I wouldn't ask for it if I didn't really need

6    it, and I do need an extra week.

7          THE COURT:  What's Khan schedule, Mr. Shargel?

8          MR. SHARGEL:  I don't have the entire schedule.  I

9    just have it in my mind that we have to file under the current

10   schedule by February 20th.  So they moved it one week.

11         You will recall that this is my second application for

12   an adjournment.  One was because of a law office issue, as Your

13   Honor knows, but this is -- we're working on it, but it's just

14   a Herculean task, if I may.

15         MR. D'ALESSANDRO:  Judge, motions were due next

16   Friday.  The government's response was March 13th.  A reply was

17   due March 20th.  And then we had oral argument on that motion

18   scheduled for March 27th, at ten.

19         THE COURT:  You want to be heard on the application

20   for adjournment?

21         MR. D'ALESSANDRO:  There is no objection by the

22   government, Your Honor.

23         THE COURT:  I'll push it all back a week.  So instead

24   of the motions being -- I take it, Mr. Solano and

25   Mr. Brounstein --

                          LISA SCHMID, CCR, RMR
                         OFFICIAL COURT REPORTER

```
 1              MR. BROUNSTEIN:  We'll join in that application.

 2              MR. SOLANO:  We will.

 3              THE COURT:  Motions will be now be filed on the 27th

 4   of February; the opposition papers, I guess, now the 20th of

 5   March; reply papers, 27th of March.

 6              And Ilene, can we have something -- how about April

 7   3rd?

 8              THE CLERK:  11 a. m.

 9              MR. SHARGEL:  Judge, I'm sorry.  May I ask the day of

10   the week?  The day of the week?

11              THE CLERK:  Friday.

12              MR. SHARGEL:  It's a Friday?  Could we have it either

13   an earlier or later time, because I have a trial that's

14   scheduled to start on March 30th.  I'm not one hundred percent

15   certain it will start that day, but in the event it starts, we

16   can do four o'clock on the Friday.  I can impose upon the judge

17   to allow us to end early on Friday.

18              THE COURT:  Does anybody have a problem with arguing

19   it that late on a Friday?

20              MR. BROUNSTEIN:  No.

21              MR. D'ALESSANDRO:  What time is that, Judge?

22              THE COURT:  Four o'clock.

23              MR. SHARGEL:  Or even earlier -- nine o'clock on

24   Friday, and then we would be done by 10:30 or 11, would that

25   work?
```

```
 1              THE COURT:  I'd prefer later.  Let's do four, as long

 2     as that doesn't pose a problem for anyone.

 3              MR. SHARGEL:  Friday April, 3rd?

 4              THE COURT:  Let us know, Mr. Shargel.

 5              MR. SHARGEL:  All right.  If it breaks, then I'll let

 6     you know and --

 7              THE COURT:  We'll push it back earlier in the day.

 8              MR. SHARGEL:  Very well.

 9              One other point.  The government has expressed an

10     interest -- this may actually be part of your original order --

11     the government as expressed an interest in preserving all

12     documents that were seized in connection with the search.  And

13     I have no objection to that, and it even may have some

14     relevance to a motion to suppress the law office search.

15              But I ask that the non-Khan related documents -- in

16     other words, files maintained in connection with other

17     clients -- be maintained by the Court, rather than the United

18     States Attorney's Office.  Even under the appearance of

19     impropriety and the idea that a client or potential client

20     perhaps thinks that his or her files are with the United States

21     Attorney's Office is, I think, somewhat unseemingly.

22              MR. D'ALESSANDRO:  It poses a problem with regard to

23     the electronic documents.  I mean, there is a server, and I

24     don't know how we -- the paper documents would be one thing.  I

25     think logistically, it makes since.  I understand the concern.
```

1    I just don't know how we would meaningfully be able to maintain

2    the integrity of a piece of evidence, an electronic device, and

3    cull out data from it without necessarily corrupting the piece

4    of evidence.  I just don't know how to do that.

5         MR. SHARGEL:  Corrupting is an overstatement, but, you

6    know, one would find it disturbing that the United States

7    Attorney's Office, which may be prosecuting -- the office that

8    may be prosecuting or investigating another client has a server

9    that simply can be accessed by now anyone, not -- I won't say

10   anyone, but anyone working on this case -- and files can be

11   observed and read and invaded, and no one has scrutinized those

12   files to see whether they're privileged.  And a significant

13   number of those files may be privileged.

14        I don't think that there is going to been issue here

15   with chain of custody.  I think that what should be done with

16   the electronic files -- just reacting to what Mr. D'Alessandro

17   said -- is to make a copy of the electronic files that deal

18   with this case, as found by Mr. Wikstrom -- and the original

19   server with the stipulation -- I will stipulate on chain of

20   custody and authenticity under Rule 901.  I'll work with the

21   government to see if we can do that and overcome any

22   evidentiary problems.  I'm not going to say, you know, "Give me

23   the server," and then come to court and cause them an

24   evidentiary problem. That would be disingenuous.

25        I strongly believe that to maintain a server that has

 1    other clients' files on it at the United States Attorney's
 2    Office -- again, is to say one hundred percent criminal defense
 3    practice.  We can expect that a large number of those files
 4    relate to matters in the Eastern District of New York, and I
 5    think would be simply wrong for the United States Attorney's
 6    Office to have that.
 7            And if there is any question about -- I hate to even
 8    use the word corruption of a file or a server, I wouldn't mind
 9    if the original server, instead of being returned, would be
10    sealed and maintained by the Court.
11            THE COURT:  Okay.
12            MR. D'ALESSANDRO:  Judge, just to finish my thoughts
13    on the matter -- one issue that would be raised -- and I
14    appreciate Mr. Shargel being candid about his willingness to
15    discuss a stipulation -- that it may be just simply
16    something -- he's raised his concerns and we could shelve it,
17    but from the government's perspective, we wouldn't need simply
18    a stipulation from him, but from the other defendants in the
19    case, as well.
20            THE COURT:  Of course.
21            As to the hard copy documents, that's kind of easy.
22    Seems to me there's an analogy here to the Title 3 side.  The
23    hard copy documents, unless there's some argument you ought to
24    bring to my attention that suggests otherwise, seems to me it's
25    easy to seal those up, even if you want to maintain them, and

1    depending on how voluminous they are, we'll find a place to put

2    them.

3         The analogy in Title 3 would be, this doesn't strike

4    me as affording you the relief you're really asking for --

5    would be to take the original servers and seal them in the same

6    way we seal -- and, of course, the Court doesn't keep them, but

7    the Court seals them and they go over to an agency, original

8    Title 3 reports.  But in that situation, the government always

9    keeps a full copy and works with a full copy.

10        Is that what you were contemplating?

11        MR. SHARGEL:  Well, what the government would --

12        THE COURT:  It's form over substance, really.

13        MR. SHARGEL:  What the government would be left with

14   is not a full copy.  What the government would be left with is

15   a copy that doesn't have the non-Khan related materials on it.

16        THE COURT:  I understand, but -- now I understand, but

17   how do I know -- does that impair your ability to establish not

18   just in this case, I mean, there are other potential cases, and

19   other folks whose rights aren't going to be waived here, in

20   terms of challenging the integrity of the evidence and the

21   like, I'm just -- maybe you ought to brief this.

22        But I can imagine -- if I were a prosecutor, I can

23   imagine possible obstacles down the road to the use of that

24   evidence in other cases, where other people haven't given up

25   that right.

```
 1           But I don't purport to be an expert on this electronic

 2    stuff, and divisibility of it, the severability of it.  What it

 3    does to the chain of custody if the relief you ask is granted

 4    -- you ask for is granted, I mean.

 5           MR. SHARGEL:  Why don't I --

 6           THE COURT:  I'll ask you to try to see if you can try

 7    to work something out.  I think it's obviously a legitimate

 8    concern to have this law office's other clients, even as an

 9    appearance matter, knowing that their confidential files are in

10    the U. S. Attorney's Office.  If they can be somehow severed

11    and kept under seal with the Court -- analogous to a T3 -- and

12    we could figure out a way to retain custody of electronic

13    files, I'm sure.  You should try to do that.

14           MR. D'ALESSANDRO:  To finish a thought with regard to

15    T3, it seems to me a simply way to do it would be a sealing

16    application and order, directing the DEA -- it's not the U. S.

17    Attorneys that hold onto the server.  It would be the DEA.

18    They're the custodians of the evidence here.

19           The DEA, similar to an original T3, maintain this

20    piece of evidence, and it's under seal.  We could bring it in

21    and Your Honor could put your signature on it, sealing it.  And

22    that is the assurance that we have with all other matters.

23    It's has protocols to it.  It's segregated.  It's put into a

24    separate vault in the DEA, and it has some --

25           MR. SHARGEL:  Let me suggest --
```

```
 1              THE COURT:  The analogy is a little imperfect, though
 2   --
 3              MR. D'ALESSANDRO:  I understand.
 4              THE COURT:  -- only because sealing really protects
 5   corruption and tampering, whereas the concern here is not
 6   tampering.  It's access.  So --
 7              MR. D'ALESSANDRO:  But with regard to safeguards, to
 8   alleviate concerns by the public or others, the government
 9   would be acting at extreme peril to have broken an order from
10   the Court, broken Your Honor's seal on a piece of equipment and
11   looked at it.  I mean, the ramifications of that, you know, are
12   dire for the assistant that would be involved, the agents that
13   would be involved.  I mean, it would subject them at a minimum
14   to criminal contempt proceedings.  So there is an assurance
15   there.  It's not -- it's a physical issue.
16              THE COURT:  Right.  Well, the appearance issue is
17   what -- that doesn't fully address the appearance issue.
18              MR. SHARGEL:  I have a suggestion that might help.
19              THE COURT:  One second.  I'll hear you in a second.  I
20   lose track of what I'm thinking.
21              When we're done with this process that Mr. Wikstrom is
22   helping out with, is there going to be any reason left then to
23   do anything other than, I mean, is there any impediment then to
24   taking the servers and thumb drives, whatever this universe
25   electronic material, placing it under seal, and finding a spot,
```

```
 1    whether it's with the Court or in an agency, that is to say,

 2    are you then going to need to keep like a working copy of this?

 3              MR. D'ALESSANDRO:  Only insofar as I think it was

 4    contemplated in the search warrant application, that if there

 5    is some appellate issue or something that we need ready access

 6    to it.  But candidly, if that comes up --

 7              THE COURT:  You get an unsealing order.

 8              MR. D'ALESSANDRO:  Yeah.  We get an unsealing order.

 9              THE COURT:  Yes?

10              MR. SHARGEL:  I think that we should express our views

11    in writing.  I'll try to work this out with Mr. D'Allesandro.

12    If we can't work it out, then I'll express our views in writing

13    and see if there are any cases on the subject.

14              But Your Honor understands the appearance problem.

15    You know that Mr. Simels has a significant defense practice in

16    the area of narcotics.  Can you imagine telling a client,

17    "Don't worry.  Your files are safe.  They're with the DEA."

18              THE COURT:  I think there are completely legitimate

19    concerns on both sides.  And you're good lawyers.  You can

20    probably work this out.  If you can't, you'll ask for relief.

21    I'll ask them to respond.  And we'll deal with it.

22              MR. SHARGEL:  Terrific.

23              THE COURT:  All right.  I'll put some thought to a

24    schedule.  And can we do this all at once, you think?  It

25    sounds like what you said, Mr. Wikstrom, is this process isn't
```

1    going to take much longer to complete, so I probably don't need

2    stages for privilege review mechanisms?

3             MR. WIKSTROM:  Correct.

4             MR. D'ALESSANDRO:  If I can just add to that?

5             THE COURT:  Thank you.

6             MR. D'ALESSANDRO:  Not all the material has been

7    searched yet.  So it may have to -- as I understand what was

8    discussed, the servers have been searched and the computers,

9    but there are still all these other things which are in the

10   pipeline, being searched.

11            THE COURT:  I got it.  But it sounds like that, as a

12   percentage of the total universe, that's fairly small.  If I

13   build in a little buffer of time for the initial assertions of

14   privilege, sounds like I can reasonably expect those would be

15   made as against all of the documents, not just one stage.

16            You're looking at me like --

17            MR. D'ALESSANDRO:  Well, in having a conversation, I

18   just don't know -- I can only comment on what I'm hearing in

19   the record here.  I'm not -- I'm not meaningfully dealing with

20   it.

21            MS. RASULO:  In terms of just the volume --

22            THE COURT:  I should be looking at you.  Now I get it.

23   You're looking at me like I've got two heads.  I'm sorry.

24            MR. D'ALESSANDRO:  Yes, for the record.

25            MS. RASULO:  With respect to what's remaining, the

1    electronics to be searched, the DEA, in terms of the total

2    volume, is saying they are about halfway through, because we do

3    have hard drives and things along those lines that could

4    contain a lot of information.  So just for the Court's, you

5    know, information, we're saying they're halfway through the

6    processing, but again, we're dealing now with hard drives and

7    CDs and DVDs.

8              THE COURT:  I got you.  Tell everybody to hurry up.

9              MS. RASULO:  We're doing our best, Judge.

10             THE COURT:  And I'll set a schedule, and hopefully, it

11   will be just be as enjoyable as it is that we only go there one

12   more time, but if we can't, we won't.

13             MS. RASULO:  Your Honor, if I may, could I have until

14   Tuesday to report back to you with respect to the DEA, only

15   Monday is a federal holiday.  So I just want to make sure I'm

16   able to get you a complete answer.

17             THE COURT:  Yes.

18             Anything else today?

19             MR. SHARGEL:  No, sir.

20             THE COURT:  Have a good day.

21             MR. SIMELS:  Thank you, Judge.

22             (Proceedings concluded.)

23

24

25